UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

---

JOSEPHINE WALETZKO,

Plaintiff,

-vs- Case No. 15-CV-317

CAPITAL ONE, N.A. f/k/a HSBC BANK; FD HOLDINGS, LLC a/k/a KROLL FACTUAL DATA, INC.; CORELOGIC CREDCO, LLC; EQUIFAX MORTGAGE SOLUTIONS, LLC; LEXISNEXIS RISK SOLUTIONS, INC.,

Defendants.

---

* * * * * *

DEPOSITION OF BOBBI JO EIDE

TAKEN ON THE 17TH DAY OF MARCH, 2016

AT NORTHWESTERN COURT REPORTERS

EAU CLAIRE, WISCONSIN

1:45 P.M.

* * * * * *

Taken before Shannon Caflisch, RPR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

APPEARANCES:

NATHAN DELADURANTEY and HEIDI N. MILLER, of the DELADURANTEY LAW OFFICE, LLC, 735 West Wisconsin Avenue, Suite 720, Milwaukee, Wisconsin 53233, appeared representing the Plaintiff.

MATTHEW STROMQUIST, of the firm of PILGRIM CHRISTAKIS, LLP, 321 North Clark Street, 26th Floor, Chicago, Illinois 60654, appeared representing the Defendant, Capital One, N.A. f/k/a HSBC Bank.

MEAGAN ANNE MIHALKO, of the firm of TROUTMAN SANDERS, LLP, Troutman Sanders Building, 1001 Haxall Point, Richmond, Virginia 23218, appeared telephonically representing the Defendant, CoreLogic Credco, LLC.

SUSAN E. GROH, of the firm of MCGUIRE WOODS, LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601, appeared telephonically representing the Defendant, LexisNexis Risk Solutions, Inc.

INDEX

EXAMINATION PAGE
Of Bobbi Jo Eide
By Mr. Stromquist . . . . . . . . . . . . . . . . . 4
By Ms. Mihalko . . . . . . . . . . . . . . . . . 32,34
By Ms. Groh . . . . . . . . . . . . . . . . . . . . 34
By Mr. DeLadurantey . . . . . . . . . . . . . . . . 35

OBJECTIONS
By Mr. DeLadurantey . . 8,11,12,19,20,27,28,29,30

EXHIBITS
(No exhibits were marked for identification.)

BOBBI JO EIDE,

after having been first duly sworn on oath by Shannon Caflisch, deposes and testifies as follows:

EXAMINATION

BY MR. STROMQUIST:

**Q Good afternoon, Ms. Eide?**

A Eide.

**Q Is it Eide?**

A Eide, yep.

**Q Thank you.**

**My name is Matt Stromquist. I represent Capital One, who's one of the defendants in this case in which Ms. Waletzko is a plaintiff.**

A Um-hum.

**Q That's your mother, correct?**

A Yes.

**Q Okay. Your mother is the plaintiff.**

**Can you please state your full name and current address?**

A It's Bobbi Jo Eide, [redacted], [redacted]

**Q And what's your telephone number?**

A [redacted]

**Q Have you ever been deposed before?**

A No.

**Q Okay. There's a court reporter here who's taking down everything that's said, so it's important that we try not to talk over each other. I'll try and let you finish your answer before you ask another question, and I just ask that you let me finish my question before you begin answering.**

A Um-hum.

**Q That way we have a clean record.**

**It's also important to give verbal responses, as opposed to shakes of the heads or nods. That can't be taken down.**

A Okay.

**Q The individual sitting to your right is very good about reminding witnesses to give verbal responses. So hopefully together we can remind you of that.**

MR. DELADURANTEY: And if you do it 20 times, don't worry. Matt and I have both seen that on occasions. Usually it's my clients. I think my record is 75 times in a day. And I just end up tapping them on the arm every time and we get through it. So don't feel bad.

THE WITNESS: Okay. Sounds good.

**Q (By Mr. Stromquist, continuing) I don't think this will be very long. But if you need to take a break, just speak up and you can take a break.**

A Okay.

**Q The oath you took is the same oath you'd take if you were testifying in a court of law and subject to the same penalties of perjury.**

**Do you understand that?**

A Yes.

**Q Okay. Is there any reason you cannot give truthful testimony today?**

A No.

**Q What's your date of birth?**

A [redacted]

**Q Okay. Have you ever been arrested?**

A No.

**Q And are you currently employed?**

A Yes.

**Q Where are you employed?**

A Fastenal Company.

**Q How do you spell that?**

A F-a-s-t-e-n-a-l.

**Q And what line of work are you employed in?**

A Accounting.

**Q Okay. How long have you been with that company?**

A 16 years next month. So just short of 16 years.

**Q Seems like the family line of work is police. I guess you bucked the trend there.**

A Yeah.
**Q What's the highest level of education you've attained?**
A Associate degree.
**Q In what?**
A In accounting.
**Q In accounting, okay.**
A Um-hum.
**Q Prior to today, had you ever spoken with Mr. DeLadurantey?**
A Yes.
**Q And when was that?**
A In February. I don't know the exact date.
**Q Was it around Valentine's Day?**
A Yes.
**Q Okay. And Ms. Miller was there, too?**
A Yes.
**Q That was -- that was in person?**
A Yes.
**Q Prior to that -- where did that meeting take place?**
A Winona, Minnesota.
**Q Okay. Was that with your sister there present, as well?**
A No. We were separate.
**Q Just the three of you?**
A Um-hum.
MR. DELADURANTEY: Is that a yes?

THE WITNESS: Oh, okay. Okay.

MR. DELADURANTEY: When you say um-hum, Shannon can hear that sound.

THE WITNESS: Just say yes.

MR. DELADURANTEY: We all can tell in person it's a yes. But once she types it down, it's harder. Sorry.

THE WITNESS: No. It's all new to me.

**Q (By Mr. Stromquist, continuing) Prior to that meeting in February, had you spoken with either one of them?**

A No.

**Q Okay. And did they -- during that meeting, did they tell you a little bit about what the case is about?**

A Yes.

**Q And what did they say to you?**

A The reason --

MR. DELADURANTEY: Just -- just a standing objection as to hearsay for me. Relaying of any other conversations that she had and the words spoken by someone else. But you can go ahead and answer.

A Just what my mom has told me about being deceased. And I don't know what else to -- you know.

**Q (By Mr. Stromquist, continuing) I mean, do you recall anything else they said to you?**

A Oh, we talked about many different things. About personal -- you know, just a casual conversation.

**Q What about specific to this case?**

A How it affected my mom, her life.

**Q And were they asking you questions?**

A A few.

**Q What did they ask you?**

A How it's affected my mom's life.

**Q Did they tell you what kinds of damages your mother is seeking in this case?**

A No. I guess be more specific. By when you say damages, what do you mean by that?

**Q Anything your -- your mother is seeking in this case.**

A Like what she wants in the end? No, we didn't discuss that at all.

**Q Okay. Did they tell you at all what they were hoping you would testify to?**

A They just -- they just kind of anticipated that I'd have to meet with somebody about mom's case. It wasn't really specific.

**Q And have you talked to your mother about your deposition today?**

A Yes.

**Q And when was that?**

A I talk to her every day multiple times.

**Q Okay. Why don't you tell me a little bit about what you -- your own understanding of what this case is about.**

A It's just horrible. I've never heard of this happening to anyone else. And my mom has been through hell and back. She -- it's just horrible.

**Q And when you say it's just horrible, what are you referring to?**

A Just what she's gone through. She -- I mean, I don't know. She's not depressed, but just borderline because she had no life. She couldn't do anything. She was dead. I mean, she had no proof -- nobody has proof that she was dead, and yet she could still file taxes every year and work her tail off. Because she could never get a loan, she had to work for her money and pay for it up front in order to get anything. She couldn't live the average person's life like the rest of us, because that was taken away from her for no reason.

**Q Because you said she was deceased?**

A Records show that she was deceased and they have no proof of it.

**Q And had you heard specifically that she had been marked deceased by one of her credit card companies?**

A Yes.

**Q And which credit card company was that?**

A Capital One.

**Q Okay. And what -- what had you heard specifically in regards to Capital One?**

A Just what my mom told me. That she -- they have her marked as deceased, but they have no documentation to prove it.

**Q When did you first hear about your mother being marked as deceased?**

A I don't know. I don't have a specific date.

**Q The records I've seen in this case indicate that she was originally marked by her credit card company as deceased in 2009.**

**Is that -- do you recall at all if you would have heard about it then?**

A I don't recall.

**Q You have no recollection at all when -- when you first heard about it?**

A I have no idea. I don't know when it happened.

**Q And I'm not -- I'm not asking when she was marked deceased, I'm asking when you first heard about it.**

MR. DELADURANTEY: Asked and answered. She said she doesn't remember.

A I don't know. I don't know when this all started.

