**Expert Report of Chris McConville**

Josephine Waletzko, Plaintiff

v.

Capital One, N.A. F/K/A HSBC Bank; Corelogic Credco, LLC and Lexisnexis Risk
Solutions Inc.
Defendants

United States District Court Western District of Wisconsin
Case No. 15-cv-317

March 18, 2016

_____

## Table of Contents

1. Qualifications ................................................................................................ 3

2. Subject of the Report ..................................................................................... 4

3. Summary of Opinions ..................................................................................... 4

4. Plaintiff's credit report issue with HSBC/Capital One ............................... 6

5. Metro 2 Format, CDIA and General Credit Reporting ................................. 7

6. Credit Scoring ............................................................................................... 10

7. Explanation of Different Credit Scores ...................................................... 15

8. Merged Credit Reports ................................................................................ 16

9. The Importance of Accurate Reporting and Scoring ................................. 17

10. Correcting Credit Reporting Errors ........................................................... 19

11. Real Financial Loss Due To Inaccurate Credit Reporting ........................ 23

12. Credit Reporting and Score Impact On Mortgage Lending ...................... 26

13. Deceased Identity Theft ............................................................................... 31

14. Credit Reputation ......................................................................................... 33

15. Emotional and Psychological Stress ........................................................... 34

DAMAGE SUMMARY ....................................................................................... 35

Appendix 1. Documents Relied Upon ............................................................. 36

Appendix 2. Curriculum Vitae of Chris McConville ...................................... 37

Appendix 3. Civil Procedure 26 Disclosure .................................................. 40

Appendix 4. ....................................................................................................... 41

Appendix 5. ....................................................................................................... 42

## 1.  Qualifications

I have extensive experience as a loan officer responsible for originating, qualifying, and pricing residential mortgages. I currently serve as the President of Credit Education for Cure My Score. I founded Cure My Score in 2008 primarily to help my mortgage clients maintain the highest credit scores possible at a time when lending credit standards where tightening dramatically. Cure My Score educates consumers on the steps needed to maximize their scores. Through my twenty-four experience dealing with credit, I have extensive knowledge of credit scoring models and a complete understanding of the effects of credit information on credit scores. I started originating loans before credit scoring was used. I have experienced the entire revolution of how credit scoring has changed lending.

I have extensive experience in all aspects of mortgage lending. I have personally originated more than 2000 residential mortgages as well as managed loan originators who have closed thousands more. I have a complete understanding of lending underwriting procedures, loan qualifications, credit standards, appraisals, risk pricing and closings. My work experience has included sub-prime, Alt-A, conforming (DU / DO and LP), FHA, USDA and Jumbo as well as loans with most of the largest wholesale lenders in the United States. In 2013, I accepted a position with Sail Mortgage in order to stay current with all lending products and continue my origination career.

During the winter of 2009, I started to offer my services as a credit / mortgage litigation consultant available to both plaintiff and defendants. After doing some investigation, I realized that most of the expert witnesses working in this area had no direct experience in dealing with credit decisions or dealing directly with consumers. I saw an opportunity for my experience and abilities to provide expert opinions based upon my twenty-four years of practical experience in the mortgage industry.  To date I have worked on 37 cases.

My pertinent education and certifications are summarized below:

- 1989   Graduated from University of Pittsburgh B.S. Degree. Annual Continued Mortgage Education Credits
- 2008 - 2012   Credit reporting and credit scoring training from nationally recognized credit expert Attorney Edward Jameson and Michael Citron
- 2009   Achieved Credit Expert Certification from Credit CRM.
- 2010   Participated in a 3 day conference in Tampa, Florida related to credit reporting post Chapter 7 Bankruptcy
- 2011   Attended a 4 day conference in San Diego California related to continued FICO Scoring education as well as CROA compliance
- 2012   20 Hours of Mortgage Education Credits with ProSchools
- 2013   Passed both the Federal and Pennsylvania Mortgage Loan Originator tests.

- 2013   Obtained Pennsylvania Mortgage Originator License #40768
- 2013   8 Hours of Mortgage Continuing Education with ProSchools
- 2014   FICO Pro Certified with All Regs
- 2014   Bank Secretary Act, Anti Money Laundering Training
- 2015   Bank Secretary Act, Anti Money Laundering Training
- Metro 2, e-OSCAR and the New FCRA/CFPB Compliance Requirements accredited class presented by Stroock & Stroock & Lavan LLP (Lorman)
- Weekly Continue to stay current on all credit scoring models, credit laws and mortgage underwriting guidelines

## 2.  Subject of the Report

I have been retained by Plaintiff to give my opinions on what led to her lack of credit scores, why she was denied credit and any associated damages.  My opinions expressed in this report are based on the mortgage and credit reporting knowledge that I have obtained over my twenty-four year career in the mortgage and credit industries as well as documents that were provided to me as part of the discovery process related to this case. My opinions are based on the information I have reviewed thus far and a reasonable assessment to a reasonable degree of certainty based upon my experience as a mortgage and credit lender. I reserve the right to modify my opinions should any new information be provided to me.

## 3.  Summary of Opinions

1. Based on the documents I reviewed, it is my opinion the Defendant, HSBC/Capitol One started to report a deceased indicator on the Plaintiff's at some point in 2009.

2. It is my opinion that Corelogic Credco, LLC and LexisNexis Risk Solutions Inc. are all credit reporting agencies.

3. It is my opinion that HSBC/Capital One is a data furnisher.

4. It is my opinion that anytime HSBC/Capital One reported to any CRA and that CRA reported an ECOA code of "X", the Plaintiff would have had a deceased indicator on her credit report.

5. It is my opinion the Plaintiff's credit scores suffered in part due to the number of times she applied for credit.  The Plaintiff's continued attempts to secure credit created an onslaught of credit inquiries which were adverse to her credit score.

6.  Based on the mortgage credit reports I reviewed, it is my opinion Trans Union reported additional major derogatory accounts and thus the Plaintiff's Trans Union FICO score would have been meaningfully lower than her Equifax and Experian FICO score (if she qualified for them).

7.  Based on the credit reports I reviewed, it is my opinion none of the Plaintiff's Equifax or Experian credit reports qualified for a FICO Score due to the presence of a deceased indictor.  Each of her Equifax and Experian credit reports contained the other two requirements needed to generate a FICO score (provided there was no deceased indicator).  Trans Union did not report any deceased indicator on any of the six mortgage credit reports I reviewed and therefore qualified for a FICO Score.

8.  It is my opinion the tri-merged credit report I reviewed from Credstar (Corelogic Credco) contained data from all three CRAs.  Credstar (Corelogic Credco) had 100% access to the Plaintiff's individual credit reports from each CRA prior to merging it into a tri-merge report.

9.  Based on the documents I reviewed, it is my opinion Credstar (Corelogic Credco) and LexisNexis all reported conflicting data related to the Plaintiff being both deceased and alive.  This conflicting data was not accurate and therefore it is my opinion none of them followed reasonable procedures to assure maximum possible accuracy with preparing the Plaintiff's credit reports.

10. Based on the documents I reviewed, it is my opinion the Credstar (Corelogic Credco) credit report I reviewed did not contain 100% accurate credit reporting,  therefore it would have led to inaccurate credit scoring (prevented Plaintiff from generating a score) or accurate approvals.  Three out of four of the LexisNexis reports I reviewed contained inaccurate credit reporting which led to inaccurate credit scoring (prevents Plaintiff from generating a score) or accurate approvals.

11. Based on the documents I reviewed, it is my opinion Capital One failed to conduct a reasonable investigation which led them to continue to report the ECOA "X" code.  If Capital One was unable to verify the Plaintiff was deceased, they should have deleted the "X" code.  Capital One attempted to profit from the Plaintiff after they themselves reported her as deceased rather than taking the steps to correct their inaccurate reporting.

12. Based on the documents I reviewed, it is my opinion the Plaintiff experienced financial losses due to the Defendants' reporting of HSBC / Capital One deceased indicator.  The Plaintiff experienced financial losses in her inability to buy a home, get the lowest available auto loan interest rates, shop around

for the best auto insurance and her inability to open other types of new credit that would have helped her continue to build a solid credit rating.

13. Based on the six mortgage credit reports I reviewed, it is my opinion none of these credit reports contained an industry standard or any Representative Score.  None of these mortgage credit reports contained sufficient credit scoring and accurate credit reporting to have any chance of mortgage approval.

14. Based on the information I reviewed, it is my opinion no creditor who obtained any of the Plaintiff's credit reports that contained a deceased indicator approved her credit requests regardless of any other qualifications. Creditors have Red Flag rules to prevent fraud and identity theft.  Capital One must not have adopted reasonable policies and procedures to identify the red flag of Identity Theft since they attempted to grant her credit while they had indications she was deceased.

15. Based on the information I reviewed, it is my opinion the Plaintiff suffered significant damage to her credit reputation from every creditor who received a credit report from the Defendants reporting the Plaintiff as deceased.

16. Based on the information I reviewed, it is my opinion the Plaintiff suffered Emotional and Psychological Damages due to the actions of the Defendants. The Plaintiff followed the law that was meant to protect her but the Defendants failed her.  The Plaintiff is not to blame and she was a victim.

## 4. Plaintiff's credit report issue with HSBC/Capital One

At some point in time, HSBC/Capital One reported the Plaintiff as deceased. This reporting came via a deceased indicator being reported by HSBC/Capital One a tradeline on the Plaintiff's credit report.  I was not provided with information indicating the exact date this deceased indicator was added to or removed (if it ever was) from the Plaintiff's credit reports.  I estimate the issue was first added to her credit report in 2009.  My estimate is based on the dispute she filed in June 2013 where she indicated this issue destroyed her life for the past four years[1] and a screen shot from State Farm indicating the Plaintiff was trying to get her deceased issue fixed for the past 4 years (note looks like it was added Jan-2014)[2].

