**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

JOSEPHINE WALETZKO,

              Plaintiff,

     vs.

CAPITAL ONE, N.A. F/K/A HSBC BANK;          CASE NO.  15-cv-317
KROLL FACTUAL DATA, INC.;
CORELOGIC CREDIT, LLC; AND EQUIFAX
MORTGAGE SOLUTIONS LLC,
LEXISNEXIS RISK SOLUTIONS INC.,

              Defendants

**EXPERT REPORT OF BRIAN H. KELLEY**

**May 24, 2016**

## TABLE OF CONTENTS

**Page**

I.      SCOPE OF ASSIGNMENT ........................................................................3

II.     PROFESSIONAL BACKGROUND, EXPERIENCE, & COMPENSATION ..................4

III.    CASE BACKGROUND ........................................................................5

IV.     HISTORY OF TRI-MERGED CREDIT REPORTS  ........................................................9

V.      REVIEW - OPPOSING EXPERT REPORT  ................................................11

VI.     OPINIONS ........................................................................15

      A.     Lenders and Resellers Must Follow GSE Guidelines for a Merged Report ..........15

      B.     A Reseller's Role is to Present All Data Received from the NCRAs ...................17

      C.     The Reseller Cannot Edit or Exclude Information .................................18

      D.     Addressing Inconsistencies in a Merged Report....................................19

      E.     Using a Report that does not Meet GSE Guidelines................................20

      F.     Other Issues Affecting Materiality of Plaintiff's Claim ........................21

VII.    CONCLUSION........................................................................25

EXHIBITS

A.      VITAE…………………………………………………………………………28

B.      4-YEAR HISTORY OF TESTIMONY……………………………………...……..30

C.      DOCUMENTS REVIEWED…..……………………………………………………36

## I.   <u>SCOPE OF ASSIGNMENT</u>

1.      I have been engaged by TROUTMAN SANDERS, LLP, on behalf of its client, CORELOGIC CREDCO, LLC ("Credco") and asked to review certain matters related to the duties and obligations of Credco in its role as a reseller of tri-merged credit reports.

2.      I have been asked to rebut the opinions of Chris McConville ("Mr. McConville"), an expert retained by the plaintiff, Josephine Waletzko ("Plaintiff or "Ms. Waletzko"), as set forth in his expert report dated March 18, 2016 ("McConville Report").

3.      I have been asked to offer my opinions regarding the customary standards and practices of commercial banks and mortgage lenders in requiring and reviewing credit reports, the use of so-called tri-merged reports or consolidated credit reports, and whether credit resellers such as Credco have the capacity or duty to reconcile, correct or censor erroneous or conflicting credit information that might be set forth in such reports.

4.      I have been asked to opine as to whether an April 4, 2013 declination by Quicken Loans of a residential loan applied for by Ms. Waletzko, resulted from a notation of "deceased" contained in a February 22, 2013 Merged Credit Report provided by Credco ("Credco Report"),[1] which reported a "deceased status" for two of the three National Credit Reporting Agencies ("NCRAs"),[2] or whether the declination by Quicken Loans was due to other factors.

5.      I have not been asked to offer an opinion regarding the conduct or culpability of co-defendants Capital One, N.A. F/K/A HSBC Bank ("Capital One"), Kroll Factual Data, Inc. ("Kroll"), Equifax Mortgage Solutions LLC ("Equifax Mortgage") or LexisNexis Risk Solutions, Inc. ("LexisNexis").

[1] February 22, 2013 CreditStar Tri-Merged Credit Report [Credco-Waletzko 000001]

[2] Two of the NCRAs, Equifax and Experian, reported Waletzko's status as "deceased," while the third NCRA, Trans Union, did not.

6.      I have no opinion as to whether actions taken by Capital One, Equifax or Experian in response to any concerns raised by Ms. Waletzko were reasonable, timely or appropriate.

7.      I have developed no opinion regarding the merits of Plaintiff's contention that the actions of the Defendants (other than Credco) caused her emotional stress, damaged her reputation or resulted in actual monetary damages.  I do find it implausible that Credco, given its limited role in issuing a single merged credit report, contributed in anyway to the prolonged emotional distress, reputational and monetary damages alleged by Plaintiff.

8.      My opinion is primarily focused on the role of Credco as a reseller of credit information and, whether its issuance of the Credco Merged Report was proper and consistent with lender requirements and guidelines for a merged report, and whether the Quicken Loans declination or Ms. Waletzko's loan was due to Equifax or Experian having reported her status as "deceased" or whether it was due to other factors.


[INTENTIONALLY LEFT BLANK]

### III.    PROFESSIONAL BACKGROUND, EXPERIENCE, & COMPENSATION

9.      I have more than 35 years of experience in the commercial banking and mortgage lending area. I have held a broad range of positions at major banks, smaller regional banks and mortgage companies, including serving as a senior executive officer, relationship manager, loan officer, underwriter and voting member of various board and executive loan committees. I have worked as a single-family loan underwriter for loans submitted to Fannie Mae and/or insured by FHA/VA, been a delegated underwriter under Fannie Mae's multi-family lending program, and been a Preferred Lender through the Small Business Administration lending program.

10.      Over my career, I have been a president, chief executive officer, and director of three regional business banks in Southern California.  As the banks' Senior Officer and member of the Directors' Loan and Marketing committees, I directed and oversaw a broad range of lending activities, including the implementation and oversight of loan policy and underwriting guidelines, specifically as they related to standards and requirements for credit reports and the process of reviewing such reports and utilizing the information contained therein.

11.      Additionally, I have held senior management positions with several national banks and mortgage companies.  As the Deputy General Manager of the Long-Term Credit Bank of Japan ("LTCB"), I led a major lending unit with a loan portfolio of between $2 billion and $3 billion, involving a broad range of secured and unsecured loans.  I was involved in the review and renegotiation of many such credit facilities, both as the responsible account officer and as a member of the bank's Loan Committee.  As a Regional Vice President with Pacific Pioneer Mortgage Company, I was active in both multi-family and single-family lending, underwriting and packaging such loans for sale in the secondary market (including loans sold to Fannie Mae and Freddie Mac).

12.     For the last four years, I have been the principal of BHK Associates, Inc., providing consulting and advisory services to major financial institutions and their regulators, including the Federal Deposit Insurance Corporation ("FDIC"), among other clients.  I have served as an expert witness on various banking, lending and board governance matters in both federal and state court, as well as in arbitration, primarily on behalf of financial institutions, regulatory authorities (including the FDIC) and major corporations. I have never been disqualified nor had my testimony excluded by any court in which I have appeared as an expert witness.

13.     I have been qualified as an expert witness in California, Washington, Arizona, Nevada, New Mexico, Oklahoma, Illinois, Tennessee, Virginia, Florida and Washington D.C.