**Q (By Mr. Stromquist, continuing) Has anyone ever told you how your mother came to be marked as deceased by one of**

**her credit card companies?**
A No.
**Q Okay. Did your mom ever mention that anyone had told her credit card company that she was dead?**
A She doesn't even know how it happened, no.
**Q Okay. Have you had any discussions with anyone about how she could have came to be marked as deceased?**
MR. DELADURANTEY: Objection, asked and answered. She said she doesn't know.
A No, I don't know.
**Q (By Mr. Stromquist, continuing) No discussions?**
A I don't know. I mean, there's -- I don't know.
**Q Meaning you don't remember having any discussions?**
A The only one I would have had a discussion with would have been my mom, but that's -- we don't know. We're just guessing. We don't know.
**Q What were some of the guesses that you came up with?**
MR. DELADURANTEY: Objection, calls for speculation.
A Yep. I'm not going to answer that.
**Q (By Mr. Stromquist, continuing) Well, what were -- when you were talking about how she could have been marked as deceased, what was discussed?**
MR. DELADURANTEY: I'm going to object. It's outside the witness's personal knowledge. She just

stated that anything she did would be a guess. And she doesn't want to guess.

A Right. I'm not going to guess.

**Q (By Mr. Stromquist, continuing) Okay. Are you pretty close to your mother?**

A Yes.

**Q Okay. I think you said earlier that you -- you talk to her on the phone every day?**

A I do. Almost every day. There's days I don't. But, yes, out of us kids, I'm probably the one that talks to her the most.

**Q And how often do you see her in person?**

A Once every three months. Not very often, 'cause she's busy working over the road.

**Q And have you been talking to your mother almost on a daily basis for years now? I mean, has that been going back --**

A Yes.

**Q Okay. Prior to 2009, too?**

A Yes.

**Q Okay. Was there ever a period between 2009 and the present that you didn't have that kind of daily, you know, relationship/daily contact with your mother?**

A Yes.

**Q When was that?**

A I don't know when.

**Q You have no idea?**

A I don't have a date. I don't know when.

**Q And what had happened that caused you not to continue talking to her on a daily basis?**

A Just applying for loans and being rejected because she's dead.

**Q And so then she was not calling you on -- I'm just trying to understand the connection.**

A That -- yes, that. And when I'd call her, she wouldn't answer the phone and wouldn't talk to me because she was beside herself.

**Q Okay.**

A She couldn't do anything.

**Q And now when did you begin speaking with her again on a daily basis?**

A I've always talked to her. There was just days that I couldn't, because she just didn't want to talk to anyone.

**Q Okay. What are the -- some of the issues she's told you about with respect to her credit card company having marked her as deceased back in 2009?**

A What issues?

**Q Yeah.**

A She would go get a car loan, she couldn't get one. She

had to have a cosigner.

**Q Where did she get a -- where did she attempt to get a --**

A I don't know.

**Q -- car loan that she wasn't able to get?**

A I don't know.

**Q Okay. She -- she didn't tell you where that was from?**

A If she did, I don't know.

**Q Okay. What else besides the car loan?**

A Recently purchasing a house.

**Q The records I've seen show that she was applying for home financing around January or February of 2013.**

**Does that sound about right?**

A I don't know the exact date, but that sounds in the ballpark.

**Q Okay. And so what do you remember about that process she went through with respect to the home financing?**

A She went through a lot of banks and could not get a loan.

**Q And did she tell you she was unable to get the loan?**

A Yes.

**Q Did you ever see any denial letters?**

A Nope.

**Q Okay. Did you ever speak to anyone at any of the banks?**

A No.

**Q Okay. So everything you know about that process and her**

**denial is what your mother told you?**
A Yes.
**Q Okay. And what did she tell you specifically about the denials for the home financing?**
A Every bank said she was deceased.
**Q And that because of that, they refused to give her a mortgage --**
A Yes --
**Q -- is that what she told you?**
A -- that's what she told me.
**Q Okay. Do you remember which banks those were?**
A No.
**Q Okay. Did she ever tell you that she didn't qualify for any financing because her credit score was not high enough?**
A Yes.
**Q And what did she say about that?**
A Just what you said, she applied for a loan and couldn't -- her credit score was not good enough to get a loan.
**Q Was that in connection with home -- home financing?**
A I'm sure that was part of it. And there were other -- like, just any loan.
**Q Did she tell you what her credit score was?**
A No.

**Q Okay. Did she ever tell you that she didn't qualify for a mortgage loan because her income was too low in relation to her other credit obligations?**

A No.

**Q Okay. Your sister who was here earlier testified that around the time she was applying for these mortgages that your mother sort of reached a low point.**

**Is that how you'd characterize it, too?**

A Yes.

**Q Okay. And she improved after that?**

A Um-hum -- yes.

**Q Has she ever described any instances where she was embarrassed or someone had laughed at her?**

A Yes.

**Q And tell me what you know about that.**

A Very little. She one time -- I'm trying to think how it went. I don't recall exactly how it went. Like insurance -- well, I don't even -- I honestly don't even know exactly what circumstance it was, but I remember having that conversation.

**Q "That conversation" being she told you about -- what did she tell you?**

A They would promise her a loan and then basically denied it because they found out that her credit report is saying she's deceased.

**Q That's what your mother told you?**
A Yes.
**Q Okay. And do you recall this being a source of stress in your mother's life going back to 2009 --**
A Yes.
**Q -- at least? Yes?**
A Yes.
**Q Okay. So is it fair to say it's something she's been dealing with for quite a while?**
A Yes.
**Q Besides what she told you about what she was feeling, did you yourself have any observations about her demeanor or mood during this period?**
A She was just extremely upset and frustrated. She could not do anything. She had no money. She had to work all the time. Her life was taken away from her because she just couldn't live a normal person's life because of the situation she was in. It was horrible.
**Q And, again, those observations go back to when this originally occurred in 2009?**
A Yes.
**Q Okay. Are you aware that your mother had also brought a lawsuit against Experian and Equifax?**
A Yes.
**Q Okay. And that lawsuit related to the same issue of her**

**being marked as deceased?**

A Yes.

Q **Okay. In that lawsuit, she alleged that she had made multiple letters and phone calls to Experian and Equifax, but that her credit file still incorrectly reflected that she was deceased. And that as a result of that, she had to endure belittling comments and being the brunt of jokes when she went to obtain financing.**

**Is that the same as what you've described here today?**

A More or less, yes.

Q **Okay. And that she alleged in that lawsuit that as a result of that, she suffered emotional distress.**

A Yes.

Q **Okay. I want to ask you: Did she ever talk about which party caused her emotional distress; or was it all just kind of one bucket of emotional distress?**

MR. DELADURANTEY: Objection calls, for speculation and a legal conclusion, lack of foundation. You can answer. Sorry.

Q **(By Mr. Stromquist, continuing) In other words, is the emotional distress that she described to you and that you observed the same emotional distress -- you know, the emotional distress due to Experian and Equifax -- the same emotional distress that she suffered as a**

**result of what any other party did?**

MR. DELADURANTEY: Objection, it's hearsay, calls for speculation. She said she doesn't know what caused it.

**Q (By Mr. Stromquist, continuing) If you know.**

A I don't know.

**Q You don't know what caused it?**

A Oh, yes, I know. I mean, just being marked deceased.

**Q Okay. And besides the being -- besides being marked as deceased, have you ever spoken with your mother about any other financial difficulties she's had in her life at any point?**

A I'm sure I have, but I don't know specifics.

**Q Were you aware of any -- did she have any financial problems due to medical bills?**

A Yes.

**Q And when was that?**

A I don't know.

**Q Okay. Was it around this same time in 2009? Do you recall at all?**

A I don't recall.

**Q Okay. What were the problems you remember with respect to the medical bills?**

A Her credit -- they charged her unbelievably high interest because of her credit score.

**Q Who charged her unbelievably --**
A The hospitals.
**Q The hospital would charge her interest on her -- on her medical bills because of her credit score?**
A Yes, because it was so low.
**Q Is that what she told you?**
A Yes.
**Q Did you ever see any documentation?**
A Nope.
**Q Have you ever seen any of her credit reports?**
A No.
**Q Okay. Have you ever seen any of her credit denial letters?**
A No.
**Q Okay. How about her applications for credit?**
A No.
**Q Okay. Have you ever seen any document that relates to this issue we're talking about today?**
A No.
**Q Okay. And have you ever talked to anyone besides your mother about this issue?**
A Yes.
**Q And who was that?**
A My husband.
**Q Okay. Besides your husband and your mother, anyone**

**else?**

A My sister.

**Q Okay. Anyone else?**

A No.

**Q Okay. And the -- so those medical bills you described, the high interest due to her low credit score, is that what you said?**

A Yes.

**Q Okay. Were those referred to a collection agency?**

A I don't know.

**Q Okay. And was that a source of stress in your mother's life?**

A Yes.

**Q Okay. How did that affect her?**

A Just draining. She couldn't pay -- I mean, she -- the bills were just so high, and she couldn't afford to pay them because of the interest that was being charged. It was pretty stressful, because she always was paying her bills and stuff like that.