---

[1] FD000071
[2] Appendix 4

**Opinion #1:  Based on the documents I reviewed, it is my opinion the Defendant, HSBC/Capitol One started to report a deceased indicator on the Plaintiff's at some point in 2009.**

# 5. Metro 2 Format[3], CDIA and General Credit Reporting

To understand what the Consumer Data Industry Association (CDIA) does and their role in credit reporting, I provided a few quotes off their website.  "The Consumer Data Industry Association is an international trade association that has represented consumer data companies for over 100 years. Our 250 members provide fraud prevention and risk management products, credit and mortgage reports, tenant and employment screening services, check fraud and verification services, and collection services to their customers. They help businesses of all sizes in making decisions that provide consumers with the products and services they want and need.   CDIA Mission – To ensure that consumer data can be collected, maintained, and used by third parties in responsible ways by U.S. businesses to help them manage risk, create fair markets for consumers, and to increase business competition."[4]  "The Metro 2 format is the specific format used by data furnishers and the CRA's.  In 1997, the credit reporting industry initiated the use of the "Metro 2" format which became the industry standard for reporting debtor information. The "Metro2" format was developed by Consumer Data Industry Association (CDIA) to replace the Metro format which was developed in the late 1970's. The Metro 2 format layout is described in the Metro 2 Credit Reporting Resource Guide.
The Metro2 format facilitates complete and greater accuracy of reporting of data and provides the following features:

  i.    The Metro 2 format is designed to be easier to use and understand;
 ii.    provides one standard computer format to be used for reporting accurate, complete and timely consumer credit information;
iii.    meets all requirements of the Fair Credit Reporting Act (FCRA), the Fair Credit Billing Act (FCBA) and the Equal Credit Opportunity Act (ECOA);
 iv.    allows for reporting information at both the account and consumer levels;
  v.    allows reporting on debtors that "cannot be located";
 vi.    allows reporting of deferred payments and "associate" borrowers /debtors information;
vii.    Identification numbers can be changed to accommodate transfer or sale of debt (asset sales); and,
viii.    the format accommodates a 4-digit "year" field to accommodate reporting in the year 2000 and beyond."[5]

---

[3] http://www.cdiaonline.org/index.cfm?unItemNumber=514

[4] http://www.cdiaonline.org/about/index.cfm?unItemNumber=515

[5] http://www.metro2creditreportingsoftware.com/whatisthemetro2format.html

The CDIA supplies users of Metro 2 a Credit Reporting Resource Guide (CRRG). This resource guide provides a great deal of information and guidance to data furnishers.  This guide gets updated on a regular basis so users of Metro 2 are aware of all available codes, changes to reporting guidelines and industry updates on how furnishers are to report complete, consistent and accurate data.  The CDIA provides resources and industry standards that data furnishers rely on to ensure compliance with complete and accurate credit reporting.  The CDIA provides detailed procedures to data furnishers on how to report data.  By having this industry standard, all data furnishers report data the same way.  It is imperative that all data furnishers report data the same.  Credit scoring models and underwriters rely on the information reported in credit reports so it must be accurate, timely and complete.

The three major credit reporting agencies (CRAs) are Trans Union, Equifax and Experian.  The following is information provided by Trans Union explaining the importance of the Metro 2 Reporting Guidelines.  "Data Reporting is at the heart of the process that builds a consumer credit report. Without data furnishers sending timely and accurate account updates to TransUnion, there is no credit report. Accurate and timely data reporting means successful risk mitigation for businesses, accurate credit scores for consumers and less litigation for credit reporting customers. Accessible credit information enables all kinds of businesses to make informed decisions when extending credit, making promotional offers and facilitating a wide range of other activity that is essential to a healthy market economy. This credit information is based on the billions of updates we receive each month from auto dealers and finance companies, banks, credit unions, mortgage companies, retailers, student loan providers, public records and more — for virtually every market-active adult in the United States. At the core of the process are the Metro 2 Reporting Guidelines."[6]

In addition to the big three CRAs, many other companies are considered credit reporting agencies.  The Fair Credit Reporting Act (FCRA) defines""the term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. ""[7]  There are many Credit Resellers that are considered CRAs.   My experience is in the mortgage business and our Credit Resellers sell credit reports directly to the mortgage originator.  A mortgage originator does not have access to go directly to any of the big three CRAs; all of their credit reports are ordered and supplied thru a number of Credit Resellers.  As

---

[6] http://www.transunion.com/corporate/business/datareporting/data-reporting.page

[7] FCRA

of today, I can order a credit report for a mortgage applicant thru any of 53 Credit Resellers.

**Opinion #2:  It is my opinion that Corelogic Credco, LLC and LexisNexis Risk Solutions Inc. are all credit reporting agencies.**

A Data Furnisher is "Company who provides consumer credit accounts receivables to one or more consumer reporting agency"[8]  It is my understanding that all data furnishers report their data to the Consumer Reporting Agencies using the Metro 2 format.

**Opinion #3:  It is my opinion that HSBC/Capital One is a data furnisher.**

The CDIA has a team of credit professionals called the Metro 2 Task Force.  It is my understanding this team includes employees from the big 3 CRAs.  It is my understanding the Task Force plays a role in training users of Metro 2 on changes, highlights, as well as other features or enhancements of Metro 2.[9]

Metro 2 includes reporting a code related to the Equal Credit Opportunity Act (ECOA).  The ECOA coding "Defines the relationship of the primary consumer to the account and designates the account as joint, individual, etc., in compliance with the Equal Credit Opportunity Act."[10]

The most common ECOA codes are 1 for an individual account and 2 for a joint account.  An ECOA code of X means the consumer is deceased.[11]

The Plaintiff had a period of time that her HSBC/Capital One account reported her as deceased.  The deceased reporting started when HSBC/Capital One first reported an ECOA code of "X".

**Opinion #4:  It is my opinion that anytime HSBC/Capital One reported to any CRA and that CRA reported an ECOA code of "X", the Plaintiff would have had a deceased indicator on her credit report.**

---

[8] 2011 CRRG

[9] http://www.cdiaonline.org/Metro2/content.cfm?ItemNumber=853&pnItemNumber=506

[10] 2014 CRRG 4-21

[11] 2014 CRRG 5-40

## 6. Credit Scoring

A FICO score predicts the likelihood of a consumer going 90 days or more delinquent in the next 24 months.  A FICO score is calculated directly at the Credit Reporting Agency (CRA) when a credit report is "pulled". The FICO score is based 100% on the data reporting at the time of the credit pull.  Personal data including name, address, employment, race, age and any other personal data is not considered in FICO scoring.

FICO scoring is "dynamic", meaning ever changing.  This is very important to understand.  I hear almost everyday consumers stating "my credit score is X" when in reality, they have no idea what their FICO score is at that moment.  A better way to understand FICO scoring is to say "When I applied for my last mortgage on July 4, 2013, my FICO score on Trans Union was X."   The data on credit reports is constantly changing and as soon as ANY data changes, the score also changes.  My experience shows that some people think their score only changes if they miss a payment on an account.  This is not the case; any data change will have a direct reflection on your score, good or bad.

FICO provides consumers Key Factors affecting their credit score. I often hear these Key Factors called adverse codes or reason codes as well. Regardless of what they are called, they are the four largest factors that are adversely affecting the score. Each of these Key Factors is adverse (lower) to the score.  These Key Factors are listed in order of their importance. The first Key Factor has the greatest affect and so forth down the line. These Key Factors are the four biggest credit characteristics affecting the score. Many consumers have well over four characteristics affecting their score, but this disclosure limits it to the top four.[12]

The FICO score calculates from 5 categories. The following is a breakdown. A negative account (except for Bankruptcy and Federal tax liens) stays on your credit for 7 years.



[13]

---

[12] Appendix 5
[13] http://www.myfico.com/crediteducation/whatsinyourscore.aspx

**Payment History:**   Any negative information on a credit report can lower a consumer's score.  A negative account is any account that is or was 30 days late or more.  In addition to late payments, charge-offs, settled accounts, collections, public records (judgments, tax liens, bankruptcies, foreclosures) are all considered negative events.  The level and time of the delinquency is also considered.

**Amounts Owed:**   This category focuses on the debt you have.  Installment debt is considered different than revolving debt.  Revolving debt is weighted much higher than installment.  Utilization rate is the percent of debt relative to the available credit.  The higher the percentage owed, the greater the adverse impact to the score.  The lower the utilization rate is the better.  As an example, 50% utilization is not as good as 5% but it is much better than 90%.

**Length of Credit History:**   The older the credit is the better.  This category looks at the time since the first credit was opened and the average age of all the credit accounts.  It is common for young adults not to score as high as older adults due to the age of their credit files.

**New Credit:**  This is most often called inquiries.  The type and age of inquiry are important.  Hard inquiries are when consumers apply for credit.  These types of inquiries can impact a credit score.  Hard inquiries are considered if they occurred in the past 12 months.  Mortgage, auto and student loans inquiries that occur within a certain time frame only count as a single inquiry (for each one).  This is meant to not penalize a consumer's credit score for shopping around to get the best deal.  Soft inquiries do not impact a credit score.  Soft inquiries include promotional, employment, insurance and in most cases utility inquiries.  Soft inquires also include any consumer reports where the consumer gets or purchases their own credit history.

While soft inquires do not impact a credit score, there are soft inquiries that are applications for credit.  A judge or jury should understand that many companies now exist where they advertise the ability to apply and shop around for credit without having a hard inquiry.  An example is Lending Tree.  Lending Tree advertises that consumers can "Request a home loan, mortgage refinance, home equity loan, auto loan, or other loan from LendingTree's network of lenders who compete for your business".

LendingTree - 800-310-1860
https://www.**lendingtree**.com/ ▾ LendingTree ▾
Request a home loan, mortgage refinance, home equity loan, auto loan, or other loan
from **LendingTree's** network of lenders who compete for your business.

Lending Tree's Terms of Use states "LendingTree will perform a soft pull of credit regardless if you provide your SSN or not… It is possible that a Lender may perform a soft inquiry on your credit at the same time for the same or similar purposes, but

the soft inquiry into your credit does not impact your credit score."[14]  This is further supported by the soft inquiry the Plaintiff has from Experian on July 18, 2014. Prosper sent her an Adverse Action Letter (denial) on July 18, 2014 thanking her for her application and informing her they were unable to accept her loan request because no score was available through Experian.  In addition to Prosper's soft inquiry, the Plaintiff's credit reports indicated the following soft inquiries (I am only listing Equifax and Experian due to those are the reports that included the death indicator):

| Credit Reporting Agency | Creditor | Date |
|---|---|---|
| Equifax | Comenity Bank | November 12 2012 |
| Experian | Chase | June 21, 2014 |
| Experian | JP Morgan Chase | April 11, 2014 |
| Experian | Springleaf Financial | May 17, 2014 |
| Experian | WFDS | March 1, 2014 |

**Opinion #5:  It is my opinion the Plaintiff's credit scores suffered in part due to the number of times she applied for credit.  The Plaintiff's continued attempts to secure credit created an onslaught of credit inquiries which were adverse to her credit score.**

**Types of Credit Used:**  This category considers what types of credit accounts are reporting.  It is best to have a healthy mix of installment and revolving credit.