14.     My current *curriculum vitae* is attached as Exhibit A.  Attached as Exhibit B, is a list of all cases in which I have offered testimony as an expert in the last four years.  I have not authored any publications in the last 10 years.  Attached, as Exhibit C, is a list of the materials that I considered in developing my opinions.

15.     In my capacity as an expert in this matter, I am being compensated at the rate of $420 per hour for document review and preparation, $465 per hour for deposition and trial testimony (4-hour minimum).  My compensation is neither dependent upon nor affected by my opinions or the outcome of this litigation.

16.     All the opinions expressed in this report are entirely my own and are based solely on my education, experience, and training, as well as the materials that I have reviewed to date.  I reserve the right to revise my opinions if additional information or testimony comes to my attention.

IV.    **CASE BACKGROUND**

17.    Credco issued a tri-merged credit report, also known as a "Credco Instant Merge Credit Report," on February 22, 2013 ("Credco Report"), at the request of Quicken Loans, with whom Ms. Waletzko and her boyfriend, David Bundy ("Mr. Bundy") applied for a home loan.

18.    The Credco Report provided credit information and account histories for both applicants.   In connection with Ms. Waletzko, the Credco Report showed that both Equifax and Experian reported a deceased notation based on a report from HSBC Bank (Capital One) in connection with a Visa credit card account (690024006236).  The account was reported with a charge off date of "2009-10."[3]  Hence, only one of the NCRAs (Trans Union) reported a FICO for Ms. Waletzko (a FICO of "581").  In addition to the "status deceased" designated by Equifax and Experian, Ms. Waletzko's public records filed reflected a personal bankruptcy in 2004 and a number of derogatory credit entries including numerous delinquent payments, collection accounts and charge-offs.[4]

19.    On April 4, 2013, Quicken Loans sent Ms. Waletzko and Mr. Bundy a letter of declination, stating "we are unable to help you with your loan," explaining that the reasons for the declination were "Credit History:  Current/previous slow payments, judgments, liens or BK [Bankruptcy]."[5]

---

[3] While unclear from the Plaintiff's sworn testimony, it appears that back in 2009, HSBC (Capital One) had been trying to collect on a seriously delinquent credit card account with Ms. Waletzko and after being informed that she was deceased, wrote-off the $2,204 outstanding balance in November of 2009 (what is unclear is whether the erroneous report of her demise came from her, her boyfriend or her ex-husband who she had divorced in 2009).

[4] There were four serious delinquencies confirmed by the Credco Report, several charge offs and at least eight reported accounts that had been sent out for collection [Credit Report, Credit History – Adverse Summary, pgs. 7 thru 9 [Chapman Declaration, Exhibit A]

[5] April 4, 2013 Letter from Quicken Loans to Josephine Waletzko [Chapman Declaration, Exhibit B]

20.     On December 14, 2014, Ms. Waletzko sued Experian and Equifax alleging that they had failed to correct their "status deceased" designation despite having allegedly received "multiple letters and phone calls" from Ms. Waletzko.[6]  Reportedly, that action was dismissed after a settlement was reached.

21.     On May 28, 2015 Ms. Waletzko filed the present case against Capital One, Kroll, Credco, and Equifax Mortgage (the "Complaint") alleging that due to the "deceased status" being reported (¶ 21), she was denied financing for a home loan by "multiple lenders" (¶ 22), was denied financing for a car "by multiple financial institutions" (¶ 23) and was "denied insurance" (¶ 25), all "due to the 'deceased record' on her credit file with the Defendants."[7]  Ms. Waletzko amended her Complaint in September 2015 to add LexisNexis Risk Solutions. Inc.

22.     The Complaint neither alleges that Ms. Waletzko contacted Credco nor alerted Credco to the disputed "status deceased" entry reflected in the Credco Report, but only alleges that "Credco [compiled] a report for at least one third party showing the incorrect "deceased status."[8]  In providing its report, Ms. Waletzko alleged that Credco violated 15 U.S.C. § 1681e(b), and is liable for damages relating to the "detriment to her credit rating, credit denial, and emotional distress" stemming therefrom.[9]

---

[6] Waletzko Complaint against Experian and Equifax, filed December 15, 2014 (Case No. 14-cv-865), pg. 3, ¶ 13.

[7] Waletzko Complaint against Capital One, et. al., filed September 7, 2015, (Case No. 3:15-cv-00317)

[8] One would presume that she refers to the February 22, 2013 Credco Report and that the third party is Quicken Loans, but no further information is provided in the Complaint [see Complaint, pg. 5, ¶ 29.

[9] Complaint, ¶¶ 48, 49 and 50

## IV.    HISTORY OF TRI-MERGED CREDIT REPORTS

23.    Credit Report Practices Pre-2008.  When I started out in the lending business back in the late 1970's, it was fairly common for banks and mortgage lenders to rely on credit reports issued by a single credit bureau with whom they had an established ongoing contractual relationship (much in the same way that lenders today choose to rely on a single issuer of title insurance or a single law firm to advise them).  However, as lenders became more sophisticated, they found it useful to order credit reports from two or more credit bureaus.  The use of multiple national credit reporting agencies ("NCRAs") better assured the accuracy of information received on an applicant – since it was not uncommon for one NCRA to have more updated information than another nor was it unusual that creditors (information providers) might favor a particular bureau in the reporting of delinquencies, foreclosures, late payment, etc.  By the 1980's, it became a best practice for lenders to routinely require credit information from multiple NCRAs.

24.    Advent of Credit Consolidators.  As lenders required credit reports issued by competing credit bureaus, they were challenged and often frustrated by the task of comparing and reconciling multiple reports – having to deal with different report formats, differing methodology and differing update frequencies.  The process of reviewing multiple credit sources led to the growth of credit consolidators or credit resellers (such as Credco) who would act as a middleman between the NCRAs and lenders, assembling the information from multiple NCRAs, presenting and organizing the information in a common and easy to read format, and clearly identifying what information came from which NCRA.[10]

---

[10] Fannie Mae maintains a list of Approved Credit Providers who are authorized to provide tri-merge credit reports.  At the top of that list is CoreLogic Credco (Source: Fannie Mae Credit Provider List for April 18, 2015, www.fanniemae.com)

25.   <u>Tri-Merged Reports ultimately mandated by GSEs</u>.  In 1988, the required use of tri-merged or consolidated credit reports was codified by a joint statement[11] issued by the various government- sponsored entities ("GSEs") that purchased, guaranteed or insured single-family loans in the secondary market.[12]  Per the 1988 Directive, all lenders selling loans to the GSEs or requesting loan guarantees from the GSEs were required to obtain a merged credit report with consolidated credit information from two or more national repositories. [13]

26.   <u>Credit Report Practices Post-2008</u>.   Today, the use of tri-merged or consolidated credit reports has become universal – whether the lender is originating residential loans for sale to Fannie Mae or commercial and residential loans for its own portfolio, the GSE's requirement of a tri-merged report has become standard practice for all lenders.