**Q Did she stop paying those bills?**

A I don't know.

**Q Okay. Are you aware of any other accounts she had that -- credit accounts that she was not paying?**

A I don't know.

**Q How about other stresses in her life?**

**Did she ever talk to you about any stress related to her employment?**
A No.
**Q Did she ever talk about her employment at Chippewa Sand Transport?**
A Yes.
**Q Did she ever describe any problems she had there?**
A No. She didn't have problems that I know of.
**Q Okay. She never talked about being bullied there?**
A Yes.
**Q What did she say?**
A She was the only woman there and everyone else was a man, and they treated her like a man.
**Q And did that cause her stress?**
A Yes.
**Q Okay. How so? Did she tell you that? Or did you witness it? Or can you describe that to me?**
A Observation just from what -- how she described it to me.
**Q What did you observe?**
A She just felt like she was being bullied. I mean, they -- I guess I don't know the specifics. She had to do the same work as a man did, but that's what her job was. I don't know the specifics.
**Q And did she get emotional about that? Did you ever see**

**her cry?**
A I don't see that that often. But, yes, she would cry to me on the phone.
**Q About that issue, with respect to her being bullied at work?**
A Yes.
**Q Okay. Often or --**
A No.
**Q Okay. And this was at -- when she was employed at Chippewa Sand Transport?**
A Yes.
**Q Okay. Did she ever talk to you about any impact on her auto insurance on account of a deceased marking on her credit report?**
A Yes.
**Q What did she say?**
A She couldn't get a loan. If she did, it was really high interest and she had to have a cosigner.
**Q I'm talking now about the auto insurance --**
A Oh.
**Q -- not financing for a new car.**
A Okay.
**Q I'll ask about that in a second.**
A Oh, yes, she did with American Family.
**Q Yeah. Tell me a little bit about that.**

A She's been part of that insurance as long as I know. And all of the sudden one day she got a letter saying they're going to drop her.

**Q Did you see that letter?**

A No.

**Q She -- did she tell you she got a letter?**

A Yes.

**Q What did she say specifically?**

A Just what I said.

**Q She got a letter from American Family saying they were going to drop her?**

A That's what she told me. I didn't see the letter.

**Q Okay. And did it say in the letter -- do you recall when that was?**

A I don't.

**Q Did it say in the letter why American Family was dropping her?**

A I don't know what the letter said. I don't recall.

**Q Did she tell you why they were dropping her?**

A She told me.

**Q What did she say?**

A Because she was marked -- she was -- her credit report was showing she was deceased.

**Q And so American Family was going to drop her insurance?**

A Yes. Um-hum.

**Q Okay. How about financing for the purchase of a car? Did she ever talk to you about that?**

A A little bit.

**Q What did she say?**

A Just that every time she'd go get a vehicle, she had to have really high interest and a cosigner.

**Q Did you ever see any of her applications?**

A No.

**Q Okay. Did you ever talk to anyone at any of the auto dealerships?**

A No.

**Q Okay. Are you aware of any medical conditions that your mother has?**

A Yes.

**Q Like what?**

A Just with her heart.

**Q What's the issue with her heart?**

A I honestly don't know what it is called. I don't know.

**Q Can you describe it to me at all, your understanding of what it was, just in laymen's terms?**

A Just something with a heartbeat.

**Q Okay. And is that something she's had for a while?**

A She just found out about it, but I don't know when.

**Q Okay. Anything else?**

A No.

**Q Okay. Are you aware that your mother had reached a settlement in her lawsuit with Equifax and Experian?**

A Yes.

**Q Okay. And how did you hear about that?**

A My mom.

**Q And did she tell you how much money she got from the settlement?**

A Yes.

**Q And how much did she receive?**

A I can't answer that.

**Q Why not?**

THE WITNESS: Am I -- can I answer that?

MR. DELADURANTEY: According to me, no. there's a protective order and a confidentiality provision in there.

To the degree that there's any reason that you know it's not to be disclosed --

MR. STROMQUIST: Well, she can disclose it now, if she knows it.

MR. DELADURANTEY: I'm going to say no. And I'll seek a protective order. We can iron that out with the judge. And if we need to renew the -- just for the sake of -- you can understand from my perspective. And if he allows the question and we do it in a -- you know, a rog or something like

that, that can be done that way to prevent everybody getting together to provide a two-second answer.

MS. MIHALKO: Nathan, this is Meagan. I'm sorry. You were trailing off. Can you repeat what you just said?

MR. DELADURANTEY: Sorry. I'm going to scoot the phone a little bit closer. My bad.

MR. STROMQUIST: I guess as I understand it, she either knows or she doesn't. She says she knows.

THE WITNESS: I don't know the exact dollar amount. I know they settled. Because there's lawyer fees and everything else, I don't know the exact amount.

**Q (By Mr. Stromquist, continuing) You know the amount of the settlement agreement?**

A No. I don't know the final number.

**Q Okay. What number do you know?**

MR. DELADURANTEY: I'm going to object. It calls for speculation. She said she didn't know. It's asked and answered.

MR. STROMQUIST: Can you read back the question when I asked her originally before the objection, my question and her answer?

(The court reporter read back as requested.)

**Q (By Mr. Stromquist, continuing) So are you refusing to answer that question?**

MR. DELADURANTEY: I'm going to object, it misstates her prior testimony. You've asked her, and she says she doesn't know the exact amount.

And when you asked her the earlier question, she said no, I can't -- you asked her the exact amount; she said no, I can't answer it. I think she's asked and answered the question.

**Q (By Mr. Stromquist, continuing) Can you tell me any amount?**

A I don't know.

**Q I will remind you you are under oath. If you know any amount, you're obligated to tell me the truth.**

A I do, but I'm going to go by what Nathan says. I don't know if --

**Q Okay. So you do know?**

A Not the exact penny -- to the penny.

**Q Okay. I'm not asking for the exact penny.**

MR. DELADURANTEY: And to the degree if you are going to go ahead and give a dollar amount -- I'm not your lawyer here today.

THE WITNESS: Right.

MR. DELADURANTEY: And Attorney Stromquist is

correct, you are under oath. If you are going to give a dollar amount, then I'm going to go ahead and object and have her not answer so we can get a ruling on the admissibility and the discoverability of that evidence.

As you well know, it's the subject of litigation in many districts. You've already sought to discover that, you know, in a pending discovery request. I think it's definitely going to require some briefing.

I don't think you're going to get a ruling from a judge today on it, but I could be wrong there. I've certainly been wrong before.

MR. STROMQUIST: Okay. Are you guys going to object to my discovery request?

MR. DELADURANTEY: We'll find out when we get an answer to you.

MR. STROMQUIST: You're not going to tell me today?

MR. DELADURANTEY: No, I'm not going to tell you today.

MR. STROMQUIST: Okay.

**Q (By Mr. Stromquist, continuing) Are you willing -- are you going to answer that question that I asked you?**

MR. DELADURANTEY: I'm lodging an objection to

state that --

MR. STROMQUIST: Yeah, I mean, I know you're objecting. I'm asking the witness.

**Q (By Mr. Stromquist, continuing) You don't have to listen to what he says. He's not your attorney. He can't -- he can't instruct you not to witness -- not to answer.**

MR. DELADURANTEY: Right. But I can get up and walk out the door. Or we can just agree that we'll get a protective order and you can revisit that question.

I mean -- you know, and there's some practical things. And I think any magistrate judge out there will say, you know, let's move on and get a ruling on it. And if it's something you can, you know, discover from her then, you know, so be it.

MR. STROMQUIST: Why don't we see if anyone else has any other questions, and then we can see if we can get Judge Crocker on the phone.

Meagan and Susan, do you guys have -- and just so I'm clear, you're instructing her not to answer?

MR. DELADURANTEY: No, not at all. I'm saying if you are going to ask her that question and answer, I'll call the magistrate judge or I'll walk out the door and get a protective order, until we get a ruling on this particular piece of

information.

MR. STROMQUIST: Okay. So you're going to seek a protective order?

MR. DELADURANTEY: Correct.

MR. STROMQUIST: Do you want to do it now with him, or are you going to just file something?

MR. DELADURANTEY: We'll file something, yeah. I think any judge I know would definitely prefer that, to rule on something that's as detailed of this nature and has been lost in every case that I'm aware of as far as being discoverable.

But that's something that Attorney Mihalko and I have already discussed.

MR. STROMQUIST: Okay. Meagan and Susan, do you guys have anything further?

MS. MIHALKO: This is Meagan.

EXAMINATION

BY MS. MIHALKO:

**Q Ms. Eide, my name is Meagan Mihalko. I represent a defendant that's been named in this suit by the name of CoreLogic Credco, LLC.**

**Have you ever heard of CoreLogic Credco, LLC?**

A No.

**Q When your mother was applying for a mortgage, did she ever tell you that she applied through Quicken Loans?**

A No.

**Q Did your mother ever tell you what her credit score was?**

A No.

**Q Did she ever tell you that Equifax and Experian were not reporting a credit score for her?**

A Yes.