FICO released the following charts showing the impact of different types of mortgage delinquency.  This chart was released during the height of the mortgage foreclosure and short sale era.[15]   While these charts identify mortgage defaults, credit scoring works very much the same for other types of defaults.  For example, repossession with a deficiency balance would impact a consumer's credit score very similar to the foreclosure with a deficiency balance listed on the chart.   In this example, a repossession and foreclosure are both major derogatory events and they would include a past due balance.

---

[14] https://www.lendingtree.com/legal/terms-of-use
[15] http://bankinganalyticsblog.fico.com/2011/03/research-looks-at-how-mortgage-delinquencies-affect-scores.html

**Impact to FICO® Score**

| | Consumer A | Consumer B | Consumer C |
|---|---|---|---|
| Starting FICO® Score | ~680 | ~720 | ~780 |
| FICO® Score after these events: | | | |
| 30 days late on mortgage | 600–620 | 630–650 | 670–690 |
| 90 days late on mortgage | 600–620 | 610–630 | 650–670 |
| Short sale / deed-in-lieu / settlement (no deficiency balance) | 610–630 | 605–625 | 655–675 |
| Short sale (with deficiency balance) | 575–595 | 570–590 | 620–640 |
| Foreclosure | 575–595 | 570–590 | 620–640 |
| Bankruptcy | 530–550 | 525–545 | 540–560 |

FICO released the next chart during this same time period indicating the estimated time frame it takes to recover from different types of defaults. [16] Again, this was released during the height of the mortgage foreclosure and short sale era. I believe these charts were released to inform the public how certain actions will impact their credit scores as well as how long the impact will last.

**Estimated Time for FICO® Score to Fully Recover**

| | Consumer A | Consumer B | Consumer C |
|---|---|---|---|
| Starting FICO® Score | ~680 | ~720 | ~780 |
| Time for FICO® Score to recover after these events: | | | |
| 30 days late on mortgage | ~9 months | ~2.5 years | ~3 years |
| 90 days late on mortgage | ~9 months | ~3 years | ~7 years |
| Short sale / deed-in-lieu / settlement (no deficiency balance) | ~3 years | ~7 years | ~7 years |
| Short sale (with deficiency balance) | ~3 years | ~7 years | ~7 years |
| Foreclosure | ~3 years | ~7 years | ~7 years |
| Bankruptcy | ~5 years | ~7–10 years | ~7–10 years |

Note: Estimates assume all else held constant over time (e.g., no new account openings, no new delinquency, similar outstanding debt).

I included this credit score information so a judge and jury has a better understanding of the consequences a single event can have on a credit score. As an example, if a consumer had a 680 FICO score (Consumer A above), there is a very good chance their credit report includes a number of adverse credit events (late payment, collections…) leading to the 680 but the presence of a new single adverse credit event can reduce their score an additional 60 to 150 points and take between 9 months to 5 years to recoup. These charts assume the data furnishers are reporting the credit data correct. These charts are meaningless if the data furnishers are reporting inaccurate data.

---

[16] http://bankinganalyticsblog.fico.com/2011/03/research-looks-at-how-mortgage-delinquencies-affect-scores.html

I reviewed six mortgage credit reports on the Plaintiff and each of these credit reports only contained her Trans Union Classic 04 FICO score.  The oldest mortgage credit report I viewed is dated January 11, 2013 and she had a 581 Trans Union FICO score.  The most recent mortgage credit report I viewed is dated July 2, 2013 and she had a 603 Trans Union FICO score.  Each of these mortgage credit reports contained Experian's and Equifax's data but no FICO scores due to the reporting of the ECOA deceased code.

Each of the six mortgage credit reports contained unique and different data from each of the CRAs.  If she qualified for all three credit scores, each score would have been different in part due to how each CRA was reporting different data.  The Plaintiff's Trans Union report dated January 11, 2013, reported four MAJOR derogatory collections that were not reporting on her Equifax or Experian.  The Plaintiff's last Trans Union credit report I viewed dated July 2, 2013 reported three MAJOR derogatory (two collections and one charge off) that were not reporting on her Equifax or Experian.

**Opinion #6:  Based on the mortgage credit reports I reviewed, it is my opinion Trans Union reported additional major derogatory accounts and thus the Plaintiff's Trans Union FICO score would have been meaningfully lower than her Equifax and Experian FICO score (if she qualified for them).**

**Requirements to generate a FICO Score:**

Not every consumer has the necessary requirements to generate a FICO Score.  When the necessary requirements are not met, a consumer does not have a zero FICO Score, they simply have no score.  If a FICO Score is generated, that means they meet all three of the minimum requirements.

The minimum requirements needed to generate a FICO Score are[17]:

1. A credit report must contain at least one account that was opened at least 6 month ago.
2. A credit report must contain at least one undisputed account with activity reporting in the past 6 months. (the same account can satisfy requirements 1 and 2)
3. A credit report must contain no deceased indicators.

**Opinion #7:  Based on the credit reports I reviewed, it is my opinion none of the Plaintiff's Equifax or Experian credit reports qualified for a FICO Score due to the presence of a deceased indictor.  Each of her Equifax and Experian credit reports contained the other two requirements needed to**

---

[17] http://www.myfico.com/CreditEducation/questions/requirement-for-fico-score.aspx

**generate a FICO score (provided there was no deceased indicator).  Trans Union did not report any deceased indicator on any of the six mortgage credit reports I reviewed and therefore qualified for a FICO Score.**

## 7.  Explanation of Different Credit Scores

I am including this information should any credit scoring questions be presented now or at a future date.

Currently consumers seem to be surrounded by advertising on credit scores but no one seems to know what they mean.  Almost everyone I speak to is under the impression that any score they see is their "Credit Score".
It is vital that a Judge or jury understands the differences in scoring models. A scoring model can be built to determine the risk of any event. These models are built to determine the likelihood of a future occurrence. An example would be a FICO score predicts the likelihood of a consumer becoming 90 days or more delinquent during the next 24 months.  While a FICO score can't determine in advance the exact consumer who will default 90 days or more in the future, it can determine the chances based on past behavior a consumer will default 90 days or more in the next two years.  The graph below provides the percentage of consumers who will likely default 90 days or more in the next two years based off their current FICO score.



Thousands of scoring models exist but consumers have been led to think they just have one credit score. It is my experience almost all consumers believe any score they see is their FICO score. FICO scores are the most widely used in lending and are currently the only credit scores used in traditional first mortgage underwriting.  All first mortgage AUS (Fannie Mae, Freddie Mac, FHA, USDA and VA) uses the same FICO model score.  AUS uses Equifax Beacon 5.0, TransUnion FICO Classic (04) and Experian Fair Issac (Version 2).  Each of these score ranges can be slightly different but none of these scores can fall below 300 or exceed 850.  Each of

---

[18] http://www.myfico.com/products/scorewatch/sample/sample_means.aspx

these scores include 4 Key Factors and will include a notice if inquires impacted the score.  The inquiry notice is often misinterpreted as a fifth Key Factor.  The Fair and Accurate Transaction Act (FACTA) only requires the inquiry notice if it is NOT one of the top four Key Factors and if they are impacting the score.

Most credit score advertisements today are from credit monitoring services. These services offer an array of scoring models that lenders don't use. In most cases, these services use similar score ranges as FICO.  However, in the very small print they disclose the score is for education purposes only and they are not used in lending decisions.

These types of scores are often called "FAKO scores" as they are not used by lenders and therefore they are fake or useless in the lending world. I've seen examples of these "FAKO scores" purchased by consumers which are more than 100 points different, higher or lower than what their real FICO score is on the same day. Currently, at this time, a very small percent of banks are using Vantage Scores. Vantage scores are not used in the traditional first mortgage business but this may change in the future. Vantage scoring model was developed in 2006 by the big three CRA's. Vantage score is similar to FICO as it is designed to measure risk. Vantage scores can range to a maximum of 990 compared to FICO's 850.
I have found Vantage scores lead to more confusion with consumers. I recently spoke to a customer who said her credit score dropped almost 100 points in one day but she was comparing a Vantage Score to a FICO score. The ranges are different so this is simply not comparing apples to apples.  Recently, Vantage came out with a software update, version 3.0.  This version now uses a 300-850 score range.


## 8. Merged Credit Reports

A merged credit report is a credit report sold by Credit Resellers that merge (combine) two or more credit reports into a single easier to read report.  It is most common in the mortgage business to order what is called a tri-merge.  A tri-merge is a merged credit report containing data from Trans Union, Equifax and Experian.  It is faster and much easier to read one report rather than needing to review three separate reports.  The Credit Resellers acquire each credit report from the CRAs and then merge them using their own proprietary software.  The Credit Resellers have access to all of the full credit reports at all times.  At times, not all tradelines merge. If this is the case, the tradelines will appear more than once on a merged report and the tradeline will indicate what CRA the data is from.  These unmerged tradelines may look like duplicate reporting but they are not.  The most common reason I find that a tradeline does not merge is due to different data reporting from one CRA versus another, the Credit Resellers software may not completely merge the tradeline or may only partially merge the tradeline.  A partial merge is when they

merge two of the CRAs' data into a single tradeline and then report the remaining CRA data on a separate, single tradeline.

Typically a tri-merge credit report is ordered by the Mortgage Loan Officer, a Mortgage Processor or an Underwriter. Most loan originating software has the ability to choose the Credit Reseller and simply choose what type of credit report they want. A mortgage credit report can also be obtained by going directly to any Credit Resellers website, loging in and ordering whatever type of credit report is needed. Once a credit report is ordered, it is delivered electronically within seconds. If the credit report is ordered via a mortgage originating software, the credit report not only is delivered in seconds, it can auto populate the liabilities (tradelines) directly into the loan application.

Once the credit report is obtained by the mortgage professional, they can use that credit report in Automated Underwriting Systems (AUS). A mortgage professional just adds the credit report reference number into their AUS and that credit report automatically populates giving the AUS full access to it. AUS gets more than the tri-merge; they get electronic files with full access to all the data from each of the three CRAs.

**Opinion #8: It is my opinion the tri-merged credit report I reviewed from Credstar (Corelogic Credco) contained data from all three CRAs. Credstar (Corelogic Credco) had 100% access to the Plaintiff's individual credit reports from each CRA prior to merging it into a tri-merge report.**

## 9. The Importance of Accurate Reporting and Scoring

It's imperative that Credit Reporting Agencies (CRAs) and Data Furnishers (DF) report 100% accurate information. Credit scoring software (regardless of what type and version used) simply reads the data that is reported by the CRAs and computes a credit score. If the data is reporting 100% correct; your score will be 100% correct. If any of the data is reporting in error, the score you get would not be 100% accurate. Inaccurate data does not always lower a credit score. Depending on the exact inaccurate data, it will either improve or decrease a credit score. For this reason, it is important that consumers know what is being reported on their credit reports. By having an erroneous credit report and / or score, they may get unfairly turned down for credit or be subject to unfair higher interest rates.