27.   <u>Guidance</u>.  The GSE have taken the lead in issuing guidelines regarding use of in-file credit reports.  Regardless of whether they are active sellers of single-family loans to Fannie Mae or Freddie Mac, virtually all banks and savings institutions have adopted the GSEs' mandates regarding the use of tri-merged credit reports which affectively assemble and display credit information provided by the big three NCRAs.

---

[11] March 30, 1988, U.S. Department of Housing and Urban Development, Washington, D.C., Standards for Residential Mortgage Credit Reports

[12] The GSEs issuing the joint statement were the Department of Housing and Urban Development (HUD), Veterans Administration (VA), Farmers Home Administration (FmHA), Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac).

[13] In the late 1980's, there were six national NCRAs that were providing credit information. Most lenders and credit consolidators would typically use data from at least three of those agencies.  By the late 1990's, the six NCRAs had merged into today's three primary NCRAs - Equifax, Trans Union and Experian.

## VI.   REVIEW – OPPOSING EXPERT REPORT

28.   <u>Limitations on Review</u>.  In my review of the McConville Report, I will primarily focus my comments on matters that directly concern Credco, the role of Credco in issuing its tri-merge credit report and Mr. McConville's opinions regarding the basis of Quicken Loans' declination of the residential loan applied for by Ms. Waletzko.

29.   <u>Does not understand role of Resellers</u>.  Despite stating that tri-merge credit reports are delivered "electronically within seconds,"[14] Mr. McConville opines that Credco did not follow "reasonable procedures" because its report reflected reports of "Plaintiff being both deceased and alive."[15]  As discussed in the forgoing section, Credco had no capacity or ability to unilaterally correct, amend or reconcile conflicting information reported by the three NCRAs, but rather could only organize and present all information received from the three NCRAs, and where such information conflicted, properly identify the source of such information.  There is no suggestion by Mr. McConville that Credco failed to do precisely that.  To suggest otherwise, is to completely miss the role of a credit reseller.[16]

30.   <u>No dispute filed with Credco</u>.  Mr. McConville notes that "a consumer can file a dispute with any CRA (including resellers),"[17] but fails to mention in his report that Ms. Waletzko never filed a dispute with Credco or even made contact with the firm.  Of course, even if Ms. Waletzko had contacted Credco to challenge the "deceased" notation identified by the

---

[14] McConville Report, pg. 17, ¶ 1

[15] *Id.,* pg. 18, ¶ 3

[16] As the country's largest reseller of credit information, Credco processes approximately 20 million merged reports annually, generating such reports within an average response time of 1-1/2 seconds [February 2, 2016 Deposition of Debra Rothrock, Credco's VP of Product Management, pg. 21, line 2]

[17] McConville Report, pg. 19, § 10, ¶ 1

CRAs (Experian and Equifax), Credco's only required response as a reseller would have been to pass that consumer dispute on to the CRAs.

31.     <u>Cites no support for what procedures Credco was obligated to follow</u>. Despite embarking on a 20 page tutorial on credit reports and credit scoring, Mr. McConville never discusses what procedures apply to credit resellers such as Credco, other than confirming that resellers "acquire each credit report from the CRAs and then merge them using their own proprietary software."[18]   Despite suggesting that Credco must follow "reasonable procedures to assure maximum possible accuracy," he does not state what those procedures are nor what ability Credco has to eliminate "conflicting data."[19]

32.     <u>Fails to address Plaintiff's abysmal FICO score</u>.  As an experienced residential loan officer, Mr. McConville is surely aware that Ms. Waletzko's FICO score of 581 would not be acceptable to any residential loan underwriter, yet he spends page after page discussing everything but Ms. Waletzko's woeful FICO score.  Interestingly, even the charts inserted by Mr. McConville do not contemplate a FICO score of less than 620.[20]

33.     <u>Speculates that Experian and Equifax would have higher FICOs</u>.  Without any support, Mr. McConville concludes, "Plaintiff's Trans Union FICO score would have been meaningfully lower than her Equifax and Experian FICO scores."[21]  Based on what?  While claiming that Trans Union reported additional major derogatory accounts, he does not explain

---

[18] Id., pg. 16, § 8

[19] Id., pg. 18, Opinion #9

[20] See Chart #2, pg. 29, McConville Report.  In fact, FNMA's underwriter guidelines do not allow the submission of loans with borrower FICO scores of under 620 (See FNMA Selling Guide, B3-5.1-01: General Requirements for Credit Scores)

[21] McConville Report, pg. 14, Opinion #6

why the same derogatory accounts would not be reported by the other two CRAs, or why their respective FICO scores would be any better than Trans Union's.

34.    <u>No discussion of actions taken by Ms. Waletzko</u>.  While conceding that Ms. Waletzko was aware that she was being reported as "deceased" as early is 2009, Mr. McConville makes no mention of what steps or actions that Ms. Waletzko took to correct her credit history, only asserting that the "Plaintiff followed the law,"[22] nor does he express any opinion as to why she waited until 2013 to contact any creditors or NCRAs regarding the "deceased" notation that was supposedly "ruining her life."  He provides no explanation why she failed, in response to an information request by Capital One[23] to provide the requested notarized statement or a confirmation letter from the Social Security Office.[24]  Mr. McConville seems to justify her inaction and inattention by simply concluding, "The Plaintiff is not to blame and she was a victim."[25]

35.    <u>No mention of the "Elephant in the Room</u>."  Mr. McConville concludes that but for the Defendants' failure to remove the "deceased status" from Ms. Waletzko's credit report, she would have been able "to continually build up her credit history," as well "benefit from

---

[22] *Id.,* pg. 35, Opinion #16

[23] July 2, 2013 Letter from Capital One's Customer Service Department requesting documentation to remove "deceased" notation from credit report [CONA 00041, Waletzko Deposition Exhibit #20]

[24] Q – "Did you send any documentation into the credit bureaus to see that the deceased mark was inaccurate"  A – "No, I didn't."  Q – "You never sent them your driver's license?"  A – "No."  Q – "You never sent them a notarized statement?"  A- "No."  Q – You never sent them a letter from the Social Security Administration?"  A – "Nope" [February 15, 2016 Deposition of Josephine Waletzko, pg. 270, lines 1 thru 13]

[25] Obviously a conclusion of Fact and Law better left to the jury than Mr. McConville.

equity appreciation of [a] home," and otherwise enjoy a good credit reputation.[26]  Nowhere does Mr. McConville discuss or try to explain the myriad of other derogatory credit issues impacting Ms. Waletzko, including her 2004 bankruptcy or the three pages of adverse items attached to her Credco Report, which highlighted several seriously delinquent accounts, four charge-offs and eight accounts that were reported as being in "collection."