**Q Did she ever tell that you TransUnion was reporting a credit score for her?**

A Yes.

**Q Did she tell you that her credit score with TransUnion did not qualify under Quicken Loans' standards for a mortgage?**

A I don't know.

**Q When did she tell you that TransUnion was reporting a score for her?**

A When she was trying to purchase a house.

**Q What did she tell you about the TransUnion score?**

A She didn't say anything specifically about the score, just that that was the only one that would report a score to the bank.

**Q And did she say whether that score was high enough to obtain financing?**

A It wasn't high enough.

**Q Do you know who David Bundy has his mortgage with?**

A No.

MS. MIHALKO: Okay. Those are all the questions I have. Thank you.

EXAMINATION

BY MS. GROH:

**Q Ms. Eide, this is Susan Groh. I represent LexisNexis which is another defendant in the case. Just -- just a few questions for you.**

**Do you have an understanding of whether the -- your mother's credit reports have been corrected as of today?**

A I don't know.

**Q Did your mother ever tell you that the deceased indicator was removed from her credit reports?**

A I don't know.

**Q You don't know whether she told you, or --**

A I -- I -- I don't know if it's been corrected. She did mention, you know, that it was discussed, but I don't know if it's been corrected. She hasn't told me that.

**Q Okay. So she never told you that it was corrected?**

A Right. Yes.

MS. GROH: Okay. That's all I have.

RE-EXAMINATION

BY MS. MIHALKO:

**Q Ms. Eide, this is Ms. Meagan Mihalko. I'm sorry. I have one additional question.**

**Did your mother tell you whether TransUnion was**

**reporting her as deceased?**

A I don't remember which credit bureau was doing that. I don't know which one it was. That sounds like the one, but I can't say for sure.

**Q Do you remember whether Equifax reported her as deceased?**

A I don't know which one.

**Q Do you remember whether it was more than one that was reporting her as deceased?**

A Yes. I know there were two.

**Q Okay. So there -- your understanding is there was one -- one bureau that was not reporting her as deceased?**

A There was two bureaus that were reporting her as deceased and one was reporting a score.

MS. MIHALKO: Okay. Thank you.

MR. DELADURANTEY: Nathan here. Just a couple of brief follow-up questions.

EXAMINATION

BY MR. DELADURANTEY:

**Q Do you remember earlier you'd been asked questions by Attorney Stromquist, who is the attorney across from you, questions about some distress your mom may have suffered from some medical bills, from some bullying at work, and then about being marked as dead on her credit**

**report?**

A Um-hum.

**Q That's a yes?**

A Yes.

**Q No problem.**

A Sorry. I'm not -- I've never done this before.

**Q If you had to rank them in order of how bad they were, how much they impacted her, what would be at the top of the list?**

A Being deceased.

**Q And if you had to put your hands next to each other to show a difference between being deceased marked at the top and then -- I mean, were the other ones a close second or --**

A Not even close, no. Being deceased was way up there.

**Q So while she may have suffered some emotional distress from the other two, you wouldn't compare them at all to being deceased?**

A Right. Yes.

**Q You'd been asked questions earlier about a time when she and Mr. Bundy had tried to purchase a home.**

**Do you remember that?**

A Yes.

**Q And Attorney Stromquist had asked you if you thought it was somewhere around the early part of 2013, correct?**

A Yes.
**Q And you said that was -- I think you used the phrase ballpark.**
A Yes.
**Q So if it was six -- also six or eight months after the beginning part of the year, would that fit within the ballpark of time frame that you were thinking?**
A Yes. Yes. Definitely.

MR. STROMQUIST: I'm sorry. Can you just read back that last question and answer?

(The court reporter read back as requested.)

MR. DELADURANTEY: Save any redirect. I don't have any further questions at this time.

MR. STROMQUIST: I don't have anything further, except to say that this deposition is being adjourned by Mr. DeLadurantey. Is that -- is that my understanding? You're adjourning the deposition to seek a protective order, so the deposition's open until that's determined.

If for whatever reason no protective order is sought, we'll seek to continue the deposition and then obviously seek any costs we have of having to fly back up here and -- and redepose her.

So, I guess, we'll expect to see a protective order on file shortly and then we can brief it.

MR. DELADURANTEY: Sure. Two different -- two different points to follow-up.

First off, it's not my deposition, so I can't adjourn it. So that's not actually possible for me to do that. Obviously we have no objection to it being held open.

Two, if you'd like to go ahead and call Crocker and see if he'd like to rule on this on the spot or how he'd like to handle it, why don't we go ahead and do that.

MR. STROMQUIST: Okay.

MR. DELADURANTEY: You know, I'm the one indicating we need to address this on a protective order. If you have a question that will involve giving a specific number -- I hardly think flying up here is necessary. Obviously Attorney Mihalko and Groh are appearing by phone today. So if you're looking for a three-second answer, I think that flying all the way up here might be a little unnecessary for that.

But I'll let you go ahead and call the judge. Let's go ahead and stay on the record for that.

MR. STROMQUIST: Let's see. I have the number here, I believe. Let's go off.

(A recess was taken.)

(A call was made to Judge Crocker's office at 2:27 p.m.)

THE COURT: Good afternoon. This is Magistrate Judge Crocker. I understand I have the attorneys for the parties in the Waletzko vs. Capital One.

I've been told you're at a deposition with the court reporter and need the Court to referee a dispute about a few things.

So, first, let's find out which attorneys are present for which parties, and then I will open up the floor for you to explain to me what you need the Court to do.

Let's start with the plaintiff. Who's appearing today, please?

MR. DELADURANTEY: Nathan DeLadurantey.

THE COURT: All right. Mr. DeLadurantey, good afternoon to you.

MR. DELADURANTEY: Good afternoon.

THE COURT: Thank you. And who have we got on behalf of the defendant today?

MR. STROMQUIST: Good afternoon, Judge Crocker. Matt Stromquist for Capital One, and we have two counsel for the other parties on a speaker phone here. I can introduce them. I don't know if

you'll be able to hear them through two separate phones. But it's Susan Groh on behalf of Lexis Nexis, and Meagan Mihalko on behalf of Credco CoreLogic.

THE COURT: Okay. Duly noted. So I don't need them to introduce themselves separately, if the two of you, Mr. DeLadurantey and Mr. Stromquist, can convey the issue for me.

So the floor is open, who wants to start?

MR. STROMQUIST: I can go ahead just briefly, Your Honor. This is -- we noticed this deposition. It's of a third party. It's of the plaintiff's daughter. And just at the very end of the deposition, I had inquired whether she was aware of a settlement the plaintiff had entered into with Equifax and Experian in a parallel piece of litigation that was pending before Your Honor that -- that subsequently settled.

She said she was aware of that. And I asked if she knew how much the settlement was, and she said yes. And then Mr. -- I asked how much did she settle for, and Mr. DeLadurantey said he was going to move for a protective order and didn't want her to answer the question. I'll let Mr. DeLadurantey speak.

THE COURT: Okay. Mr. DeLadurantey, that's your cue.

MR. DELADURANTEY: Thank you, Your Honor. The issue that multiple defendants have sought in this case, the first being Credco by Attorney Mihalko, who is on the phone, was the actual settlement agreements that my client entered into with different defendants in a different lawsuit that had different obligations under the Fair Credit Reporting Act.

We declined to produce those settlement agreements, because we didn't believe that they were relevant. Defendant Credco in this case has not sought them since we lodged that objection.

Earlier this week --

THE COURT: Mr. DeLadurantey, I can stop you right there, 'cause I can give you both the ruling today.

MR. DELADURANTEY: Sure.

THE COURT: Mr. Stromquist, if you want that information, you need to get it directly from the plaintiff and her attorney. If they have declined to answer your direct discovery requests, feel free to file a motion to compel and we'll key it up in the usual fashion.

However, I will not allow the serendipitous discovery of -- of a number just because the plaintiff's daughter happens to know it.

I don't blame you for trying, but that's not the way to get it. The way to get it is through the front door, not the back door. And if Mr. DeLadurantey does not want to give it to you, which pretty much he's telling me now, go ahead and file your motion. Understood?

MR. STROMQUIST: Okay. Thank you, Your Honor.

MR. DELADURANTEY: Thank you, Your Honor.

MR. STROMQUIST: Sorry to bother you on this afternoon. Thank you.

THE COURT: It's not the worst thing to happen to me today.

MR. STROMQUIST: We appreciate it. Thank you.

(The telephone call came to an end.)

MR. STROMQUIST: Thank you.

MR. DELADURANTEY: No problem. Meagan and Susan, first off, I'm not sure that you heard everything that went on the phone. We apologize. We're working with what technology we have. Do you need us to recap that?

MS. MIHALKO: This is Meagan. I was able to hear everything.

MR. DELADURANTEY: Sweet.

MS. GROH: This is Susan. I could hear, as well. No need to summarize.

MR. STROMQUIST: I don't have anything further for this witness. Do you guys?

MS. GROH: This is Susan. No, I don't.