The FCRA addresses the requirements that CRAs must follow in preparing credit reports. The FCRA states; "Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures

to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[19]

**Credstar (Corelogic Credco):** I only reviewed one credit report from Credstar. On this report, HSBC/Capital One was reporting the Trans Union data as a single tradeline and merged the Equifax and Experian data on a separate tradeline. On this report, Trans Union was not reporting a deceased indicator while Experian and Equifax were. This report contained a number of accounts with a current payment activity and at least two accounts that were opened after HSBS/Capital One started to report the deceased indicator. The Credstar report contained conflicting data that simply could not be accurate. They reported the Plaintiff as deceased while at the same time reported her alive, making payments and opening new accounts. In fact, they reported the HSBC/Capital One both as her being deceased and as her being alive.

**LexisNexis**: I reviewed four credit reports from LexisNexis. On January 6, 2014, LexisNexis sold three credit reports to three different insurance companies. The one report contained only Trans Union data and reported the Plaintiff as alive. The two other ones reported only Experian data and both these reports reported the Plaintiff as deceased. I was not provided any data on the time of the day that each of these three reports were generated, therefore I am not aware of the order they were generated. On March 7, 2014, LexisNexis provided a single Experian credit report to State Farm Auto Insurance Company indicating the Plaintiff was deceased. Each of the Experian reports contained conflicting data stating the Plaintiff was deceased while LexisNexis knew Trans Union was reporting the Plaintiff as alive. In fact, they reported the HSBC/Capital One as her being alive to one insurance company while reporting to the other insurance companies she was deceased.

**Opinion #9: Based on the documents I reviewed, it is my opinion Credstar (Corelogic Credco) and LexisNexis all reported conflicting data related to the Plaintiff being both deceased and alive. This conflicting data was not accurate and therefore it is my opinion none of them followed reasonable procedures to assure maximum possible accuracy with preparing the Plaintiff's credit reports.**

Accurate reporting plays a key role in more than just credit scoring. Lenders look at much more than just a 3 digit number. Credit reports contain a vast amount of information lenders use in making credit decisions.

I will provide some industry examples.

---

[19] Fair Credit Reporting Act

Auto lending certainly considers credit scoring but also reviews past auto loans, if any, to consider the payment history on previous and current auto loans. Auto lenders also review credit reports for past repossessions. The actual data on the credit report is very important. If an applicant has a good credit score with past repossessions, the lender may choose to decline the application or assign a higher interest rate. If an applicant has a lower credit score yet have previous perfect paid auto loans, the applicant may get approved for more favorable terms. Auto lending also reviews the credit reports for established payment histories. It is important to determine if a consumer can manage debt.

In mortgage lending, both the reported data and the FICO score are important. Based on my lending experience, the FICO score is first considered to see if programs exist. If the FICO score is high enough, other data gets reviewed. I will discuss this more in detail later in this report.

**Opinion #10:  Based on the documents I reviewed, it is my opinion the Credstar (Corelogic Credco) credit report I reviewed did not contain 100% accurate credit reporting,  therefore it would have led to inaccurate credit scoring (prevented Plaintiff from generating a score) or accurate approvals. Three out of four of the LexisNexis reports I reviewed contained inaccurate credit reporting which led to inaccurate credit scoring (prevents Plaintiff from generating a score) or accurate approvals.**

## 10.  Correcting Credit Reporting Errors

Consumers have the ability to dispute information on their credit reports directly with the CRAs or the data furnisher. A consumer can file a dispute with any CRA (including resellers) electronically (various websites), by mail or phone.

Once a CRA gets a notice of dispute, they start an investigation via software called e-OSCAR (Online Solution for Complete and Accurate Reporting). Based on the nature of the dispute, the CRA assigns a dispute code to the dispute and can add specific dispute reasons. The CRA electronically submits an Automated Consumer Dispute Verification (ACDV) to the data furnisher. Once the data furnisher receives an ACDV, they investigate the dispute and report the results of their investigation on the ACDV to the CRAs, generally within 30 days (45 days if using www.annualcreditreport.com). The data furnisher updates the ACDV to reflect one of three options. They can update it to report unchanged, modify the reporting of the tradeline or delete the tradeline. If the data furnisher chooses to modify the tradeline, the ACDV would include the updated or modified data so the CRA can modify the tradeline.

The credit reporting agencies (CRAs) and credit data furnishers are required under the Fair Credit Reporting Act (FCRA) to report fair and accurate reporting. They also must "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…."[20]

The Fair Credit Reporting Act (FCRA) 1681 s-2(b) requires[21]:

**(b)   Duties of Furnishers of Information upon Notice of Dispute**

    (1)   *In general.*   After receiving notice pursuant to section 611(a)(2) [§ 1681i] of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall

        (A)   conduct an investigation with respect to the disputed information;

        (B)   review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [§ 1681i];

        (C)   report the results of the investigation to the consumer reporting agency;

        (D)   if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

        (E)   if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly–

            (i)   modify that item of information;

            (ii)   delete that item of information; or

            (iii)   permanently block the reporting of that item of information.

The accuracy of the credit reporting is the only way to get accurate credit scores and fair underwriting.   Data furnishers and the CRAs have a great responsibility to the public to ensure they follow these requirements.

On June 19, 2013, the Plaintiff disputed her HSBC/Capital One.  On June 19, 2013, Experian and Equifax each sent HSBC/Capital One an ACDV.  HSBC/Capital One was put on notice that the Plaintiff launched a proper dispute indicating she was not deceased.  I was not provided information on the reason why HSBC/Capital One reported the ECOA code of "X".  I do understand that once HSBC/Capital One

---

[20] Fair Credit Reporting Act
[21] Fair Credit Reporting Act

received the ACDV's, they were required to conduct an investigation related to the Plaintiff's dispute.

Experian ACDV:  Experian sent an ACDV electronically to HSBC/Capital One on June 19, 2013.  Experian's ACDV had a due date of July 12, 2013.  This due date gave HSBC/Capital One twenty-four days to complete their investigation.  On July 1, 2013, thirteen days after receiving the ACDV, HSBC/Capital One's employee, Gamie Arroyo, responded to Experian instructing Experian to make some modifications to the reporting but to continue to report the ECOA code of "X".  Gamie Arroyo provided Experian with a contact phone number of 503-851-6704.  I did not receive information related to what Gamie Arroyo's investigation detailed but his/her investigation didn't result in the removal of the Plaintiff's erroneous ECOA "X" code.  Somehow after thirteen days, Gamie Arroyo must have "verified" the Plaintiff was deceased since he/she did not delete the ECOA "X" code.

Equifax ACDV:  Equifax sent an ACDV electronically to HSBC/Capital One on June 19, 2013.  Equifax's ACDV had a due date of July 13, 2013.  This gave HSBC/Capital One 25 days to complete their investigation.  On July 2, 2013, fourteen days after receiving the ACDV, the Defendant's employee, Viswanath Gudivada, responded to Equifax instructing Equifax to make some modifications to the reporting but to continue to report the ECOA code of "X".  Viswanath Gudivada provided Equifax with a contact phone number of 702-243-1040.  I did not receive information related to what Viswanath Gudivada's investigation detailed but his/her investigation did not result in the removal of the Plaintiff's erroneous ECOA "X" code.  Somehow after fourteen days, Viswanath Gudivada must have "verified" the Plaintiff was deceased since he/she did not delete the ECOA "X" code.

It seems odd to me that either of Capital One processors could have verified the Plaintiff was deceased since I am aware she is alive and well.  It appears to me if HSBC/Capital One ACDV processors conducted a reasonable investigation, they would have either verified the Plaintiff was alive or they would have concluded that they could not verify if she was alive or dead.  If they were unable to verify if she was alive or dead, according to the FCRA, they should have modified or deleted the ECOA "X" code.

It seems reasonable to me that any investigation would have included the following:

First, I would think the ACDV processors would have considered the nature of the dispute.  I would expect that well over 90% (if not 99%) of Capital One disputes are related to something other than an improper deceased indicator.  I would expect their processors would have wondered why a deceased person would be disputing their account years after the ECOA "X" code was added.  I have no idea why Capital One would assign two different ACDV processors to investigate the Plaintiff's dispute that she was alive.  It appears these processors didn't even work together since they had different phone numbers with different area codes.  It

21

makes zero sense that a single Capital One employee was not responsible for conducting the Plaintiff's dispute.  I may be wrong since I have no information related to the steps Capital One took to investigate this and perhaps, these two processors worked as a team.

I would think any investigation by Capital Ones processors would have included contacting the Social Security Administration or reviewing the Social Security Administration Death Master File to see if the Plaintiff was listed as deceased.  They could have gone to www.ssdmf.com or via an app on their phone to investigate the Social Security Administrations Death Master File.

I would think Capital Ones processors would have pulled the Plaintiff's credit report as part of their investigation.  If they did, they would have verified the Plaintiff had at least sixteen inquiries on Equifax, thirteen inquiries on Experian and fifteen inquires on Trans Union after the date HSBC/Capital One added their ECOA "X" code and the date of the June 19, 2013 dispute.  The Plaintiff's credit report would have also indicated the Plaintiff's open accounts with Ally Financial, Chase and Royal Credit Union which were reporting each month as paid as agreed.  A deceased person clearly would not be applying for credit, opening new credit and make monthly payments on their obligations.

If HSBC/Capital One checked their internal records or any of the inquires as stated above, they would have noticed the Plaintiff applied for a vehicle loan with Capital One on or about April 24, 2012.  This financing application was made through Chilson Chrysler Dodge LLC.  It is my experience that the first thing auto salesman do is photo copy a prospective clients driver's license.  Clearly the Plaintiff was alive when she applied for her auto financing with Capital One.  It is interesting to note that Capital One did approve the Plaintiff's application.  I have proof that Capital One pulled the Plaintiff's Equifax, Experian and Trans Union credit reports on April 24, 2012.  I know Equifax and Experian credit reports contained an ECOA code of "X", so the Plaintiff would not have met the minimum credit score requirement.  Capital One would have used the Plaintiff's Trans Union credit report, where they would have received the necessary score they needed to generate an approval.  This is alarming that in April 2012, Capital One had the proof they were reporting inaccurate data on the Plaintiff's credit reports and they didn't take the steps to correct their errors.  It too would be alarming if their ACDV processors did not review this information as part of their June 2013 investigations.  Lastly, I find it VERY alarming that Capital One had credit reports indicating the Plaintiff was deceased yet they still approved her application in an attempt to make a profit from her.  Her approval stated "Tier 6" indicating their "Buy rate and/or fee will increase for back end % >=15.01."  Capital One acted recklessly when they granted the Plaintiff their high interest rate approval.