36.     <u>Emotional and Psychological damages</u>.  While not claiming any background or professional training in medicine or psychology, Mr. McConville has no problem concluding that Ms. Waletzko "suffered Emotional and Psychological Damages due to the actions of the Defendants."[27]

37.     <u>Damages</u>.  While apparently claiming to believe that Damages are within the purview of his opinion, even having a section of his Report entitled "Damages," Mr. McConville provides no basis or estimate for what he believes the damages are that Ms. Waletzko is entitled to, only assuring the reader that "a jury is the best method for calculating damages."[28]

[INTENTIONALLY LEFT BLANK]

---

[26] McConville Report, pg. 35, Damage Summary

[27] McConville Report, pg. 35, Opinion #16

[28] *Id.,* pg. 35, Damage Summary

## VII.   OPINIONS

### A.   Lenders and Resellers Must Follow GSE Guidelines for a Merged Report

38.   <u>GSE's have specific requirements</u>.  The largest of the GSEs in terms of market share is certainly Fannie Mae (FNMA), and insofar as setting standards for residential lending is concerned, the other GSEs such as Freddie Mac (FHLMC) and the Federal Housing Authority (FHA), tend to follow its lead.  Fannie Mae requires the use of tri-merge reports, specifically requiring that FICO (Fair Isaac's) credit scores be obtained from all three of the national CRAs,[29] as well as a "three in-file merged credit report" from one of the credit information providers listed on Fannie Mae's website.[30]  The Fannie Mae guidelines also set out specific requirements for the information that should be set forth in the merged report as well as the format of the report.[31]

39.   <u>All collected information must be shown</u>.  Fannie Mae does not allow a credit reseller such as Credco to change any collected information, specifically stating: "Collected credit report information *should not be changed*,"[32] and further mandates that the "report must include *all information* from three different repositories [i.e., the NCRAs],"[33] that "the report

---

[29] See Fannie Mae Underwriting Guidelines, B3-5.1-01, General Requirements for Credit Scores, pg. 461, which specifically requires that FICO scores be obtained from EquiFax, Experian and Trans Union.  Likewise, HUD (FHA & VA) requires a tri-merged report (HUD Section 4155.1, Subsection 2), while Freddie Mac permits as few as two NCRA's in merged reports (FHLMC Section 37.10 (d))

[30] *Id.*, B3-5.2-01, Requirements for Credit Reports pg. 472

[31] *Id.*, pg. 468

[32] *Id.*, pg. 470

[33] *Id.*, pg. 473

must include *all discovered credit and legal information*,"[34] and "*include the most derogatory information* that is in in-file credit reports" (emphasis mine).[35]  Fannie Mae's position is certainly reflected in the directives of the other GSEs including Freddie Mac and HUD.[36]

40.    <u>Accuracy of Credit Information</u>.  Fannie Mae holds that it is the lender's responsibility to "carefully review the credit information with the borrower" and if needed, to "request the credit reporting company [NCRA] that provided the information to confirm its accuracy."[37]  It should be noted, that per Fannie Mae, the lender has the primary responsibility for assessing the accuracy of the information presented, to communicate any questions with the borrower and to confirm the accuracy of such information with the NCRA.  Credit information providers or resellers such as Credco simply present the information provided to them by the NCRAs.

41.    <u>Only the Lender can decide to exclude derogatory or conflicting information</u>.  The GSEs clearly require that any determination regarding the applicability or reliability of information presented in a merged report is solely at the discretion of the Lender.  Freddie Mac's guidelines state:  "the Seller [Lender] must determine whether the derogatory information is significant . . . In making its determination, the Seller [Lender] should not ignore any derogatory

---

[34] *Id.*, pg. 469

[35] *Id.*, pg. 474

[36] For similar requirements set forth in Freddie Mac's Seller/Servicer Guide, refer to Section 37.10 (d) requiring that "all records from all repositories" are to be included in the report. Similarly HUD's Mortgage Credit Analysis Guidelines require under Section 4155.1, pg. 1-C-3, that "all credit information available in the accessed repositories" must be obtained.

[37] Fannie Mae Underwriting Guidelines, B3-5.2-03, Accuracy of Credit Information in Credit Report, pg. 475

credit [information]," but determine the relative weight of such information.[38]  As a former

lender and loan underwriter, I would absolutely insist upon my right to review any and all

information contained in the in-file accounts of the NCRAs – it being not only the responsibility

of the Lender, but a critical component of the Lender's analysis of risk.


### B.    A Reseller's Role is to Present All Data Received from the NCRAs

42.    <u>An underwriter insists on seeing all information</u>.  The purpose of a tri-merged

credit report is to see *all* information obtained from the three credit bureaus.  As a former loan

underwriter and credit officer, I would not expect (or permit) a reseller such as Credco to

determine what information was accurate or material.  I would want to see it all.  As a lender, it

is my sole responsibility to determine the materiality or weight of derogatory information and to

determine what information to exclude.

43.    <u>Conflicting information</u>.  In a perfect world, all three of the NCRAs would

present identical tradelines regarding an applicant's payment history or credit practices.

However, in practice there are often conflicting tradelines or other items of information reported

by the NCRAs.  As noted earlier, this can happen because one NCRA can have more updated

information than another, some Furnishers may prefer sending information to a particular NCRA

or due to other factors. While duplicate tradelines can be consolidated into a single line item, to

the extent there are tradelines or items of information sourced from only one or two of the three

credit bureaus, I would expect to see those tradelines or items clearly presented with an

indication as to source.

---

[38] FHLMC (Freddie Mac) Single Family Lending Guidelines, Section 37.7 (b)

44.  <u>The underwriter's role</u>.  It is the underwriter's sole province to determine whether conflicting information is material or has been provided in error.  Again, the primary purpose of a tri-merged credit report is for the underwriter to see all the information available on the applicant that is maintained by the NCRAs and make a business judgment as to the relative weight of such information, and whether or not any such information is accurate.

## C.    The Reseller Cannot Exclude or Edit Information

45.  <u>Reseller has no discretion to exclude information</u>.  A credit information reseller such as Credco has absolutely no discretion to exclude what may appear to be inaccurate or conflicting information.  Rather, it must present all information received from the three NCRAs clearly identifying from which NCRA the conflicting information is sourced.

46.  <u>Reseller has no standing to analyze information</u>.  A reseller such as Credco has no standing to analyze or weigh the materiality or accuracy of information – they are simply an assembler of that information.[39]  As a former credit officer and underwriter of loans, I would take great umbrage to any credit report provider that attempted to edit the information received or censor information received from the NCRA's that it deemed unreliable or in conflict.  That is simply not the reseller's role – and were it to do so, it would effectively be frustrating the lender in its role as underwriter and assessor of the various credit factors leading to a decision to lend.