MS. MIHALKO: This is Meagan. I do not, either.

MR. STROMQUIST: Okay.

MR. DELADURANTEY: I don't have anything else.

THE WITNESS: Okay. Thank you.

MR. STROMQUIST: Thanks. And thank you for coming earlier.

(The deposition of Bobbi Jo Eide came to a close at approximately 2:35 p.m.)

STATE OF MINNESOTA)
COUNTY OF DAKOTA )

Be it known that I took the deposition of Bobbi Jo Eide on the 17th day of March, 2016 at Eau Claire, Wisconsin;

that I was then and there a Notary Public in and for the County of Dakota, State of Minnesota, and that by virtue thereof I was authorized to administer an oath;

that the witness, before testifying, was by me first duly sworn to testify to the whole truth and nothing but the truth relative to said cause;

that the testimony of said witness was recorded in stenotype by myself and reduced to print by means of Computer-Assisted Transcription under my direction, and that the deposition is a true record of the testimony given by the witness to the best of my ability;

that I am not related to any parties hereto nor interested in the outcome of the action.

Dated this 23rd day of March, 2016.

______________________________

Shannon Caflisch, RPR
Notary Public,
Dakota County, Minnesota
My Commission expires 1-31-2020

**A**

**a/k/a** 1:8
**ability** 44:15
**able** 15:4 40:1 42:24
**account** 24:13
**accounting** 6:21 7:5,6
**accounts** 22:22,23
**Act** 41:10
**action** 44:17
**actual** 41:6
**additional** 34:24
**address** 4:19 38:13
**adjourn** 38:4
**adjourned** 37:16
**adjourning** 37:17
**administer** 44:7
**admissibili...** 30:4
**affect** 22:14
**afford** 22:16
**afternoon** 4:6 39:3 39:18,19 39:22 42:13
**agency** 22:9
**agree** 31:8
**agreement** 28:17
**agreements** 41:7,12
**ahead** 8:20 29:22 30:2 38:7,10,21 38:22 40:10 42:8
**alleged** 19:3 19:12
**allow** 42:1
**allows** 27:24
**American** 24:24 25:10,16 25:24
**amount** 28:13,15 28:16 29:6 29:9,12,15 29:22 30:2
**ANNE** 2:13
**answer** 5:4 8:21 12:20 14:11 19:20 27:10,12 28:3,25 29:3,9 30:3,17,24 31:6,20,23 37:10 38:18 40:24 41:23
**answered** 11:21 12:9 28:22 29:10
**answering** 5:6
**anticipated** 9:18
**apologize** 42:21
**APPEAR...** 2:1
**appeared** 2:5,10,15 2:20
**appearing** 38:17 39:15
**applications** 21:15 26:7
**applied** 16:18 32:25
**applying** 14:6 15:10 17:6 32:24
**appreciate** 42:16
**approxima...** 43:15
**arm** 5:20
**arrested** 6:12
**asked** 11:21 12:8 28:22 28:24 29:5 29:7,8,10 30:24 35:21 36:20,24 40:19,21
**asking** 9:5 11:19,20 29:20 31:3
**Associate** 7:3
**attained** 7:2
**attempt** 15:2
**attorney** 29:25 31:5 32:12 35:22,22 36:24 38:16 41:5 41:22
**attorneys** 39:5,10
**authorized** 44:7
**auto** 24:13 24:19 26:9
**Avenue** 2:4
**average** 10:17
**aware** 18:22 20:14 22:22 26:12 27:1 32:11 40:14,19

**B**

**back** 10:6 13:17 14:22 18:4 18:19 28:23 29:1 37:10,11 37:23 42:6
**bad** 5:21 28:8 36:7
**ballpark** 15:14 37:3 37:7
**bank** 1:7 2:11 16:5 33:20
**banks** 15:17 15:23 16:11
**basically** 17:23
**basis** 13:16 14:5,16
**beginning** 37:6
**behalf** 39:21 40:2,3
**believe** 38:24 41:12
**belittling** 19:7
**best** 44:15
**bills** 20:15 20:23 21:4 22:5,16,19 22:20 35:24
**birth** 6:10
**bit** 8:13 10:1 24:25 26:3 28:8
**blame** 42:4
**Bobbi** 1:13 3:4 4:1,20 43:14 44:3
**borderline** 10:10
**bother** 42:12
**break** 5:24 5:25
**brief** 35:18 37:25
**briefing** 30:10
**briefly** 40:10
**brought** 18:22
**brunt** 19:8
**bucked** 6:25
**bucket** 19:17
**Building** 2:14
**bullied** 23:9 23:21 24:4
**bullying** 35:24
**Bundy** 33:24 36:21
**bureau** 35:2 35:12
**bureaus** 35:14
**busy** 13:14

**C**

**Caflisch** 1:20 4:3 44:21
**call** 14:10 31:23 38:7 38:21 39:1 42:17
**called** 26:18
**calling** 14:8
**calls** 12:18 19:4,18 20:3 28:21
**Capital** 1:7 2:10 4:11 11:1,3 39:6,23
**car** 14:25 15:4,8 24:21 26:1
**card** 10:23 10:25 11:11 12:1 12:4 14:21
**case** 1:6 4:12 8:13 9:3 9:10,13,19 10:2 11:10 32:10 34:6 41:5,13
**casual** 9:2
**cause** 13:13 23:14 41:17 44:10
**caused** 14:4 19:16 20:4 20:7
**certainly** 30:13
**characterize** 17:8
**charge** 21:3
**charged** 20:24 21:1 22:17
**Chicago** 2:9 2:19
**Chippewa** 23:4 24:10
**CHRISTA...** 2:8
**circumsta...** 17:19
**Claire** 1:16 44:4
**Clark** 2:9
**clean** 5:8
**clear** 31:20
**client** 41:7
**clients** 5:18
**close** 13:5 36:13,15 43:15
**closer** 28:8
**collection** 22:9
**coming** 43:13
**comments** 19:7
**Commission** 44:24
**companies** 10:23 12:1
**company** 6:17,22 10:25 11:11 12:4 14:21
**compare** 36:17
**compel** 41:24
**Computer...** 44:13
**conclusion** 19:19
**conditions** 26:12
**confidenti...** 27:14
**connection** 14:9 16:21
**contact** 13:23
**continue** 14:4 37:21
**continuing** 5:23 8:9 8:24 11:24 12:11,21 13:4 19:21 20:5 28:16 29:2,11 30:23 31:4
**conversati...** 9:2 17:20 17:21
**conversati...** 8:19
**convey** 40:8
**CoreLogic** 1:8 2:16 32:21,22 40:4
**correct** 4:15 30:1 32:4 36:25
**corrected** 34:9,15,17 34:18
**cosigner** 15:1 24:18 26:6
**costs** 37:22
**counsel** 39:24
**County** 4:20 44:2,6,23
**couple** 35:17
**court** 1:1,15 5:1 6:3 29:1 37:11 39:3,8,8 39:13,17 39:20 40:5 41:1,16,20 42:14
**Credco** 1:8 2:16 32:21 32:22 40:3 41:5,13
**credit** 10:23 10:25 11:11 12:1 12:4 14:21 16:14,19 16:24 17:3 17:24 19:5 20:24,25 21:4,10,12 21:15 22:6 22:23 24:14 25:22 33:2 33:5,8,10 34:9,12 35:2,25 41:9
**Crocker** 31:18 38:8 39:4,23
**Crocker's** 39:1
**cry** 24:1,2
**cue** 41:2
**current** 4:18
**currently** 6:14

**D**

**daily** 13:16 13:22 14:5 14:16
**Dakota** 44:2 44:6,23
**damages** 9:9 9:11
**DATA** 1:8
**date** 6:10 7:12 11:9 14:3 15:13
**Dated** 44:18
**daughter** 40:13 42:3
**David** 33:24
**day** 1:14 5:19 7:13 9:25 13:8 13:9 25:2 44:4,18
**days** 13:9 14:17
**dead** 10:12 10:13 12:4 14:7 35:25
**dealerships** 26:10
**dealing** 18:9
**deceased** 8:22 10:19 10:20,23 11:5,8,11 11:20,25 12:7,23 14:22 16:5 17:25 19:1 19:6 20:8 20:10 24:13 25:23 34:11 35:1 35:6,9,13 35:15 36:10,12 36:15,18
**declined** 41:11,22
**defendant**