**Opinion #11: Based on the documents I reviewed, it is my opinion Capital One failed to conduct a reasonable investigation which led them to continue to**

report the ECOA "X" code.  If Capital One was unable to verify the Plaintiff was deceased, they should have deleted the "X" code.  Capital One attempted to profit from the Plaintiff after they themselves reported her as deceased rather than taking the steps to correct their inaccurate reporting.

## 11.  Real Financial Loss Due To Inaccurate Credit Reporting

I previously discussed how inaccurate credit reporting equates to consumers having inaccurate credit scores as well as inaccurate credit reports.  We now live in a world that revolves around risk.  Derogatory credit and lower credit scores equates to greater risk and leads to more credit denials and higher interest rates.  Higher interest rates compensate banks for taking on higher risk credit.  Paying higher interest rates to offset higher risk is generally referred as risk based pricing. The following are some of the categories where inaccurate credit reporting leads to financial losses for consumers.

**Mortgage lending:**

First and second mortgage lending requires credit reports and credit scores.   The credit reports and credit scores are used both in the application decision process and the credit score plays a key part in determining the interest rate.  Interest rate adjustments based on credit scores can be substantial.  The mortgage application can only receive an accurate approval and accurate interest rate if the credit is reporting accurate.

The Plaintiff had the following inquires (hard and soft) where her mortgage requests were denied.  These are only the ones I am aware of, more may exist.  I am only showing the ones where Equifax and Experian reports were used since they are the only CRAs that were reporting the ECOA "X" code.

Equifax: Kroll Factual Data 1/11/2013, 1/22/13, 3/12/13 and 6/5/13, Credco/ Quicken Loans 2/22/13, and Equifax Mortgage Services 7/2/13.   I have not been provided any information on the exact date Equifax removed the deceased indicator off the Plaintiff's HSBC / Capital One Bank tradeline.  I did review an Equifax document[22] dated 8/3/2014 stating the HSBC #517669002400 is currently not reporting on her file.

Experian: Kroll Factual Data 1/11/2013, 1/22/2013, 3/12/2013 and 6/5/2013, Credco/Quicken Loans 2/22/2013, Equifax Mortgage Services

---

[22] EIS-WALETZKO-000008

7/2/13, and 1st National Bank of Omaha 7/26/13.  I have not been provided information on the exact date Experian removed (if they ever removed) the deceased indicator off the Plaintiff's HSBC / Capital One Bank tradeline.  I reviewed an ACDV dated 1/13/2015 confirming the deceased indicator was reporting as of that date.  The "On Profile" reports an ECOA code of "X".


**Auto Lending, Business Loans, Credit Card, Retail Cards……………………**

I have not worked in these industries but I have a great deal of experience with consumers and lending practices.  I know finance managers in the auto business and have a good understanding of their lending practices.  Credit scores and credit histories are factored in both the approval and in many cases if approved the interest rate charged.

The Plaintiff had the following inquires (hard and soft) where her auto and credit card requests or potential credit opportunities were denied or not offered.  These are only the ones I am aware of, more may exist.

Equifax: GECRB 11/28/2011, Capital One 4/24/2012 (she did get an Ally Financial auto loan in April 2012 but the approval was based on her Trans Union credit repot), CBNA 11/10/2012, Comentiy Bank 11/12/2012, Discover Financial Services 1/14/2013, True Credit/Chase 3/12/13, Medallion Bank 5/31/13, True Credit/TUS 5/31/13, SCUSA Chrysler Cap 9/28/2013 and 3/1/13, Kay Jordan 5/7/14, DR. Leonard's 5/12/2014, Brookwood Loans, Mason 6/18/2014, Capital One Auto Fin 7/7/2014 and Capital One Bank USA 7/9/2014.  I have not been provided any information on the exact date HSBC/Capital One or Equifax removed the deceased indicator off the Plaintiff's HSBC / Capital One Bank tradeline.  I did review an Equifax document[23] dated 8/3/2014 stating the HSBC #517669002400 is currently not reporting on her file.

Experian: Kohls/Capital One 11/21/2011, Capital One Auto Finance 4/24/2012 (she did get an Ally Financial auto loan in April 2012 but the approval was based on her Trans Union credit repot), Citi Card/Citibank 11/10/2012, Springleaf Financial Services 4/29/2013, 4/30/2013 and 5/23/2013, 700 Credit/Jack Links AU 5/25/2013 and promotional inquiries, WFDS 3/1/14 (she did secure an auto loan in March 2014 but I believe Wells Fargo would have made a hard inquiry with Trans Union), Springleaf Financial Services 3/17/2014, JP Morgan Chase Bank NA 4/11/2014, Chase 6/21/2014, Prosper/Webbank 7/18/2014, Rise 9/15/2014 and 10/20/2014, Lending Club Corp 9/16/2014, SYNCB/Sams 9/17/2014, Capital One 10/4/2014, 10/11/2014, 10/18/2014 and 10/24/2014,

---

[23] EIS-WALETZKO-000008

Springleaf 3/17/2014, 10/4/2014, 10/24/2014, 12/08/2014 and Chase Card 12/21/2014. I have not been provided information on the exact date HSBC/Capital One or Experian removed (if they ever removed) the deceased indicator off the Plaintiff's HSBC / Capital One Bank tradeline.

**Insurance Companies use of credit reports and credit scores:**

It is common for insurance companies to use a CLUE (Comprehensive Loss Underwriting Exchange) report now. Lexis Nexis/Choice Point also sells a score known as Attract Score. This score uses in part, information off of a consumer's credit report. This information is used to determine if an applicant is approved as well as at what rate. The FTC also confirmed how the use of credit scores is used in the insurance industry.[24]
The Plaintiff had the following soft inquires by Experian related to getting new or lower cost insurance; Progressive Insurance 1/6/2014, LexisNexis/Statefarm 1/6/2014 and 3/7/2014 and LexisNexis/Esurance 1/6/2014. I believe each of these inquiries reported the HSBC/Capital One Bank deceased indicator.

**Credit reporting and employment:**

More employers than ever are using information on applicants credit report. According to Society for Human Resource Management 60% of employers are now reviewing credit reports on new job applicants.[25] I recently spoke to a woman who was turned down for a pet sitting job due to her credit report.

It is important to note, only credit reports are issued to employers and do not include credit scores.

**Opinion #12: Based on the documents I reviewed, it is my opinion the Plaintiff experienced financial losses due to the Defendants' reporting of HSBC / Capital One deceased indicator. The Plaintiff experienced financial losses in her inability to buy a home, get the lowest available auto loan interest rates, shop around for the best auto insurance and her inability to open other types of new credit that would have helped her continue to build a solid credit rating.**

---

[24] http://www.statefarm.com/_pdf/ftcreport.pdf
[25] http://www.usatoday.com/money/workplace/2011-04-07-creditreports-in-hiring-decisions.htm

## 12.  Credit Reporting and Score Impact On Mortgage Lending

As previously mentioned, I've been in the mortgage business before credit scores were used. An applicant's credit history has always been a key indicator in the decision process of being approved for a mortgage. Before the use of credit scoring, banks would have credit guidelines that needed to be met to approve a loan. It was quite simple to review a credit report and look to see what late payments were reported. Once a Loan Officer obtained an applicant's credit report, an experienced Loan Officer could quickly determine if an applicant would be approved or denied (based on credit) within minutes.

**Mortgage underwriting uses Credit Reports in four different ways.**

1.     **Automated Underwriting Systems (AUS)**

In the mid to late 1990's, lending guidelines quickly began to change as many lenders were adapting credit scoring as part of their approval process. At first, a consumer needed to meet a certain credit score and certain credit standards (example 1 x 30 on a mortgage). Credit scoring continued to advance and change the face of lending. During the late 1990s lenders were starting to use custom computer software to determine the eligibility of a loan.  This software is called Automated Underwriting Systems (AUS).  This quickly led to almost 100% automated underwriting. After AUS took over, computers replaced underwriters in determining if an applicant would qualify. I remember trained underwriters complaining that they have become nothing more than babysitters to the computers. I also remember Loan Officers, including myself, being shocked at some of the loans that ended up getting approved by AUS.

Today, AUS is still the dominant decision maker for loans. After the 2008 housing and mortgage collapse almost all loans are run through Fannie Mae (known as Desktop Underwriter / Originator, DU/DO), Freddie Mac (known as Loan Prospector, LP).  Prior to the housing and mortgage crisis, there were so many other types of loan products available to choose from including sub-prime.  All of these alternative loan products QUICKLY went away and Fannie Mae and Freddie Mac were about the only options.  Right around this same 2008 or so timeframe, lenders more than ever relied on the need to get an approval from either DU or LP or the loan application would almost always be denied.  All of these loans are run through AUS and an answer is generated, approved or denied (various other terms are used with the same meaning). One of the factors in the AUS decision process is the applicants FICO score. While other credit factors are considered, such as past mortgage history, time since bankruptcy, and time since foreclosure; the FICO credit score plays a big role.  Currently Fannie Mae and Freddie Mac will not purchase a loan with a mid FICO score less than 620 (exception for non-

26

traditional credit). FHA has FICO restrictions as well. FHA credit score minimums seem to vary from bank to bank.

Similar to many types of other software, AUS has changed with the times.  AUS needs to efficiently approve or deny mortgage applications based on many factors.  These factors are credit risk, collateral, and capacity.   Here is a brief explanation of each of these.

**Credit Risk:** This is the overall picture of the credit risk associated with the file.  A great deal is included in this evaluation.  Payment histories, length of credit history, type of debts, derogatory payment histories, level of derogatory, presence of a major derogatory, are a few of the considerations.  Keep in mind that AUS does take into account a great deal of credit history when it considers applications for approval.  In addition to any particular negative credit event, AUS also considers the date of the event.  The date of any delinquency and level of delinquency is essential to be accurate, if it is not, a credit deal can get denied when it should have been approved.

**Collateral:**  This area deals with the type of property (how many units, single or multi family, mobile home…..), the occupancy of the property (owner occupied, second home, investment), the equity in the property (LTV, loan to value) to name a few.  Each of these areas contains different levels of risk.  As an example, an owner occupied home at 50% LTV possesses much less risk than an investment property at 90% LTV.