47.  <u>Violating GSE requirements</u>.  Additionally, were Credco or any reseller to edit or exclude credit information it received from the NCRAs, it would result in the credit report not

---

[39] "As a CRA reseller, it is not our role to analyze the information delivered from the three credit reporting agencies.  We compile that information and format it in a common structure for delivery to our clients, and then it's the client who would take the information and has the interaction with the consumer regarding any questions they have about the credit report" [February 2, 2016 Deposition of Debra Rothrock, Credco's Vice President of Product Management, pg. 29, lines 12 thru 19]

being in compliance with the GSE requirements – effectively making any loan extended by the lender unsellable in the secondary market - a big problem.[40]  Any lender selling a mortgage to Fannie Mae or Freddie Mac with a non-compliant credit report would risk the loss of its standing to conduct business with the GSE as well as expose the lender to significant monetary exposure.[41]

### D.   Addressing Inconsistencies in a Merged Report

48.   <u>Inconsistencies in the merged report between NCRAs must be clearly identified</u>. All the GSEs require that payment histories can be consolidated in a single line if reported consistently by each NCRA, but where one NCRA reports a tradeline or other item of information that is not reported by other NCRAs, that tradeline or other item must still be reported by the reseller and referenced by source.

49.   <u>Duplicate Reporting</u>.  Fannie Mae has concluded that "errors that are the result of the credit merge do not typically affect the credit or risk analysis of the loan casefile."[42]  This generally occurs when, for example, a single trade line is reported as two different loans. Likewise, public records are susceptible to duplicate reporting.  However, Fannie Mae makes it clear that it is not the role of the credit reseller to reconcile or correct such duplicate reporting, but rather the Lender's underwriter is charged with the responsibility of determining whether a

---

[40] "Any credit report that does not meet these standards is not acceptable as documentation for a mortgage sold to Freddie Mac," see FHLMC Underwriting Standards, Credit Reports, Section 37.10 (f)

[41] Lenders that are approved servicers of Fannie Mae and Freddie Mac have very specific "put-back" clauses in their servicing contracts that require the repurchase of non-conforming loans as well as the levying of fines or penalties stemming from the sale of non-conforming loans to the GSEs.

[42] Fannie Mae Guidelines, B3-2-08, Erroneous Credit Report Data, pg. 313

duplication has occurred.  It is appropriate for the lender take on that responsibility, since it has the primary relationship with the proposed borrower and the NCRAs, it is in the best position to determine whether a duplication has occurred.

50.  <u>Only the NCRA can change report information</u>.  FNMA's guidelines are quite clear:  "Credit repositories (CRAs) should only change the information called to its attention by a creditor [Furnisher]."[43]  Credco, as a mere reseller or assembler of credit information, has absolutely no right to change or exclude the information received from the NCRAs, it could only assemble, organize and present the totality of the information received.

### E.  Using a Report That Does Not Meet GSE Guidelines

51.  <u>Affect of GSE non-compliance</u>.  As indicated above, were the lender to allow Credco or any other reseller or credit assembler to exclude or modify the information provided the NCRAs in the merged report, that report would no longer be acceptable to the GSEs, and by extension, any loan originated by the lender utilizing such a disallowed credit report would be rejected by the broader secondary market and ineligible for sale to either Fannie Mae or Freddie Mac.  As indicated above, if a loan with a non-conforming credit report were unknowingly purchased by Fannie Mae or Freddie Mac, it could subject the lender to buy-back provisions under its servicing agreement or even subject the lender to fines, penalties or the termination of the servicing contract.

52.  <u>Non-compliance with a bank's own lending policies</u>.  In my experience, most banks' loan policies mirror Fannie Mae requirements when it comes to the use of tri-merged

---

[43] *Id.*, B3-5.2-01, Acceptable and Unacceptable Changes, pg. 470

credit reports.  Hence, the acceptance of a credit report which violates Fannie Mae's guidelines would likely also violate a bank's own credit guidelines.

53.     <u>Ultimately, reliance upon a non-compliant Credit Report will also hurt the applicant</u>.  Without access to the secondary market or the ability to obtain a GSE credit enhancement or guarantee, any loan made pursuant to a non-conforming credit report, if made at all, would be substantially more expensive to the applicant since it could obtain neither a government guaranty (from VA or FHA) nor could it be ultimately sold in the secondary market to Fannie Mae or Freddie Mac.  Lacking any secondary market acceptance, it would be dependent on much higher pricing charged by a portfolio lender or finance company.   Ignoring the established credit report protocol will in the end simply cost the consumer more money.


**F.     Other Issues Affecting Materiality of Plaintiff's Claim**

54.     <u>Plaintiff never contacted Credco.</u>  Even if Credco had an independent duty to investigate a disputed item (which as indicated in the forgoing opinions I do not believe to be the case), there is certainly no indication that the Plaintiff ever contacted Credco regarding the disputed items or afforded Credco an opportunity investigate or correct its report.[44]

55.     <u>No indication that Experian and Equifax's "deceased" notations impacted Quicken Loans Credit Decision</u>.  As reflected in its Notice of Declination, Quicken Loans stated that its adverse credit decision was based on Ms. Waletzko's "Credit History: Current/previous slow payments, judgments, liens or BK [Bankruptcy]."  There was no mention of the "status deceased" notations or the lack of FICO scores from Equifax or Experian being considered a

---

[44] Plaintiff admitted that she did not notify Credco of a disputed item or request a reinvestigation (Plaintiff's Reponses to Credco's First Request for Admissions, October 10, 2015, Admissions #3 thru #6)

factor.[45]  Furthermore, Quicken Loans later confirmed, "If one bureau reports the consumer as deceased, but one or more of the other bureaus provide a credit score, Quicken Loans will consider the loan application using the scores provided and ignore the deceased notation."[46] Quicken Loans indeed confirmed that its decision to decline the loan was "based on Plaintiff's credit score of 581 reported by Trans Union,"[47] as well as the many derogatory items disclosed.

56.   <u>Plaintiff's credit problems much bigger than a "deceased" notation in the credit report</u>.  I have reviewed no credible information which suggests that Ms. Waletzko was denied credit due to the "deceased" notation in her credit reports, but I reviewed multiple documents which confirm a denial of credit based on her subpar credit score, excess leverage and poor payment history.[48]  Her credit issues (as of February 2013) are summarized as follows:

### REPORTED DELINQUENCIES

| Creditors | High Balance | Days Late | Status |
|---|---|---|---|
| Chase Bank | 3,500 | 90 + days | Closed |
| GECRB/Care | 1,500 | 60 days | Open |
| CB/FSHNBGY | 700 | 30 days | Open |

Source:  Credco merged report for 2/22/13, Adverse Summary

### CHARGE OFFS

| Creditors | Amount | Charge-off Amount | Date of C/O |
|---|---|---|---|
| HSBC (One Capital) | 2,204 | 2,204 | 2009-10 |
| Certified Recovery | 362 | 362 | 2010-04 |
| Certified Recovery | 202 | 202 | 2012-07 |
| Meta Bank | 367 | 367 | 2010-03 |

Source:  Credco merged report for 2/22/13, Adverse Summary

---

[45] April 4, 2013 Declination Letter from Quicken Loans, pg. 1, ¶ 1 [Exhibit #11 of Waletzko Deposition]