2:10,16,20 32:20 34:6 39:21 41:13
**defendants** 1:10 4:12 41:4,8
**definitely** 30:9 32:8 37:8
**degree** 7:3 27:16 29:21
**DeLadura...** 2:3,4 3:8 3:12 5:16 7:9,25 8:2 8:5,17 11:21 12:8 12:18,24 19:18 20:2 27:13,20 28:7,20 29:4,21,25 30:16,20 30:25 31:7 31:21 32:4 32:7 35:17 35:20 37:12,16 38:1,12 39:16,16 39:17,19 40:7,22,24 41:1,3,16 41:19 42:7 42:11,19 43:1,10
**demeanor** 18:13
**denial** 15:21 16:1 21:12
**denials** 16:4
**denied** 17:23
**deposed** 4:24
**deposes** 4:3
**deposition** 1:13 9:21 37:15,18 37:21 38:3 39:7 40:11 40:14 43:14 44:3 44:14
**deposition's** 37:19
**depressed** 10:10
**describe** 23:7,17 26:19
**described** 17:12 19:9 19:22 22:5 23:18
**detailed** 32:9
**determined** 37:19
**difference** 36:12
**different** 9:1 38:1,2 41:8,8,9
**difficulties** 20:11
**direct** 41:23
**direction** 44:13
**directly** 41:21
**disclose** 27:18
**disclosed** 27:17
**discover** 30:8 31:15
**discoverab...** 30:4
**discoverable** 32:11
**discovery** 30:9,15 41:23 42:2
**discuss** 9:14
**discussed** 12:23 32:13 34:16
**discussion** 12:14
**discussions** 12:6,11,13
**dispute** 39:9
**distress** 19:13,16 19:17,22 19:23,24 19:25 35:23
36:16
**DISTRICT** 1:1,2
**districts** 30:7
**document** 21:17
**document...** 11:5 21:8
**doing** 35:2
**dollar** 28:12 29:22 30:2
**door** 31:8,24 42:6,6
**draining** 22:15
**Drive** 2:19
**drop** 25:3,11 25:24
**dropping** 25:17,19
**due** 19:24 20:15 22:6
**duly** 4:2 40:5 44:9

**E**

**E** 2:18
**earlier** 13:7 17:5 29:7 35:21 36:20 41:15 43:13
**early** 36:25
**Eau** 1:16 44:4
**education** 7:2
**Eide** 1:13 3:4 4:1,6,7 4:8,9,20 32:19 34:5 34:23 43:14 44:3
**eight** 37:5
**either** 8:10 28:10 43:8
**embarrass...** 17:13
**emotional** 19:13,16 19:17,22 19:23,24 19:25
23:25 36:16
**employed** 6:14,16,20 24:9
**employment** 23:2,4
**endure** 19:7
**entered** 40:15 41:7
**Equifax** 1:9 18:23 19:5 19:24 27:2 33:4 35:5 40:16
**everybody** 28:2
**evidence** 30:5
**exact** 7:12 15:13 28:12,15 29:6,8,19 29:20
**exactly** 17:17,19
**EXAMIN...** 3:3 4:4 32:17 34:3 35:19
**exhibits** 3:15 3:16
**expect** 37:24
**Experian** 18:23 19:4 19:24 27:2 33:4 40:16
**expires** 44:24
**explain** 39:12
**extremely** 18:14

**F**

**F-a-s-t-e-n...** 6:19
**f/k/a** 1:7 2:11
**FACTUAL** 1:8
**fair** 18:8 41:9
**family** 6:24 24:24
25:10,16 25:24
**far** 32:11
**fashion** 41:25
**Fastenal** 6:17
**FD** 1:7
**February** 7:12 8:10 15:11
**feel** 5:21 41:23
**feeling** 18:11
**fees** 28:14
**felt** 23:21
**file** 10:13 19:5 32:6 32:7 37:25 41:24 42:9
**final** 28:18
**financial** 20:11,14
**financing** 15:11,16 16:4,14,21 19:8 24:21 26:1 33:22
**find** 30:16 39:10
**finish** 5:4,5
**firm** 2:8,13 2:18
**first** 4:2 11:7 11:16,20 38:3 39:10 41:5 42:20 44:8
**fit** 37:6
**floor** 2:9 39:12 40:9
**fly** 37:23
**flying** 38:15 38:19
**follow-up** 35:18 38:2
**follows** 4:3
**found** 17:24 26:23
**foundation** 19:20
**frame** 37:7
**free** 41:23
**front** 10:16 42:6
**frustrated** 18:14
**full** 4:18
**further** 32:15 37:13,15 43:4

**G**

**getting** 28:2
**give** 5:9,14 6:7 16:6 29:22 30:2 41:17 42:7
**given** 44:14
**giving** 38:15
**go** 8:20 14:25 18:19 26:5 29:16,22 30:2 38:7 38:9,21,22 38:24 40:10 42:8
**going** 12:20 12:24 13:3 13:16 18:4 25:3,11,24 27:20 28:7 28:20 29:4 29:16,22 30:1,2,9 30:11,14 30:18,20 30:24 31:22 32:2 32:6 40:22
**good** 4:6 5:13,22 16:19 39:3 39:17,19 39:22
**Groh** 2:18 3:7 34:4,5 34:20 38:17 40:2 43:2,6
**guess** 6:24 9:11 13:1 13:2,3 23:22 28:9 37:24
**guesses** 12:17
**guessing**
12:16
**guys** 30:14 31:19 32:15 43:5

**H**

**handle** 38:9
**hands** 36:11
**happen** 42:14
**happened** 11:18 12:5 14:4
**happening** 10:4
**happens** 42:3
**harder** 8:7
**Haxall** 2:14
**heads** 5:10
**hear** 8:3 11:7 27:4 40:1 42:25 43:2
**heard** 10:4 10:22 11:2 11:14,17 11:20 32:22 42:20
**hearsay** 8:18 20:2
**heart** 26:16 26:17
**heartbeat** 26:21
**HEIDI** 2:3
**held** 38:6
**hell** 10:5
**hereto** 44:16
**high** 16:14 20:24 22:6 22:16 24:17 26:6 33:21,23
**highest** 7:2
**HOLDINGS** 1:7
**home** 15:11 15:16 16:4 16:21,21 36:21
**honestly** 17:18 26:18
**Honor** 40:11 40:17 41:3 42:10,11
**hopefully** 5:15
**hoping** 9:16
**horrible** 10:4,6,7 18:18
**hospital** 21:3
**hospitals** 21:2
**house** 15:9 33:16
**HSBC** 1:7 2:11
**husband** 21:24,25

**I**

**idea** 11:18 14:2
**identificati...** 3:16
**Illinois** 2:9 2:19
**impact** 24:12
**impacted** 36:8
**important** 5:2,9
**improved** 17:10
**income** 17:2
**incorrectly** 19:5
**INDEX** 3:1
**indicate** 11:10
**indicating** 38:13
**indicator** 34:12
**individual** 5:13
**information** 32:1 41:21
**inquired** 40:14
**instances** 17:12
**instruct** 31:6
**instructing** 31:20

17:18 24:13,19 25:1,24
**interest** 20:25 21:3 22:6,17 24:18 26:6
**interested** 44:17
**introduce** 39:25 40:6
**involve** 38:14
**iron** 27:21
**issue** 18:25 21:18,21 24:4 26:17 40:8 41:4
**issues** 14:20 14:23

**J**

**January** 15:11
**Jo** 1:13 3:4 4:1,20 43:14 44:3
**job** 23:23
**jokes** 19:8
**JOSEPHI...** 1:4
**judge** 27:22 30:12 31:12,18 31:23 32:8 38:21 39:1 39:4,22

**K**

**key** 41:24
**kids** 13:10
**kind** 9:18 13:22 19:17
**kinds** 9:9
**knew** 40:20
**know** 7:12 8:23,23 9:2 10:10 11:9,18,23 11:23 12:5 12:9,10,12 12:12,15 12:16 13:23 14:1 14:3 15:3 15:5,7,13 15:25 17:15,19 19:23 20:3 20:5,6,7,8 20:13,18 22:10,21 22:24 23:8 23:22,24 25:1,18 26:18,18 26:23 27:17,25 28:12,13 28:14,16 28:18,19 28:21 29:6 29:13,14 29:17,18 30:6,8 31:2,11,13 31:14,15 32:8 33:13 33:24 34:10,13 34:14,15 34:16,17 35:3,7,10 38:12 39:25 42:3
**knowledge** 12:25
**known** 44:3
**knows** 27:19 28:10,11
**KROLL** 1:8

**L**

**lack** 19:19
**laughed** 17:13
**law** 2:4 6:3
**lawsuit** 18:23,25 19:3,12 27:2 41:8
**lawyer** 28:14 29:23
**laymen's** 26:20
**legal** 19:19
**let's** 31:13 38:22,23 38:24 39:10,14
**letter** 25:2,4 25:6,10,12 25:13,16 25:18
**letters** 15:21 19:4 21:13
**level** 7:2
**Lexis** 40:2
**LexisNexis** 1:9 2:21 34:5
**life** 9:4,8 10:11,17 18:4,16,17 20:11 22:12,25
**line** 6:20,24
**list** 36:9
**listen** 31:4
**litigation** 30:7 40:17
**little** 8:13 10:1 17:16 24:25 26:3 28:8 38:19
**live** 10:16 18:17
**LLC** 1:7,8,9 2:4,16 32:21,22
**LLP** 2:9,14 2:18
**loan** 10:15 14:25 15:4 15:8,18,19 16:18,20 16:23 17:2 17:23 24:17
**loans** 14:6 32:25
**Loans'** 33:11
**lodged** 41:14
**lodging** 30:25
**long** 5:24 6:22 25:1
**looking** 38:18
**lost** 32:10
**lot** 15:17
**low** 17:2,7 21:5 22:6