**Capacity:** This deals with the ability to repay debts.  This is referred to DTI which stands for Debt to Income ratio.  DTI is looked at in two ways.  The front end considers debt to income for the mortgage payment itself (principle, interest, taxes, insurance and mortgage insurance).  The second DTI is referred to the back end and this includes the mortgage payment (principle, interest, taxes, insurance and mortgage insurance) along with all other obligations such as minimum payments on credit cards, student loan payments, auto payments and any other bank debts.  Utility bills, monthly living expenses, taxes (other than real estate) insurance payments (other than home owners) and other type of non-bank debts are not considered in this.  Rental income and rental debt are calculated different and I will address this later in my report.  The lower the combined DTI is, the less the risk.

Many consumers fail to understand how AUS makes credit decisions.  The software determines if the risk exceeds the build in tolerance.   It is important to note that AUS can only make accurate findings (risk assessment) if it understands the data it generates.  What I mean is if the data received is inaccurate, misleading, unclear or misinterpreted the AUS will either not be able to determine the credit risk (deny a loan that should have been approved) or worse make an inaccurate risk assessment that may lead

to an approval on a loan that should have been denied.  AUS systems are very sophisticated but the findings are only as accurate as the data received.

The following was taken directly from the most recent Fannie Mae Seller Guide published October 22, 2013.

Public Records, Foreclosures, and Collection Accounts

*"A credit history that includes any significant derogatory credit event that was reported as a public record, such as bankruptcy filings, foreclosures, deeds-in-lieu of foreclosure, judgments, tax liens, or accounts that have been turned over to a collection agency, is considered a high risk.  The more recently such events occurred, the more adverse the impact is on the credit profile.  Although most public record information is retained in the credit history for seven years (ten years for bankruptcies), as time passes, it does become less significant to DU's credit evaluation".[26]  "The presence of significant derogatory credit events dramatically increases the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, and short sales". [27]*

AUS looks at the entire loan file to determine their findings.  No two files are alike so one loan with a high LTV may get denied while a similar high LTV file may get approved.  A high LTV loan with layers of credit and capacity risk is likely to get denied.  A high LTV loan with no layers of credit or capacity risk is likely to get approved.  A file with layers of credit risk may get approved due to low LTV……… understand, AUS takes the entire loan file into consideration.

In order for a loan to make it to funding, a human must now review the credit report to determine the presence of certain significant derogatory credit.  Certain types of significant derogatory credit will lead to a denial REGARDLESS of the AUS findings.  The presence of a significant derogatory (bankruptcy, foreclosure, short sales, collections, charge-offs, mortgage late payments and judgments) does not automatically lead to a denial, it does require additional review to determine when the event occurred.  Depending on the significant derogatory, mortgage products have certain waiting periods which must be met before considering the loan application for approval.

## 2.       FICO Score

---

[26] Fannie Mae Single Family Sellers Guide published October 22, 2013
[27] Fannie Mae Single Family Sellers Guide published October 22, 2013

FICO scores are used to determine program eligibility and pricing (interest rate).  FICO scores are used in AUS, program overlays and underwriting.  Credit scores are the most important factor in determining the interest rate.  In 2008, Fannie Mae (Freddie Mac has a similar policy) created Loan Level Pricing Adjustments (LLPA), this is also referred to as Risk Base Pricing.[28]  The chart below provides an example of how LLPA works.  The chart below is what I would call a base chart, meaning additional pricing add-ons may apply.  Cash-out refinance and investments properties in particular are subject to additional add-ons.  There are no add-ons for specific credit reporting events, as an example if an applicant had a past foreclosure; there is not a specific add-on.  I believe this is due to the FICO credit score already factors in the foreclosure.

| Table 2: All Eligible Mortgages (excluding MCM) – LLPA by Credit Score/LTV Ratio | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | LTV Range | | | | | | | | |
| | ≤ 60.00% | 60.01 – 70.00% | 70.01 – 75.00% | 75.01 – 80.00% | 80.01 – 85.00% | 85.01 – 90.00% | 90.01 – 95.00% | 95.01 – 97.00% | SFC |
| Representative Credit Score | Applicable for all mortgages with terms greater than 15 years  For whole loans purchased on or before August 31, 2015, or  loans delivered into MBS pools with issue dates of August 1, 2015 or earlier | | | | | | | | |
| ≥ 740 | -0.250% | 0.000% | 0.000% | 0.250% | 0.250% | 0.250% | 0.250% | 0.250% | N/A |
| 720 – 739 | -0.250% | 0.000% | 0.250% | 0.500% | 0.500% | 0.500% | 0.500% | 0.500% | N/A |
| 700 – 719 | -0.250% | 0.500% | 0.750% | 1.000% | 1.000% | 1.000% | 1.000% | 1.000% | N/A |
| 680 – 699 | 0.000% | 0.500% | 1.250% | 1.750% | 1.500% | 1.250% | 1.250% | 1.000% | N/A |
| 660 – 679 | 0.000% | 1.000% | 2.000% | 2.500% | 2.750% | 2.250% | 2.250% | 1.750% | N/A |
| 640 – 659 | 0.500% | 1.250% | 2.500% | 3.000% | 3.250% | 2.750% | 2.750% | 2.250% | N/A |
| 620 – 639 | 0.500% | 1.500% | 3.000% | 3.000% | 3.250% | 3.250% | 3.250% | 3.000% | N/A |
| < 620 (1) | 0.500% | 1.500% | 3.000% | 3.000% | 3.250% | 3.250% | 3.250% | 3.250% | N/A |
| Representative Credit Score | Applicable for all mortgages with terms greater than 15 years  For whole loans purchased on or after September 1, 2015, or  loans delivered into MBS pools with issue dates on or after September 1, 2015 | | | | | | | | |
| ≥ 740 | 0.000% | 0.250% | 0.250% | 0.500% | 0.250% | 0.250% | 0.250% | 0.750% | N/A |
| 720 – 739 | 0.000% | 0.250% | 0.500% | 0.750% | 0.500% | 0.500% | 0.500% | 1.000% | N/A |
| 700 – 719 | 0.000% | 0.500% | 1.000% | 1.250% | 1.000% | 1.000% | 1.000% | 1.500% | N/A |
| 680 – 699 | 0.000% | 0.500% | 1.250% | 1.750% | 1.500% | 1.250% | 1.250% | 1.500% | N/A |
| 660 – 679 | 0.000% | 1.000% | 2.250% | 2.750% | 2.750% | 2.250% | 2.250% | 2.250% | N/A |
| 640 – 659 | 0.500% | 1.250% | 2.750% | 3.000% | 3.250% | 2.750% | 2.750% | 2.750% | N/A |
| 620 – 639 | 0.500% | 1.500% | 3.000% | 3.000% | 3.250% | 3.250% | 3.250% | 3.500% | N/A |
| < 620 (1) | 0.500% | 1.500% | 3.000% | 3.000% | 3.250% | 3.250% | 3.250% | 3.750% | N/A |

(1)  A minimum required credit score of 620 applies to all mortgage loans delivered to Fannie Mae in accordance with the *Selling Guide*; exceptions to this requirement are limited to loans in which all borrowers have nontraditional credit.

[29]

### 3.        Lender Overlays

Lender overlays are additional guidelines, over and above AUS findings, imposed by lending institutions.  These overlays became popular after the 2008 mortgage crisis.  Some of the common overlays include maximum debt ratios, maximum loan to values, credit score restrictions and credit reporting restrictions (foreclosure, short sale, collections, mortgage lates, judgments, bankruptcy and charge-offs).  In short, an AUS approved loan may get denied due to the tighter overlay restrictions.

---

[28] http://themortgagereports.com/2770/llpa-loan-level-pricing-adjustments
[29] https://www.fanniemae.com/content/pricing/llpa-matrix.pdf

4.        **Underwriting**

An amazing thing happened in the mortgage industry post the 2008 mortgage crisis, Underwriters actually underwrite loans.  What I mean by this is underwriters take the AUS approvals and review the loan file to make sure each and every condition is met.  While Fannie Mae and Freddie Mac allow for what is called manual underwriting, post the housing and mortgage crisis of 2008, the banks that offered manual underwriting were and are nowhere to be found.  By having an AUS approve or accept findings, the user (lender) is limited on their buy back requirements.  If the lender confirms all the data was entered correct (income, assets, job history……) they are in the clear because it was AUS that generated the approval and determined if the applicant met the credit risk requirements.  Keep in mind, an underwriter is still responsible for making sure waiting periods after a major mortgage credit event occurred were met as well as to ensure the data entered into DU or LP's final submission was 100% accurate.  After the start of the 2008 housing and mortgage crisis it made zero sense for lenders to take on more risk and that is why AUS approvals became the new industry standard.  Prior to 2008 housing and mortgage crisis, many risky loan products were available such as sub-prime, Alt-A, no income document loans and negative amortization option arm loans.  Most if not all of these risky loan programs became extinct in 2008 or so.

The credit score AUS and underwriters use for underwriting and pricing is called the Representative Score.  "The representative credit score for the mortgage loan is determined based on the credit scores of each borrower and is used to determine loan eligibility and for pricing purposes (i.e., assessing LLPAs). Follow these steps to calculate the representative credit score for a mortgage:".   The industry standard is to get reports and scores from Trans Union, Experian and Equifax and use the middle of those three scores.

| Step | Description |
|------|-------------|
| 1 | Fannie Mae recommends obtaining at least two credit scores for each borrower. |
| 2 | Select a single applicable score for underwriting each borrower.<br><br>• When two credit scores are obtained, choose the lower score.<br>• When three credit scores are obtained, choose the middle score. (If two of the three scores are the same, choose the middle of the three scores. For example: 700, 680, 680 = 680; 700, 700, 680 = 700) |
| 3 | If there is only one borrower, the single applicable score used to underwrite that borrower is the representative credit score for the mortgage.<br>If there are multiple borrowers, determine the applicable credit score for each individual borrower and select the lowest applicable score from the group as the representative credit score for the mortgage. |

30

---

[30] https://www.fanniemae.com/content/guide/selling/b3/5.1/02.html

A single credit score is not acceptable.  I found another client who had the same exact deceased indicator on his Experian and Equifax as the Plaintiff.   Similar to the Plaintiff, this consumer only generated a credit score with Trans Union (they did not have the deceased indicator) "Bank of America representatives told him a report from just that agency was not sufficient."[31]

**Opinion #13:  Based on the six mortgage credit reports I reviewed, it is my opinion none of these credit reports contained an industry standard or any Representative Score.  None of these mortgage credit reports contained sufficient credit scoring and accurate credit reporting to have any chance of mortgage approval.**