[46] Declaration of Jamie Chapman, Quicken Loans, pg. 1, ¶ 4 (also see pg. 2, ¶ 13)

[47] *Id.,* pg. 2, ¶ 12

[48] The Credco Report reflects a total of $109,549 in consumer debt, with monthly payment obligations totaling $2,428 and past-due payments totaling $4,066 [Credco Report, pg. 3, Account Balances]

### ACCOUNTS PLACED FOR COLLECTION

| Agency | Creditor | Balance | Status |
|---|---|---|---|
| Certified Recovery | Medical Assoc. | 695 | Frozen |
| Certified Recovery | MCHS | 684 | Frozen |
| Alliance Collection | Medical Payment Data | 293 | Closed (2010-04) |
| Certified Recovery | MCHS | 797 | Frozen |
| Certified Recovery | Medical | 202 | Closed (2010-04) |
| Certified Recovery | Medical | 362 | Closed (2011-10) |
| Jeff Cappsys | FingerHut | 397 | Closed (2013-01) |
| State Collections Svcs | Medical | 1,148 | Closed (2009-08) |

Source:  Credco merged report for 2/22/13, Adverse Summary

As reflected in the above summaries of accounts reported as delinquent, charged-off or placed for collection as of February 22, 2013,[49] Ms. Waletzko's credit problems were hardly due to the "deceased" notation on her credit report.  Rather, her credit report reflected a pattern of reckless and irresponsible credit habits, which doubtless led to any reputational issues she may have had regarding her credit worthiness.

57.    <u>Plaintiff's professed ignorance regarding collection matters</u>. Despite having had eight accounts placed for collection between 2009 and 2013, Ms. Waletzko did not recall having any unpaid medical bills, expressing her opinion that "the way medical bills work, you can have a medical bill and you pay on it and they still turn you in to collections, so it doesn't even matter."[50]

58.    <u>Plaintiff's 4-year delay in reporting error</u>.  Despite claiming that the "deceased" notation had "destroyed my life for 4 years,"[51] there is no indication that Ms. Waletzko took any action to correct her credit file or dispute the notation until contacting Capital One in July of

---

[49] Credco Report, Credit History/Adverse Summary, pgs. 7 thru 11

[50] Waletzko Deposition, pg. 53, lines 22 thru 24

[51] Notes from 6/13/13 Meeting at Associated Bank [FD-000071, Waletzko Deposition, Exhibit 5, pg. 3]

2013. Ms. Waletzko may well have found it convenient to be "deceased" in 2009 when such a notation resulted in Capital One's forgiveness of $2,204 in credit card balances.  It was only after her frustration in obtaining home financing in 2013 that she became concerned about the supposed impact of the "deceased" notation on her credit score (wrongly concluding that it was responsible for her subpar FICO score or the denial of credit stemming therefrom).

[INTENTIONALLY LEFT BLANK]

## VII.    CONCLUSION

59.    <u>Credco obligation is to bundle and present information properly</u>.  As a reseller or consolidator of credit information provided by the three NCRAs, Trans Union, Experian and Equifax, Credco's role was simply to bundle and present the information received.  It had absolutely no authority or capacity to cull the information received, delete information it considered non-material or exclude inaccurate information.

60.    <u>Requirements of an underwriter</u>.  As a former loan underwriter, I would refuse to accept any tri-merged report where a reseller such as Credco had modified or changed the credit information received from the NCRAs, not only because such a modification would disqualify the credit report under the GSE standards, but in allowing Credco to make such changes, the underwriter would be allowing its judgment to be interposed by Credco's.  That would be unacceptable to me or any other credit underwriter that I am acquainted with.

61.    <u>Reseller must share all data received</u>.  As a credit underwriter, I would insist on seeing all the data provided by the NCRA's, whether Credco deemed the information accurate or not.  It is simply not Credco's role to edit, evaluate or exclude any of the information that is provided it by the NCRAs.  The weight and relevance of any information provided by the NCRAs and reflected in the tri-merge report is solely up to the lender to determine.  To conclude otherwise would invalidate the primary purpose of the tri-merged credit report and adversely impact the very integrity of the credit process.

62.    <u>Credco cannot unilaterally change information provided by NCRAs</u>.  Credco was a mere bundler, assembler and reseller of information provided by the NCRAs.  It did not have the capacity to make any changes, corrections or deletions in the information being reported.  Ultimately, neither the banks nor the GSE want resellers such as Credco to do anything other

than assemble and organize the data and information received from the NCRAs.  Credco met that requirement and should not be asked to do more.

63.   Quicken Loan's credit denial had nothing to do with "deceased" notation.  As to the merits of Plaintiff's argument that she was denied credit from Quicken Loans because of the "deceased" notation in her credit report, I reviewed no credible evidence or testimony supporting that contention, and in fact found that Quicken Loans had ignored the notation in its credit decision, instead citing her subpar FICO score provided by Trans Union as well as the numerous loan delinquencies, collection matters and charge-offs, as well as her 2004 bankruptcy filing, as justification for its credit denial.

64.   Plaintiff took limited or no remedial action.  In my experience, responsible consumers not only protect their credit reputation, but are willing to take reasonable and timely steps to dispute incorrect credit information.  In the present case, the Plaintiff made no attempt to correct her credit file for a period of almost four years, and then refused to follow the simplest of corrective steps requested by HSBC/Capital One (the Furnisher who had originally reported the "deceased" notation).

65.   McConville's Expert Report.  I found Mr. McConville's Expert Report to be unpersuasive.  While providing a "grand tutorial" on credit reports, FICO scores and identity theft, he failed to adequately address even the most fundamental of issues raised by this case.  Although claiming to have opinions regarding damages related to reputational harm or emotional suffering, he is clearly unqualified to discuss either matter.  He speculates, without any support whatsoever, that had Experian and Equifax removed the "deceased" notation, they would have reported FICO scores significantly higher than that reported by Trans Union.  Despite being a professed expert in residential underwriting, he neither challenges Trans Union's FICO score of

581, nor explains how any regulated residential lender could consider a loan to a borrower with such a low FICO score (nearly 40 points below minimum FNMA underwriting requirements). His report reflects little understanding of the role of a reseller such as Credco, nor of its obligation to report and clearly identify all information received from the three National Reporting Credit Agencies.

This report discusses the opinions I have formed to date.  My opinions and the basis for them may be amended and/or supplemented based upon information that subsequently comes to my attention.

Brian H. Kelley

May 24, 2016

# EXHIBIT A (VITAE)

BRIAN H. KELLEY
BHK ASSOCIATES, INC.

## *Chronological Resume*

**BHK Associates, Inc.**                                                    **2011 to Present**
Principal

> Consulting and Advisory Services to financial institutions, the FDIC and commercial real estate investors. Expert Witness and Litigation Support focused on corporate finance, banking and commercial & consumer lending. Qualified as an expert in Federal and State Court.