**M**

**magistrate** 31:12,23 39:4
**man** 23:13 23:13,23
**March** 1:14 44:4,18
**marked** 3:16 10:22 11:5 11:7,11,19 11:25 12:7 12:22 14:22 19:1 20:8,9 25:22 35:25 36:12
**marking** 24:13
**Matt** 4:11 5:17 39:23
**MATTHE...** 2:8
**MCGUIRE** 2:18
**Meagan** 2:13 28:4 31:19 32:14,16 32:19 34:23 40:3 42:19,24 43:7
**mean** 8:24 9:12 10:9 10:12 12:12 13:16 20:8 22:15 23:21 31:2 31:11 36:13
**Meaning** 12:13
**means** 44:12
**medical** 20:15,23 21:4 22:5 26:12 35:24
**meet** 9:19
**meeting** 7:19 8:9,12
**mention** 12:3 34:16
**Mihalko** 2:13 3:6 28:4 32:12 32:16,18 32:19 34:1 34:22,23 35:16 38:16 40:3 41:5 42:24 43:7
**Miller** 2:3 7:15
**Milwaukee** 2:5
**Minnesota** 4:21 7:20 44:1,6,23
**misstates** 29:5
**mom** 8:22 9:4 10:5 11:4 12:3 12:15 27:5 35:23
**mom's** 9:8 9:19
**money** 10:15 18:15 27:6
**month** 6:23
**months** 13:13 37:5
**mood** 18:13
**mortgage** 1:9 16:7 17:2 32:24 33:12,24
**mortgages** 17:6
**mother** 4:15 4:17 9:9 9:13,21 11:7,25 13:5,15,23 16:1 17:7 18:1,22 20:10 21:21,25 26:13 27:1 32:24 33:2 34:11,25
**mother's** 18:4 22:11 34:9
**motion** 41:24 42:9
**move** 31:13 40:23
**multiple** 9:25 19:4 41:4

**N**

**N** 2:3
**N.A** 1:7 2:10
**name** 4:11 4:18 32:19 32:20
**named** 32:20
**Nathan** 2:3 28:4 29:16 35:17 39:16
**nature** 32:10
**necessary** 38:16
**need** 5:24 27:22 38:13 39:8 39:12 40:6 41:21 42:23 43:3
**never** 10:4 10:14 23:9 34:18 36:6
**new** 8:8 24:21
**Nexis** 40:3
**nods** 5:10
**Nope** 15:22 21:9
**normal** 18:17
**North** 2:9
**NORTHW...** 1:15
**Notary** 44:5 44:22
**noted** 40:5
**noticed** 40:11
**number** 4:22 28:18,19 38:15,23 42:2
**nwcr@nw...** 1:23

**O**

**oath** 4:2 6:2 6:2 29:14 30:1 44:7
**object** 12:24 28:20 29:4 30:3,15
**objecting** 31:3
**objection** 8:18 12:8 12:18 19:18 20:2 28:25 30:25 38:5 41:14
**OBJECTI...** 3:11
**obligated** 29:15
**obligations** 17:3 41:9
**Observation** 23:18
**observations** 18:12,19
**observe** 23:20
**observed** 19:23
**obtain** 19:8 33:22
**obviously** 37:22 38:5 38:16
**occasions** 5:18
**occurred** 18:20
**office** 2:4 39:1
**Oh** 8:1 9:1 20:8 24:20 24:24
**okay** 4:17 5:1,12,22 6:1,7,12 6:22 7:6 7:15,21 8:1,1,12 9:16 10:1 11:2 12:3 12:6 13:4 13:7,19,21 14:13,20 15:6,8,15 15:23,25 16:3,11,13 17:1,5,10 18:3,8,22 18:25 19:3 19:12,15 20:9,19,22 21:12,15 21:17,20 21:25 22:3 22:5,9,11 22:14,22 23:9,16 24:7,9,12 24:22 25:13 26:1 26:9,12,22 26:24 27:1 27:4 28:19 29:18,20 30:14,22 32:2,14 34:1,18,20 35:11,16 38:11 40:5 41:1 42:10 43:9,11
**once** 8:6 13:13
**ones** 36:13
**open** 37:19 38:6 39:11 40:9
**opposed** 5:10
**order** 10:16 27:14,21 31:9,24 32:3 36:7 37:18,20 37:25 38:14 40:23
**originally** 11:11 18:20 28:24
**outcome** 44:17
**outside** 12:25

**P**

**p.m** 1:17 39:2 43:15

**parallel** 40:16
**part** 16:22 25:1 36:25 37:6
**particular** 31:25
**parties** 39:5 39:11,24 44:16
**party** 19:16 20:1 40:12
**pay** 10:15 22:15,16
**paying** 22:18,20 22:23
**penalties** 6:4
**pending** 30:8 40:17
**penny** 29:19 29:19,20
**period** 13:21 18:13
**perjury** 6:4
**person** 7:17 8:5 13:12
**person's** 10:17 18:17
**personal** 9:2 12:25
**perspective** 27:24
**Peterson** 4:20
**phone** 13:8 14:11 19:4 24:3 28:8 31:18 38:17 39:25 41:6 42:21
**phones** 40:2
**phrase** 37:2
**piece** 31:25 40:16
**PILGRIM** 2:8
**place** 7:19
**plaintiff** 1:5 2:6 4:13 4:17 39:14 40:15 41:22
**plaintiff's** 40:12 42:3
**please** 4:18 39:15
**point** 2:14 17:7 20:12
**points** 38:2
**police** 6:24
**possible** 38:4
**practical** 31:11
**prefer** 32:8
**present** 7:21 13:22 39:11
**pretty** 13:4 22:18 42:8
**prevent** 28:1
**print** 44:12
**prior** 7:8,19 8:9 13:19 29:5
**probably** 13:10
**problem** 36:5 42:19
**problems** 20:15,22 23:7,8
**process** 15:15,25
**produce** 41:11
**promise** 17:23
**proof** 10:12 10:12,21
**protective** 27:14,21 31:9,24 32:3 37:18 37:20,24 38:13 40:23
**prove** 11:6
**provide** 28:2
**provision** 27:15
**Public** 44:5 44:22
**purchase** 26:1 33:16 36:21
**purchasing** 15:9
**put** 36:11

**Q**

**qualify** 16:13 17:1 33:11
**question** 5:4 5:5 27:24 28:24,25 29:3,7,10 30:24 31:10,22 34:24 37:10 38:14 40:24
**questions** 9:5 31:17 34:2,7 35:18,21 35:23 36:20 37:13
**Quicken** 32:25 33:11
**quite** 18:9

**R**

**rank** 36:7
**RE-EXA...** 34:21
**reached** 17:7 27:1
**read** 28:23 29:1 37:9 37:11
**really** 9:20 24:17 26:6
**reason** 6:7 8:16 10:18 27:16 37:20
**recall** 8:24 11:13,15 17:17 18:3 20:20,21 25:13,18
**recap** 42:23
**receive** 27:9
**recess** 38:25
**recollection** 11:16
**record** 5:8 5:19 38:22 44:14
**recorded** 44:11
**records** 10:20 11:10 15:10
**redepose** 37:23
**redirect** 37:12
**reduced** 44:12
**referee** 39:8
**referred** 22:9
**referring** 10:8
**reflected** 19:6
**refused** 16:6
**refusing** 29:2
**regards** 11:3
**rejected** 14:6
**related** 18:25 23:1 44:16
**relates** 21:17
**relation** 17:3
**relationshi...** 13:23
**relative** 44:10
**Relaying** 8:18
**relevant** 41:13
**remember** 11:22 12:13 15:15 16:11 17:19 20:22 35:2 35:5,8,21 36:22
**remind** 5:15 29:14
**reminding** 5:14
**removed** 34:12
**renew** 27:22
**repeat** 28:5
**report** 17:24 24:14 25:22 33:19 36:1
**reported** 35:5
**reporter** 5:1 29:1 37:11 39:8
**REPORT...** 1:15
**reporting** 33:5,7,14 35:1,9,12 35:14,15 41:10
**reports** 21:10 34:9 34:12
**represent** 4:11 32:19 34:5
**representing** 2:5,10,15 2:20
**request** 30:9 30:15
**requested** 29:1 37:11
**requests** 41:23
**require** 30:10
**respect** 14:21 15:16 20:22 24:4
**responses** 5:9,14
**rest** 10:17
**result** 19:6 19:13 20:1
**revisit** 31:9
**Richmond** 2:14
**right** 5:13 13:3 15:12 29:24 31:7 34:19 36:19 39:17 41:17
**Risk** 1:9 2:21
**road** 13:14
**rog** 27:25
**RPR** 1:20 44:21
**rule** 32:9 38:8
**ruling** 30:4 30:11 31:13,25 41:17