## 13.  Deceased Identity Theft

One form of Identity Theft is when an account is fraudulently opened using the personal information of another.  This type of Identity Theft is referred to as Ghosting.  The sad truth is even after a consumer becomes deceased, they can still fall victim to Identity Theft.  Millions of deceased become victim to Identity Theft each year with nearly a third of them intentionally targeted.[32]  The American Association of Retired Persons (AARP) recommends family members of the deceased "Using certified mail with "return receipt," send copies of the death certificate to each credit-reporting bureau — Equifax, Experian and TransUnion — asking them to place a "deceased alert" on the credit report…" in an effort to thwart Identity Theft.[33]  The IRS provides the same advice as AARP, "Send copies of the death certificate to each credit reporting bureau asking them to put a "deceased alert" on the deceased's credit report."[34]

Identity theft exists in the mortgage market. An example of mortgage identity theft provided by The Financial Services Round Table is, "Sam knows that, due to his negative credit history, he will most likely be denied for a mortgage. Therefore, he provides his deceased father's personal information on the application and uses fake documentation to represent his income and job title."[35]

---

[31] http://blog.timesunion.com/advocate/earth-to-experian-hes-not-dead-yet/3207/

[32] http://member.aarp.org/money/scams-fraud/info-03-2013/protecting-the-dead-from-identity-theft.html

[33] http://member.aarp.org/money/scams-fraud/info-03-2013/protecting-the-dead-from-identity-theft.html

[34] http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Deceased-Taxpayers-Protecting-the-Deceaseds-Identity-from-ID-Theft

[35] https://www.fanniemae.com/content/tool/mortgage-fraud-prevention-consumers.pdf

Mortgage giant Fannie Mae has a Mortgage Fraud Program identifying Red Flags to help prevent fraud.  One of their Red Flags is any credit reports listing any Social Security number, death or fraud alerts.[36]

The risk of fraud / Identity Theft dictates why a bank would not want to establish a new account to a consumer who has a deceased indicator on their credit report.  "The **Red Flags Rule** was created by the Federal Trade Commission (FTC), along with other government agencies such as the National Credit Union Administration(NCUA), to help prevent identity theft. The rule was passed in January 2008, and was to be in place by November 1, 2008. But due to push-backs by opposition, the FTC delayed enforcement until December 31, 2010."[37]  In part, the Red Flag Rules require lenders to establish "A program must include reasonable policies and procedures to identify the red flags of identity theft that may occur in your day-to-day operations. Red Flags are suspicious patterns or practices, or specific activities that indicate the possibility of identity theft.[3] For example, if a customer has to provide some form of identification to open an account with your company, an ID that doesn't look genuine is a "red flag" for your business."[38]  While each creditor determines their own procedures to identify suspicious activities to prevent identity theft, it is reasonable to conclude the presence of a deceased indicator on a credit report would be considered a suspicious activity.

Equifax is aware of how important it is not to be declared deceased.  I found the following consumer question and answer from an Equifax moderator.[39]  The moderator provided a link to the consumer on how to dispute the inaccurate deceased reporting by Equifax.

***Deb D* says:**
*September 9, 2013 at 4:47 pm*

I have an account on my credit report that is not mine, it's a Wal-Mart charge account. The account in question was my husbands and I was never an authorized user on this account how it ended up on my report is a mystery to all involved but not only that the account wasn't and isn't in bad standings it has been closed since 2007 ***the problem is I was reported deceased since 2007…*** I am working on getting that off but what I'm wondering about is all the inquiries that are on my report it seems that when I applied for a loan it obviously comes up deceased and instead of someone telling me their findings they continue doing inquiries with other companies in hopes of a different outcome. Since this is a domino effect, I disputed a bunch of those inquiries are they going to be removed??

Reply

---

[36] https://www.fanniemae.com/content/tool/common-red-flags.pdf

[37] https://en.wikipedia.org/wiki/Red_Flags_Rule

[38] https://www.ftc.gov/tips-advice/business-center/guidance/fighting-identity-theft-red-flags-rule-how-guide-business

[39] http://blog.equifax.com/credit/checking-your-equifax-credit-report-8-things-to-look-for/

- ***EFX Moderator, KB* says:**

  <u>September 11, 2013 at 3:19 pm</u>

  Deb, sorry to hear about your issue. The problem of your being deceased is certainly inaccurate. You may have an error in your credit report. Here is a link on what to do if you think there might be an error in your credit report:http://blog.equifax.com/credit/what-to-do-if-you-think-theres-an-error-on-your-credit-report/

Experian understands how the deceased indicator prevents lenders from granting new credit. Experian provides the following advice on what happens once you die. "Experian doesn't close or delete a credit file immediately after a person dies. Instead, the file will be "flagged" to indicate the individual is deceased. Doing so is important because it actually helps prevent using the deceased's identity to commit fraud. If someone were to try to use the dead person's identity to apply for credit, the lender would receive a "deceased indicator" and would be able to stop the transaction and take appropriate action."[40]

While Experian and Equifax understand how deceased indicators are a method of preventing ID Theft, it appears Capital One does not. Capital One Auto Finance approved the Plaintiff's auto loan request in 2012 when they knew two out of three of her credit reports listed her as deceased. As a matter of fact, their very own company was the one who was reporting her as deceased.

**Opinion #14: Based on the information I reviewed, it is my opinion no creditor who obtained any of the Plaintiff's credit reports that contained a deceased indicator approved her credit requests regardless of any other qualifications. Creditors have Red Flag rules to prevent fraud and identity theft. Capital One must not have adopted reasonable policies and procedures to identify the red flag of Identity Theft since they attempted to grant her credit while they had indications she was deceased.**

## 14. Credit Reputation

After dealing with thousands of credit and mortgage clients, I understand the value of credit reputation. Dealing directly with clients provides me with firsthand knowledge of how personal credit is viewed by the client. "Reputation" is defined as[41]: the estimation in which a person or thing is held, especially by the community

---

[40] https://www.experian.com/ask-experian/20081029-what-happens-to-your-credit-file-when-you-die.html

[41] http://dictionary.reference.com/browse/reputation

or the public generally; repute: a man of good reputation.  Credit reputation is simply how a consumer's credit is viewed.  Do they pay their bills or not?  During my career I heard co-workers refer to clients with impaired credit as scum bags, dead beats, low life's or other derogatory terms.

The majority of consumers that I deal with take great pride in their credit.  Based on my lending experience, lenders judge applicants based on the information being reported on their credit reports as fact.  Basically if the credit report says it, then it must be true and the consumer's credit application is judged as such.

The Plaintiff's credit reputation was damaged each time she applied for credit while the Defendants' reported a deceased indicator.  The Plaintiff indicated she was belittled and made fun of due to her credit report indicating she was deceased.  The belittling and being the brunt of jokes she heard is in addition to any reputation that occurred behind the scenes.  The credit requests she made with a credit report containing a death indicator were high risk to creditors due to potential fraud and identity theft.  Some of the past creditors may have felt she was attempting to commit a crime by trying to commit fraud or identity theft.

**Opinion #15:  Based on the information I reviewed, it is my opinion the Plaintiff suffered significant damage to her credit reputation from every creditor who received a credit report from the Defendants reporting the Plaintiff as deceased.**

## 15.  Emotional and Psychological Stress

After dealing with thousands of credit and mortgage clients, my understandings of the emotional roller coaster people go thru when dealing with credit errors is based on fact.

My expertise in this field is from my direct experience dealing with clients who have suffered great amounts of emotional and psychological stress.  Inaccurate credit reports lead to frustration, anger, sickness, hopelessness, personal relationship issues, sleeplessness and many other ugly traits.  The Plaintiff was not deceased.  She was not to blame for Equifax and Experian's credit reporting errors.  Based on what I read, she has likewise suffered these emotional upsets.

The Plaintiff's handwritten dispute from June 2013 explains exactly how the Defendants' deceased reporting was "destroying" her life[42] (see below).  I would

---

[42] FD000071

imagine this anger, frustration, hopelessness and other traits only worsened when
she found out HSBC/Capital One refused to correct this.



**Opinion #16:  Based on the information I reviewed, it is my opinion the
Plaintiff suffered Emotional and Psychological Damages due to the actions of
the Defendants.   The Plaintiff followed the law that was meant to protect her
but the Defendants failed her.  The Plaintiff is not to blame and she was a
victim.**

## DAMAGE SUMMARY

**Below is a list of all the areas the Plaintiff suffered damages related to the
Defendants' actions.  Many types of damages cannot be calculated in dollars
and a jury is the best method for calculating damages.**

- Damage related to the Plaintiff's inability to purchase a home.  From what I
  understand, her boyfriend bought a home by himself since she could not
  qualify.  The Plaintiff will not be able to benefit from the equity or the
  appreciation of the home.

- Additional interest Plaintiff suffered by her auto lenders not being able to
  obtain credit scores from the Defendants.  Her inability to use her highest
  credit score would have limited her ability to secure the lowest interest rate.

- The Plaintiff suffered damages due to her lack of access to revolving credit. She attempted a number of times to secure credit cards where the banks denied her based on credit reports from the Defendants.

- The Plaintiff suffered damages by her inability to continually build up her credit history.  Credit reports and scores are a building process over time. The Plaintiff had a prolonged period of time where she was unable to secure credit which prevented her from building her credit history.

- The Plaintiff suffered due to her inability to get the lowest insurance rates.

- Additional areas of damage:

  Emotional and psychological, credit reputation, legal costs, and punitive damages.

## Appendix 1.  Documents Relied Upon

- Complaint Case No. 14-cv-865
- United Bank documents related to a 2008 vehicle purchase (30 pages)
- Consumer Loan Services documents (51 pages)
- Independence State Bank documents (54 pages)
- Quicken Loan documents (26 pages)
- Wells Fargo Auto Loan documents (13 pages)
- First National Bank Auto Loan documents (17 pages)
- Prosper Loan request documents (23 pages)
- Badgerland Loan documents (24 pages)
- Capital One documents (66 pages)
- Chilson Auto Loan documents (24 pages)
- EIS 00001-000052
- Insurance Denial (1 page)
- FD 000001-000138
- Lexis Nexis Trans Union report dated January 6, 2014 (3 pages)
- Lexis Nexis Experian report dated January 6, 2014 (3 pages) (State Farm)
- Lexis Nexis Experian report dated January 6, 2014 (3 pages) (Esurance)
- Lexis Nexis Experian report dated February 7, 2014 (3 pages)
- Lexis Nexis Experian report dated March 7, 2014 (3 pages)
- Ken Mullen State Farm documents (2 pages)
- Experian documents (72 pages)
- Trans Union documents (112 pages)
- 2009-2014 Credit Reporting Resource Guides
- Credstar tri-merge dated February 22, 2013 (8 pages)

## Appendix 2.  Curriculum Vitae of Chris McConville

**Chris McConville Bio and CV**
**4046 Turnwood Lane**
**Moon Township, PA  15108**
**Office 724-312-4793**
**chris@myexpertcreditwitness.com**

Chris McConville, Credit / Mortgage Consultant and Educator, Senior Loan Officer, and founder of www.myexpertcreditwitness.com.   In addition to his credit knowledge, he has extensive lending knowledge in Fannie Mae, Freddie Mac, FHA, USDA, prime and sub prime, Alt-A, mortgage laws, title, appraisals, underwriting, HVCC, TIL, RESPA and predatory lending that he obtained from his 2000+ closings as an originator.