**Pacific Commerce Bank, N.A., Los Angeles**                             **2005 to 2011**
President, CEO and Director

> Directed successful turnaround, restructure and recapitalization. Guided subsequent growth of $195 million multi-branch commercial bank active in Greater Los Angeles. Focus on Commercial & Industrial lending, and commercial real estate construction and consumer loans. Obtained SBA Preferred Lender status.

**Professional Business Bank, Pasadena**                                 **2002 to 2005**
President, CEO and Director

> Turnaround of failing bank through capital raise, return to profitability and revamp of lending (commercial, residential & consumer). Guided lending and operations through 4-fold increase in asset size leading to successful sale of bank.

**Friedemann O'Brien Goldberg & Zarian LLP (Arent Fox LLP), Los Angeles**    **2001 to 2002**
Of Counsel

> Private practice in business law, finance, commercial real estate and banking practices. Also served as expert witness on complex commercial credits & entitlement issues.

**InterBusiness Bank, N.A., Los Angeles**                                **1999 to 2001**
Founding President, CEO and Director

> Founded and directed all activities of highly successful de-novo bank, from OCC/FDIC approval, capital raising and opening, to subsequent growth and lending/operations at 3 branches.

**The Long-Term Credit Bank of Japan, Ltd., Los Angeles Agency**         **1989 to 1999**
Deputy General Manager/Senior Vice President

> Led major lending unit with $2 Billion + portfolio. Directed/performed business lending, asset based finance, healthcare, REIT and real estate construction and permanent lending. Managed syndications desk, overseeing $1 billion+ in participation sales and acquisitions (transactions from $10 to $200 million). Directed legal team, disposition of major office and hotel properties, and workout of $300+ million in troubled loans.

**Pacific Pioneer Financial Corporation, Bellevue, WA & Phoenix, AZ**    **1983 to 1989**
Regional Vice President, Manager

> Opened and managed regional lending office concentrated in commercial and residential lending (multi-family, commercial/office, retail, single-family, etc.). Financed apartments between 50 and 300 units as designated FNMA and FHLMC underwriter. Also provided permanent financing through Life Company correspondents.

**Well Fargo Realty Advisors, Portland, Oregon & Seattle, Washington**         **1979 to 1983**
Assistant Vice President
> Originated and underwrote major loans for bank's REIT as well as for Bank's own portfolio. Typical transactions of $2 to $20 million, covering multi-family, office, hotel & retail development. Coordinated due diligence, acquisition, management and disposition of investment properties throughout Western U.S.

**First Security Bank, Salt Lake City & Portland**         **1977 to 1979**
In-House Legal Counsel (1977 – 1979)
> Legal Counsel for Commercial Real Estate Group. Managed Construction Lending Group.

**Brigham Young University**         **1976 to 1977**
Assistant Professor, Department of History
Assistant Director, Instructor of BYU Semester Abroad Program, Madrid Spain Campus.

## *Education*

**Brigham Young University**
- Juris Doctorate, J. Reuben Clark School of Law (1976).
- B.A. in History/Spanish Literature, Magna Cum Laude with Honors (1973).

**University of Mexico School of Law,** Guadalajara, Mexico
Visiting Scholar (1976)

**University of Madrid, Spain**
Exchange Fellow (1973)

**American Institute of Real Estate Appraisers**
Completed core M.A.I. courses

Completed various credit training programs offered by Wells Fargo, First Security Bank and The American Bankers Association.

## *Licenses & Affiliations*

**Licenses:**         **Past & Present Affiliations:**
   California Bar Association         California Bankers Association
   Utah Bar Association         Independent Bankers Association
   Hawaii Bar Association         American Bankers Association
   California Brokers License (1995-2005)         Home Builders Association of America
        International Council of Shopping Centers
**Associations:**         Mortgage Bankers Association (Past Speaker & Committee Member)
   Charles River Associates
   Thomson Reuters International         Forensic Expert Witness Association
   MCS Associates         Mortgage Bankers Association of America (Past Speaker & Panelist)
        Western Independent Bankers (Former Director)
        AM Best Qualified Expert
        Listed with JurisPro, Forensis & HG Experts

# EXHIBIT B

## Previous Expert Testimony
## Past Four Years

### TRIAL AND ARBITRATION TESTIMONY (9)

*AURGROUP Credit Union, et. al., v. California Credit Union*
Testimony in Arbitration (JAMS), Los Angeles, California (October 2011)

*California Bank and Trust v. Kruger*
Testimony in California Superior Court, Los Angeles, California
(March 2012)

*SA Challenger v. Kaman Fox Goldsham, et. al.*
Testimony in Arbitration (JAMS), Los Angeles, California
(September 2013)

*Anyia v. One West Bank*
Testimony in Arbitration (ARC), Los Angeles, California (October 2013)

*LFG Liquidation Trust v. Ernst & Young, LLP*
Testimony in Arbitration (ARC), Richmond Virginia (October 2014)

*LWL Investment Group v. Universal Bank*
Testimony in California Superior Court –Los Angeles, CA (April 2015)

*Livermore Acres v. Bank of Stockton*
Testimony in California Superior Court – Stockton, CA (June & August 2015)

*Pickett v. Wachovia*
Testimony in California Superior Court – Santa Ana, CA (October 2015)

*Moore v. Wells Fargo Bank*
Testimony in California Superior Court – Auburn, CA (November 2015)

## DEPOSITIONS (25)

*AURGROUP Credit Union, et. al. v. California Credit Union*
Deposition (September 2011)

*California Bank and Trust v. Kruger*
Deposition (February 2012)

*Royal Business Bank v. A.G.C.A.*
Deposition (March 2013)

*Wells Fargo Equipment Finance v. Renaissance Surgical Arts at Newport Harbor*
Deposition (September 2013)

*SA Challenger v. Kaman, Fox, Goldsham, et. al.*
Deposition (September 2013)

*Manhattan Lofts v. Sixth and Spring LLC*
Deposition (October 2013)

*Anyia v. One West Bank*
Deposition (October 2013)

*Badame v. JP Morgan Chase Bank*
Deposition (January 21, 2014)

*FDIC (as Receiver for Cooperative Bank) v. Willetts, et. al.*
Deposition (April 24, 2014)

*Pritikin v. Comerica Bank*
Deposition (May 2, 2014)

*Sorrento Pavilions, LLC v. East West Bank*
Deposition (May 28, 2014)

*LFG Liquidation Trust v. Ernst & Young, LLP*
Deposition (July 17, 2014)

*Roslyn Lane LLC v. Royal Business Bank*
Deposition (August 4, 2014)

*Brandenburger v. Wells Fargo Bank*
> Deposition (October 10, 2014)

*Pickett v. Wells Fargo Bank*
> Deposition (February 12, 2015)