**S**

**sake** 27:23
**Sand** 23:4 24:10
**Sanders** 2:13,14
**Save** 37:12
**saying** 17:25 25:2,10 31:21
**says** 28:10 29:6,16 31:5
**scoot** 28:7
**score** 16:14 16:19,24 20:25 21:4 22:6 33:2 33:5,8,10 33:15,17 33:18,20 33:21 35:15
**second** 24:23 36:14
**see** 13:12 15:21 21:8 23:25 24:2 25:4,12 26:7 31:16 31:17 37:24 38:8 38:23
**seek** 27:21 32:3 37:18 37:21,22
**seeking** 9:10 9:13
**seen** 5:17 11:10 15:10 21:10,12 21:17
**separate** 7:22 40:1
**separately** 40:6
**September** 6:11
**serendipit...** 42:1
**settle** 40:22
**settled** 28:13 40:18
**settlement** 27:2,7 28:17 40:15,20 41:6,11
**shakes** 5:10
**Shannon** 1:20 4:3 8:3 44:21
**she'd** 26:5
**short** 6:23
**shortly** 37:25
**show** 10:20 15:10 36:12
**showing** 25:23
**sister** 7:21 17:5 22:2
**sitting** 5:13
**situation** 18:18
**six** 37:5,5
**Solutions** 1:9,9 2:21
**somebody** 9:19
**sorry** 8:7 19:20 28:5 28:7 34:23 36:6 37:9 42:12
**sort** 17:7
**sought** 30:8 37:21 41:4 41:14
**sound** 8:3 15:12
**sounds** 5:22 15:13 35:3
**source** 18:3 22:11
**South** 4:20
**speak** 5:25 15:23 40:25
**speaker** 39:24
**speaking** 14:15
**specific** 9:3 9:11,20 11:9 38:15
**specifically** 10:22 11:2 16:3 25:8 33:18
**specifics** 20:13 23:22,24
**speculation** 12:19 19:19 20:3 28:21
**spell** 6:18
**spoken** 7:8 8:10,20 20:10
**spot** 38:9
**standards** 33:11
**standing** 8:17
**start** 39:14 40:9
**started** 11:23
**state** 4:18 31:1 44:1 44:6
**stated** 13:1
**STATES** 1:1
**stay** 38:22
**stenotype** 44:12
**stop** 22:20 41:16
**Street** 2:9
**stress** 18:3 22:11 23:1 23:14
**stresses** 22:25
**stressful** 22:18
**Stromquist** 2:8 3:5 4:5 4:11 5:23 8:9,24

11:24 12:11,21 13:4 19:21 20:5 27:18 28:9,16,23 29:2,11,25 30:14,18 30:22,23 31:2,4,16 32:2,5,14 35:22 36:24 37:9 37:14 38:11,23 39:22,23 40:8,10 41:20 42:10,12 42:16,18 43:4,9,12
**stuff** 22:19
**subject** 6:3 30:6
**subsequen...** 40:18
**sudden** 25:2
**suffered** 19:13,25 35:24 36:16
**suit** 32:20
**Suite** 2:5,19
**summarize** 43:3
**sure** 16:22 20:13 35:4 38:1 41:19 42:20
**Susan** 2:18 31:19 32:14 34:5 40:2 42:20 43:2,6
**Sweet** 43:1
**sworn** 4:2 44:9

**T**

**tail** 10:14
**take** 5:24,25 6:2 7:19
**taken** 1:14 1:20 5:11 10:18 18:16 38:25
**talk** 5:3 9:25 13:7 14:11 14:18 19:15 23:1 23:4 24:12 26:2,9
**talked** 9:1 9:21 14:17 21:20 23:9
**talking** 12:22 13:15 14:5 21:18 24:19
**talks** 13:10
**tapping** 5:20
**taxes** 10:13
**technology** 42:22
**telephone** 4:22 42:17
**telephonic...** 2:15,20
**tell** 8:5,13 9:9,16 10:1 15:6 15:19 16:3 16:13,24 17:1,15,22 23:16 24:25 25:6 25:19 27:6 29:11,15 30:18,20 32:25 33:2 33:4,7,10 33:14,17 34:11,25
**telling** 42:8
**terms** 26:20
**testified** 17:5
**testifies** 4:3
**testify** 9:17 44:9
**testifying** 6:3 44:8
**testimony** 6:8 29:5 44:11,14
**thank** 4:10 34:2 35:16 39:20 41:3 42:10,11 42:13,16 42:18 43:11,12
**Thanks** 43:12
**thereof** 44:7
**thing** 42:14
**things** 9:1 31:12 39:9
**think** 5:18 5:23 13:7 17:16 29:9 30:9,11 31:12 32:8 37:2 38:15 38:18
**thinking** 37:7
**third** 40:12
**thought** 36:24
**three** 7:23 13:13
**three-seco...** 38:18
**time** 5:20 17:6,16 18:16 20:19 26:5 36:20 37:7 37:13
**times** 5:16 5:19 9:25
**today** 6:8 7:8 9:22 19:10 21:18 29:23 30:12,19 30:21 34:9 38:17 39:15,21 41:18 42:15
**told** 8:22 11:4,24 12:3 14:20 16:1,9,10 17:21 18:1 18:11 21:6 25:12,20 34:14,17 34:18 39:7
**top** 36:8,13
**trailing** 28:5
**Transcript...** 44:13
**Transport** 23:5 24:10
**TransUnion** 33:7,10,14 33:17 34:25
**treated** 23:13
**trend** 6:25
**tried** 36:21
**Troutman** 2:13,14
**true** 44:14
**truth** 29:15 44:9,10
**truthful** 6:7
**try** 5:2,3
**trying** 14:9 17:16 33:16 42:4
**two** 35:10,14 36:17 38:1 38:1,7 39:24 40:1 40:7
**two-second** 28:2
**types** 8:6

**U**

**um-hum** 4:14 5:7 7:7,24 8:2 17:11 25:25 36:2
**unable** 15:19
**unbelievab...** 20:24 21:1
**understand** 6:5 14:9 27:23 28:9 39:4
**understan...** 10:2 26:19 34:8 35:11 37:17
**Understood** 42:9
**UNITED** 1:1
**unnecessary** 38:20
**upset** 18:14
**usual** 41:25
**Usually** 5:18

**V**

**Valentine's** 7:13
**vehicle** 26:5
**verbal** 5:9 5:14
**Virginia** 2:15
**virtue** 44:6
**vs** 39:5
**vs-** 1:6

**W**

**Wacker** 2:19
**Waletzko** 1:4 4:13 39:5
**walk** 31:8,23
**want** 13:2 14:18 19:15 32:5 40:23 41:20 42:7
**wants** 9:14 40:9
**wasn't** 9:19 15:4 33:23
**way** 5:8 28:1 36:15 38:19 42:5 42:5
**we'll** 30:16 31:9 32:7 37:21,24 41:24
**we're** 12:15 21:18 42:22
**week** 41:15
**went** 15:16 15:17 17:17,17 19:8 42:21
**West** 2:4,19
**WESTERN** 1:2
**willing** 30:23
**Winona** 7:20
**Wisconsin** 1:2,16 2:4 2:5 44:4
**witness** 5:22 8:1,4,8 23:17 27:12 28:12 29:24 31:3 31:6 43:5 43:11 44:8 44:11,15
**witness's** 12:25
**witnesses** 5:14
**woman** 23:12
**WOODS** 2:18
**words** 8:19 19:21
**work** 6:20 6:24 10:14 10:15 18:15 23:23 24:5 35:25
**working** 13:14 42:22
**worry** 5:17
**worst** 42:14
**wouldn't** 14:10,11 36:17
**wrong** 30:12 30:13
**www.nwco...** 1:22

**X**

**Y**

**yeah** 7:1 14:24 24:25 31:2 32:7
**year** 10:14 37:6
**years** 6:23 6:23 13:16
**yep** 4:9 12:20

**Z**

**0**

**1**

**1-31-2020** 44:24
**1-800-628-...** 1:24
**1:45** 1:17
**1001** 2:14
**15-CV-317** 1:6
**16** 6:23,23
**17th** 1:14 44:4
**1976** 6:11

**2**

**2:27** 39:2
**2:35** 43:15
**20** 5:16
**2009** 11:12 13:19,21 14:22 18:4 18:20 20:19
**2013** 15:11 36:25
**2016** 1:14 44:4,18
**23218** 2:15
**23rd** 44:18
**25** 4:20
**26th** 2:9
**28119** 4:20

**3**

**32,34** 3:6
**321** 2:9
**34** 3:7
**35** 3:8

**4**

**4** 3:5
**4100** 2:19

**5**

**507-450-7...** 4:23
**53233** 2:5
**55962** 4:21

**6**

**60601** 2:19
**60654** 2:10

**7**

**720** 2:5
**735** 2:4
**75** 5:19
**77** 2:19

**8**

**8,11,12,19,...** 3:12

**9**

**9th** 6:11