Chris is a credit expert/educator on the topics of credit scoring, credit reporting, FCRA, FDCPA, FACTA, Identity Theft, FICO scoring, dispute process, credit related damages, mortgage underwriting, originating, pricing, yield spread premiums and most other related mortgage areas.  For the past 20+ years, Chris has dealt directly with the consumer and the underwriter.  This real life experience has given him knowledge that can't be found in a book.  During his career, he has gained much insight on the internal working of credit reporting and scoring.  This experience came from working directly with CBC Innovis, Landsafe Credit, Credit Plus, First American CREDCO, Kroll Factual Data as well as personal training direct from other credit professionals.  This knowledge will prove to be very valuable serving as a Credit Expert Witness and are essential for those involved in credit or mortgage litigation.

Chris has 20+ years in the mortgage business and credit field.  Chris started as a Loan Officer at Pennsylvania Mortgage Store in 1991 and was promoted to Vice President of Lending in 1996.  He founded his own mortgage business, Pennsylvania Home loans in 2006.  In 2013, he accepted a position with Sail Mortgage in order to stay current with all lending products and continue his origination career.  In 2008, he started offering his services as a credit consultant for both businesses and consumers.  He found a great need for credit education due to the start of the "Credit Crunch".   In the fall of 2009 he started offering his services as an Expert Credit Witness.

He has reviewed over 15,000 tri-merged credit reports with mortgage applicants and has a complete understanding of how reporting errors on credit reports have or don't have on the applicant's ability to borrow through first-hand experience.  He also has experienced thousands of disputes with the credit reporting agencies and has a complete understanding of the dispute (E OSCAR) process.

**Relevant Experience at Pennsylvania Money Store:1991-2006**

- Originated residential Mortgages that included pulling, analyzing and reviewing credit bureaus with each applicant.
- Managed a team of originators and was responsible for all credit training.
- Responsible for selecting Credit Agencies and then participate in continued credit education.
- Handled the company transition to become a direct delegated underwriter for a large national bank, Flagstar Bank, FSB.
- Developed lending relationships with over 50 national banks including Wells Fargo, Bank of America, Washington Mutual, Flagstar Bank FSB, Countrywide and CitiBank.
- Negotiated interest rates on both the prime and subprime markets.
- Developed company procedures to ensure privacy and security of all clients' credit reports.
- Participated on advisory boards with National City and Mellon Bank to assist in new loan product development and qualifications.

**Relevant Experience at Pennsylvania Home Loans:2006-2009**

- All of the above as well as ownership responsibilities.
- Designated a 5 star lender with Flagstar Bank, FSB in only one year.  This designation is given to less that 5% of all approved brokers.

**Relevant Experience at Proficio Mortgage Ventures:2009-December 2010**

- Originate Residential Mortgages
- Works closely with underwriting to resolve any issues.
- Loan pricing and locks.
- All performances of a Loan Officer

**Relevant Experience as a credit consultant:2008-present**
- President of Credit Education for Cure My Score.
- Provides Credit Scoring, Credit Reporting Education to consumers.
- Provides budgeting and financial education.
- Conducts credit education presentations to Real Estate Agents, Mortgage Originators, Accountants, Financial Planners and Attorneys.
- Continues to stay current on any changes to credit laws and FICO scoring model changes.

**Relevant Experience as a credit/mortgage expert witness: 2010-present**
- Offer both credit and mortgage expert witness consulting to include expert reports, depositions, trail and litigation support.
- I have FCRA experience along with calculating related damages in both Federal and State Court.
- Successful Testimony experience in Federal Court.

- Complete understanding of e OSCAR, ACDV, CDV, AUD, dispute process and responsibilities.
- Complete understanding of the entire mortgage process from start to finish including Automated Underwriting, DU / LP.

**Relevant Experience at Sail Mortgage: 2013 –present**

- Originate Residential Mortgages
- Works closely with underwriting to resolve any issues.
- Loan pricing and locks.
- All performances of a Loan Officer

**Education and Certifications:**

- 1989   Graduated from University of Pittsburgh B.S. Degree.
- Annual  Continued Mortgage Education Credits
- 2008 - 2012   Credit reporting and credit scoring training from nationally recognized credit expert Attorney Edward Jameson and Michael Citron.
- 2009   Achieved Credit Expert Certification from Credit CRM.
- 2010   Participated in a 3 day conference in Tampa, Florida related to credit reporting post Chapter 7 Bankruptcy.
- 2011   Attended a 4 day conference in San Diego California related to continued FICO Scoring education as well as CROA compliance.
- 2012   20 Hours of Mortgage Education Credits with ProSchools
- 2013   Passed both the Federal and Pennsylvania Mortgage Loan Originator tests.
- 2013   Obtained Pennsylvania Mortgage Originator License #40768
- 2013   8 Hours of Mortgage Continuing Education with ProSchools
- 2014   FICO Pro Certified with All Regs.
- 2014   Bank Secretary Act, Anti Money Laundering Training
- 2015   Bank Secretary Act, Anti Money Laundering Training
- Metro 2, e-OSCAR and the New FCRA/CFPB Compliance Requirements accredited class presented by Stroock & Stroock & Lavan LLP (Lorman)
- Weekly  Continue to stay current on all credit scoring models, credit laws and mortgage underwriting guidelines.

## Appendix 3.  Civil Procedure 26 Disclosure

The following is submitted pursuant to the Federal Rule of Civil Procedure 26, Disclosure of expert testimony.

Expert Witness:

Chris McConville
4046 Turnwood Lane
Moon Township, PA 15108
724-312-4793

Compensation:

$250 per hour for all work with the exception of court / deposition time.
$325 per hour for any court / deposition time.

Documents Review:

Refer to the Documents reviewed section in this report.

Statements of all opinions expressed and the basis and reasons therefore:

Please refer to the Summary of Opinions section in this report.

Publications:

I blog on myexpertcreditwitness.com and curemyscore.com.

List of all other cases during the last 4 years that I have testified as an expert at trail or by deposition:

Alisha Kingery, f.k.a. Alisha Wilkes v. Quicken Loans, Inc
Southern District of West Virginia, Charleston Division
Civil Action No. 2:12-cv-1353

# Appendix 4.



## Appendix 5.

| Reason Statement | Equifax (BEACON 5.0) | TransUnion (FICO Classic 98/04) | Experian (Alpha/Num) (FICO II) |
|---|---|---|---|
| Amount owed on accounts is too high | 01 | 01 | A/01 |
| Level of delinquency on accounts | 02 | 02 | B/02 |
| Too few bank revolving accounts | 03 | -- | C/03 |
| Too many bank or national revolving accounts | 04 | -- | D/04 |
| Too many accounts with balances | 05 | 05 | E/05 |
| Too many consumer finance company accounts | 06 | 06 | F/06 |
| Account payment history is too new to rate | 07 | 07 | G/07 |
| Too many inquires last 12 months | 08 | 08 | H/08 |
| Too many accounts recently opened | 09 | 09 | J/09 |
| Proportion of balance to credit limits is too high on bank revolving and other revolving accounts | 10 | 10 | K/10 |
| Amount owed on revolving accounts is too high | 11 | 11 | L/11 |
| Length of time revolving accounts have been established | 12 | 12 | M/12 |
| Time since delinquency too recent or unknown | 13 | 13 | N/13 |
| Length of time accts have been established | 14 | 14 | O/14 |
| Lack of recent bank revolving information | 15 | 15 | P/15 |
| Lack of recent revolving account information | 16 | 16 | Q/16 |
| No recent non-mortgage balance information | 17 | 17 | R/17 |
| Number of accounts with delinquency | 18 | 18 | S/18 |
| Too few accounts currently paid as agreed | 19 | 27 | T/19 |
| Date of last inquiry too recent | -- | 19 | -- |
| Time since derogatory public record or collection too short | 20 | 20 | V/20 |
| Amount past due on accounts | 21 | 21 | W/21 |

| Reason Statement | Equifax (BEACON 5.0) | TransUnion (FICO Classic 98/04) | Experian (Alpha/Num) (FICO II) |
|---|---|---|---|
| Serious delinquency, derogatory public record or collection | 22† | 22 | X/22 |
| Number of bank or national revolving accounts with balances | 23 | -- | -- |
| No recent revolving balances | 24 | 24 | U/24 |
| Length of time installment loans have been established | 25† | -- | 25† |
| Number of revolving accounts | 26† | -- | 26† |
| Number of bank or other revolving accounts | -- | 26† | -- |
| Number of established accounts | 28 | 28 | 28† |
| No recent bankcard balances | -- | 29 | -- |
| Time since most recent account opening is too short | 30 | 30 | Z/30 |
| Too few accounts with recent payment information | 31 | -- | 31† |
| Lack of recent installment loan information | 32 | 04 | Y/32 |
| Proportion of loan balances to loan amounts is too high | 33 | 03 | I/33 |
| Amount owed on delinquent accounts | 34 | 31† | 34† |
| Payment due on accounts | -- | 36 | -- |
| Length of time open installment loans have been established | -- | -- | 36† |
| Number of consumer finance company accounts established relative to length of consumer finance history | -- | -- | 37† |

| Reason Statement | Equifax (BEACON 5.0) | TransUnion (FICO Classic 98/04) | Experian (Alpha/Num) (FICO II) |
|---|---|---|---|
| Serious delinquency and public record or collection filed | 38 | 38 | 38† |
| Serious delinquency | 39 | 39 | 39† |
| Derogatory public record or collection filed | 40 | 40 | 40† |
| Lack of recent auto loan information | 98† | 97† | 98† |
| Length of time consumer finance company loans have been established | -- | 98† | -- |
| Lack of recent consumer finance company account information | 99† | 99† | 99† |

43

---

[43] https://www.credco.com/assets/pdfs/datasheets/FICO-booklet.pdf