*Moore v. Wells Fargo Bank*
> Deposition (March 18, 2015)

Livermore Acres v. *Bank of Stockton*
> Deposition (April 22, 2015)

*Great American Insurance Company of NY v. CR Operating Company*
> Deposition (July 2, 2015)

*Cruces Equity Partners v. First American Bank, et. al.*
> Deposition (July 14, 2015)

*Rosenberger v. United Community Bancshares, Inc.*
> Deposition (August 5, 2015)

*Chelan County v. Bank of America*
> Deposition (August 26, 2015)

*Farmers & Merchants Bank of Long Beach v. Ukleja*
> Deposition (October 14, 2015)

*Franko v. Banc of California*
> Deposition (December 2, 2015)

*Joyce v. CoreLogic Credco, LLC*
> Deposition (December 11, 2015)

*Harris v. CoreLogic Credco, LLC*
> Deposition (December 11, 2015)

*Howe Investment Company Limited v. Quarles & Brady, LLP*
> Deposition (March 28, 2016)

## DECLARATIONS AND REPORTS (35)

*Pickett v. Wachovia Bank*
> Declaration (May 4, 2012)

*Redwood Mortgage Investors v. Diablo Villas, LLC*
> Declaration (February 28, 2013)

*Levy v. Richards*
> Declaration (March 26, 2013)

*Royal Business Bank v. A.G.C.A.*
> Declaration (April 18, 2013)

*LWL Investment Group v. Universal Bank*
> Declaration (August 10, 2013)

*Wells Fargo Equipment Finance v. Renaissance Surgical Arts at Newport Harbor*
> Declaration (August 13, 2013)

*Revere Financial Corporation v. Roger*
> Declaration (September 18, 2013)

*Bank of America v. Chicago Title*
> Declaration (November 8, 2013)

*Badame v. JP Morgan Chase Bank*
> Expert Report (December 9, 2013)

*FDIC (as Receiver for Cooperative Bank v. Willetts, et. al.*
> Expert Report (December 9, 2013)

*Celtic Bank Corporation v. Oceanside at Vine LLC*
> Expert Report (January 24, 2014)

*FDIC (as Receiver for Cooperative Bank v. Willetts, et. al.*
> Expert Rebuttal Report (February 21, 2014)

*LFG Liquidation Trust v. Ernst & Young, LLP*
> Expert Report (May 19, 2014)

*Sorrento Pavilion, LLC v. East West Bank*
  Declaration (May 22, 2014)

*United States of America v. Israel*
  Expert Report (May 27, 2014)

*Clark County v. Metro HQ, LLC*
  Expert Report (July 10, 2014)

*U.S. Bank v. Augusta Financial, Inc.*
  Expert Report (August 1, 2014)

*Clark County v. Metro HQ, LLC*
  Expert Rebuttal Report (August 8, 2014)

*Brandenburger v. Wells Fargo Bank, N.A.*
  Declaration (August 11, 2014)

*Chelan County v. Bank of America*
  Expert Report (April 21, 2015)

*CSMC 2006-C5 Office v. Vinod Gupta*
  Expert Report (May 25, 2015)

*Page v. CoreLogic Credco*
  Expert Report (May 31, 2015)

*Joyce v. CoreLogic Credco*
  Expert Report (June 1, 2015)

*Redding v. CoreLogic Credco*
  Expert Report (June 1, 2015)

*Ford v. DataQuick Information Services, Inc.*
  Expert Report (June 24, 2015)

*Rosenberger v. United Community Bancshares, Inc.*
  Expert Report (July 15, 2015)

*Credit Union 1 v. Reid*
      Expert Report (September 15, 2015)

*Banc of California v. Franko*
      Expert Report (October 2, 2015)

*Burden v. CoreLogic Credco, LLC*
      Expert Report (October 12, 2015)

*Harris v. CoreLogic Credco, LLC*
      Expert Report (October 15, 2015)

*Dan Qing Lin v. CoreLogic Credit, LLC*
      Expert Report (November 16, 2015)

*Bodeker v. JP Morgan Chase Bank*
      Expert Report (December 30, 2015)

*Howe Investments Company Limited v. Quarles & Brady, LLP*
      Expert Report (March 1, 2016)

*Banning Healthcare Investments, LLC v. Ventas, Inc.*
      Expert Report (March 15, 2016)

*Red Mortgage Capital, LLC vs. Verandas at Crestview LLC*
      Expert Report (May 4, 2016)

# PUBLICATIONS & ARTICLES

None

# EXHIBIT C

## LIST OF MATERIALS REVIEWED

| Document | Date of Document | Reference/Source |
|---|---|---|
| AMENDED COMPLAINT (Josephine Waletzko vs. Bank One, N.A., et al.) | 9/7/15 | U.S. District Court Western District of Wisconsin Case 15-cv-317 |
| Other Court filings including: Credco's Response to RFP Credco's Response to ROGS Credco's Answer to Amended Complaint Credco's Answer to Discovery Plaintiff's Discovery Responses to Credco's Discovery | Various | U.S. District Court Western District of Wisconsin Case 15-cv-317 |
| Deposition of Debra Rothrock and accompanying Exhibit #1 | 2/2/16 | |
| Deposition of Josephine Waletzko and Accompanying Exhibits #1 through #27 | | |
| Expert Report of Chris McConville and Appendices 1 thru 5 | 3/18/16 | |
| Declaration of Jamie Chapman, Quicken Loans | 2016 | |
| FNMA Selling Guide – General Requirements for Credit Scores | 2/24/15 | B3-5.1-01 |
| Better Business Bureau – Review for CMS Credit Repair, LLC | 5/16/16 | www:bbb.org |
| Credco Production Documents | Various | Credco-Waletzko 000001 thru 000205 |
| Plaintiff's Production Documents | Various | Waletzko 000001 thru 0000016 |

| | | Waletzko 000048 Waletzko 000017 thru 0000047 |
|---|---|---|
| Credco Merged Credit Report for David Bundy and Josephine Waletzko | 2/22/13 | Produced by Quicken Loans |
| United Bank documents | Various | 30 pages |
| Big Lots documents | Various | 7 pages |
| Consumer Loan Services (Kroll) | Various | 51 pages |
| Security Financial Bank documents | Various | 17 pages |
| Independence Bank documents | Various | 54 pages |
| Royal Credit Union documents | Various | 75 pages |
| American Family Insurance documents | Various | 129 pages |
| Wells Fargo documents | Various | 13 pages |
| First National Bank documents | Various | 17 pages |
| Auto 1 thru Auto 5 | Various | |
| Bridgerland Auto documents | Various | 24 pages |
| Capital One documents | Various | 66 pages |
| Chilson Chrysler Dodge documents | Various | 24 pages |
| State Farm Fire & Casualty documents | Various | 87 pages |
| Kroll Factual Data documents | Various | FD000001 thru FD000138 |
| Trans Union Documents | Various | 112 pages |
| | | |