IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOSEPHINE WALETZKO,

Plaintiff,

v.

CORELOGIC CREDCO, LLC,

Defendant.

OPINION AND ORDER

15-cv-317-wmc

---

In this lawsuit, plaintiff Josephine Waletzko, who is very much alive, alleges that defendant CoreLogic Credco, LLC ("Credco") violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, by furnishing her prospective lender with a credit report indicating that she may be dead.[1] Credco now moves for summary judgment. (Dkt. #81.) Because the evidence of record does not support plaintiff's claim that the inaccurate report caused her an actual injury, the court will grant Credco's motion and dismiss this case.

## MOTIONS TO STRIKE

As a preliminary matter, plaintiff moves to strike two declarations filed by defendant in support of its motion for summary judgment, both of which contain potentially material facts. Plaintiff first moves to strike the declaration of Jamie Chapman. (Dkt. #98.) Chapman is the Director of Solution Consulting at Quicken

---

[1] Plaintiff previously dismissed her claims against all other defendants, including Capital One Bank, N.A., FD Holdings, LLC, Equifax Mortgage Solutions, LLC, Kroll Factual Data, Inc. and LexisNexis Risk Solutions Inc.

Loans, whose denial of Waletzko's home loan application is the basis for this lawsuit.[2] (Decl. of Jamie Chapman (dkt. #86) ¶ 1.)   Chapman's declaration includes facts regarding Quicken Loans' procedures for evaluating an applicant's credit report, as well as facts regarding the specific, inaccurate report from Credco at issue here, and the reasons for Quicken Loans' denial of Waletzko's application, which Quicken Loans described in a letter addressed to her.   Chapman authenticates copies of the Credco report and letter, which are both attached to her affidavit.

Specifically, plaintiff moves to strike two paragraphs in Chapman's declaration, both of which plaintiff claims assert facts that are *not* within Chapman's personal knowledge.   *See* Fed. R. Civ. P. 56(c)(4).   First, paragraph fourteen of Chapman's declaration alleges that:   "On April 4, 2013, Quicken Loans mailed a [home loan application] denial letter to Plaintiff.   Attached as Exhibit B is a true and accurate copy of the April 4, 2013 denial letter."   (Decl. of Jamie Chapman (dkt. #86) ¶ 14.)   Plaintiff contends that Chapman lacks personal knowledge about whether Quicken Loans actually sent the letter.   According to plaintiff, Chapman admitted at her 30(b)(6) deposition for Quicken Loans that:   (1) she only "guessed" that Quicken Loans mailed the letter; (2) she did not know whether Quicken Loans kept notes about letters they sent; and (3) she did not know whether Quicken Loans or an outside vendor typically mailed denial letters.

In response, defendant cites Chapman's testimony at her 30(b)(6) deposition that: (1) the copy of the letter addressed to Waletkzo was from Quicken Loans' company

---

[2] As the "Director of Solution Consulting," Chapman oversees a "hybrid team that works between underwriting and banking."   (Decl. of Jamie Chapman (dkt. #86) ¶ 1.)

records; and (2) its business practice is to keep a copy of every application denial or withdrawal letter, which it sends for every denied or withdrawn application. Thus, the court agrees with defendant that as a witness familiar with Quicken Loans' business practices regarding denial letters, Chapman is capable of authenticating Waletzko's denial letter and asserting that its practice is to mail denial letters to the prospect. Since all of this testimony is admissible under Rule 56(c)(4), the jury would be free to infer (or reject an inference) that the mail was, in fact, timely sent.

Second, plaintiff moves to strike paragraph twelve, which is supported by Chapman's assertion that "[t]he decision to deny Plaintiff's application was based on Plaintiff's credit score of 581 reported by Trans Union." (Decl. of Jamie Chapman (dkt. #86) ¶ 12.) Plaintiff again claims that Chapman lacks personal knowledge to support that assertion because (1) it is based solely on the denial letter; *and* (2) the letter appears to reference a credit report dated March 28, 2013, which the parties now agree does not exist. Thus, plaintiff argues, "[o]ne cannot have personal knowledge about a credit report that is not in their possession, nor has been viewed by them." (Pl.'s Mot. to Strike (dkt. #98) at 2.)

Defendant explains in response, however, that Chapman testified at her 30(b)(6) deposition that the March date referenced in the letter was the date that Quicken "withdrew the loan from [its] system or denied the loan from [its] system," and thus did not reflect any credit report other than the one Credco prepared on February 22, 2013, which reflected her 581 score. (Dep. of Quicken Loans (dkt. #103) at 42:16-19.) Again, the court agrees with defendant. As an individual with knowledge of Quicken Loans'

business practices regarding home loan applications, Chapman has sufficient knowledge to assert the basis for Quicken Loans' denial of Waletzko's home loan application, based on her review of the denial letter. Moreover, plaintiff wholly fails to explain why, under the facts of this case, it would be material if the March date actually reflected a second date that her credit score was reported by TransUnion.

Plaintiff's challenge to the declaration of Debra Rothrock is similarly unavailing. As Credco's Vice President of Project Management, Rothrock generally describes the procedures surrounding Credco's assembly of credit information reported by the three nationwide credit reporting agencies ("NCRAs"), Equifax, Experian and TransUnion, into something it calls a "trimerge" credit report for lenders. Plaintiff argues primarily that Rothrock's declaration should be stricken because Credco did not disclose her as an expert witness, but whatever merit there may be in plaintiff's conclusory argument that Rothrock's "report offers numerous statements of opinions that are based on [her] specialized knowledge, experience, training, and education," simply explaining how Credco assembles credit information is *not* among the objectionable opinions. (Pl.'s Mot. To Strike (dkt. #99) at 2.) Instead, Rothrock's declaration on this subject includes facts based on her four years of experience at Credco regarding the procedure by which Credco generates credit reports, not opinions requiring technical or specialized knowledge. Plaintiff's arguments that Rothrock lacks personal knowledge about the credit reporting industry discussed in her declaration fail for much the same reason, since her knowledge would likely include at least some knowledge about how NCRAs generate reports. Accordingly, the court will deny both of plaintiff's motions to strike.

In turn, defendant asks for the court to sanction plaintiff under 28 U.S.C. § 1927 for moving to strike Chapman and Rothrock's declarations. While the court agrees that plaintiff's motions lack much merit, they do not rise to the level of frivolousness to constitute "a serious and studied disregard for the orderly process of justice." *Overnite Transp. Co. v. Chi. Indus. Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983). Thus, the court will not sanction plaintiff for filing her motions to dismiss, although it may be inclined to sanction any similarly frivolous motions filed later in this case.

UNDISPUTED FACTS[3]

## A. Credco's process for generating credit reports[4]

The parties agree that Credco is a consumer reporting agency ("CRA") under the definitions provided by the FCRA. Credco is also considered a "reseller" under the FCRA because it "assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party" but "does not maintain a database of the assembled or merged information from which new consumer reports are produced." 15 U.S.C. § 1681a(u).

---

[3] When viewed in the light most favorable to plaintiff, as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where expressly noted below.

[4] Plaintiff purports to dispute several facts regarding the process by which Credco generates a credit report based on the arguments presented in her motion to strike Rothrock's declaration, but since that motion has already been denied, the court will consider those facts to be undisputed.

As a result, to obtain information from Credco, a lender submits information about a consumer applicant, which Credco passes along to the NCRAs without modification.  The NCRAs then search their databases of assembled or merged credit information from various, so-called "furnishers" (*e.g.*, credit card issuers) to determine what information might concern the consumer applicant identified by the lender.  Credco offers no input into the NCRAs' process for selecting what information to report.

After receiving the requested information from the various NCRAs, Credco uses a proprietary process to assemble that information into a trimerge credit statement for the identified applicant in accordance with the format required by that particular lender.  In doing so, Credco does not modify the information reported by the three NCRAs, nor does Quicken Loans expect Credco to do so.  (Decl. of Jamie Chapman (dkt. #86) ¶ 4.)  Quicken Loans then uses its own proprietary rules to determine which information provided by Credco it considered relevant in evaluating an application.

While Credco does not modify the information it receives from NCRAs before passing it on to lenders, Credco does have some processes in place to ensure the accuracy of the information, at least over the long run, including principally conducting data validation audits, which are designed to detect any discrepancies between the information reported by the NCRAs and the information included in the trimerge credit report, as well as employing rules to ensure that each NCRA is reporting information as it typically would.  Credco's systems actually generate an error code when an NCRA provides information that does not comport with the lenders' or its own requirements.

**B. Quicken Loans' denial of Waletzko's loan application**

In May of 2012, Capital One Bank purchased the HSBC credit card portfolio. Afterward, the Bank reported plaintiff Josephine Waletzko, an HSBC card holder, as deceased to NCRAs Experian and Equifax.[5]   Despite Waletzko's efforts to resolve the inaccuracy, Experian's and Equifax's "deceased" notations showed up on Credco's trimerge credit report prepared for Quicken Loans.[6]   In turn, Quicken Loans' request was prompted by Waletzko's oral application for a mortgage over the phone on February 22, 2013.   As reflected in Credco's trimerge report dated the same day, Equifax and Experian, but not TransUnion, indicate that Waletzko was deceased based on the report from Capital One.[7]   In addition, Credco's trimerge report indicated that: (1) Waletzko's

---

[5] The parties dispute when Waletzko first became aware that she was being reported as deceased. Defendant contends that Waletzko knew in 2009, citing a handwritten note it asserts she faxed to Associated Bank in 2013, which demanded that a deceased report from Transunion, Experian and Equifax be removed while noting that the discrepancy had "destroyed [her] life *for 4 years.*" (Def.'s PFOF Ex. 2 (dkt. #84-2).)   Defendant also notes that during Waletzko's deposition testimony, she refers to struggling with being deemed deceased for "a long time" and for "years." (Def.'s Reply PFOF (dkt. #106) ¶¶ 6, 7.)   While acknowledging that the handwriting of the faxed note is hers, plaintiff denied knowing that she was being reported "deceased" as early as 2009, and she did not recall faxing the note.  (*Id.* at ¶ 4.)   In any event, the parties' dispute regarding the date on which Waletzko became aware of deceased notations in her credit history is immaterial to the resolution of this case for reasons explained in this opinion.

[6] The record is silent as to *when* Waletzko initiated a dispute with Experian and Equifax apparently over the deceased notation, but those two companies appear to have sent "automated consumer dispute verification" forms to Capital One in or around June of 2013.  (Def.'s PFOF Exs. 3, 4 (dkt. ## 84-3, 84-4).)   This prompted Capital One to send a letter to Waletzko, dated July 2, 2013, that it "received notification on May 26, 2009 indicating that [she] was deceased," and inviting her to submit a letter from the Social Security office and a notarized copy of her driver's license if she wished to update her account.  (Def.'s PFOF Ex. 5 (dkt. #84-5).)   Despite Capital One's 30(b)(6) representative's deposition testimony affirming that Capital One mailed the letter (Dep. of Sheila Loving (dkt. #89) at 69:14-18), plaintiff disputes both that she received it and that Capital One even sent it.  (Pl.'s Resp. PFOF (dkt. #91) ¶ 9.)   Regardless, it is undisputed that Waletzko provided neither form of documentation to Capital One.

[7] This much concerning Waletzko's trimerge credit report from Credco is undisputed.  Plaintiff

Visa credit card from Capital One had a charge-off date of "2009-10"; (2) all three NCRAs reported that Waletzko filed for and was discharged from bankruptcy in 2003 and 2004, respectively; and (3) all three NCRAs reported that Waletzko had delinquent accounts with Chase, GECRB/Care and CB/FSHNBGV.  As the only NCRA that did not report Waletzko as deceased, Credco's trimerge report includes TransUnion's report that she had a FICO score of 581, stating four factors that weighed adversely: (1) "Serious delinquency and public record or collection filed"; (2) "Time since delinquency is too recent or unknown"; (3) "Length of time since derogatory public record or collection is too short"; and (4) "Number of accounts with delinquency."  (Decl. of Jamie Chapman Ex. A (dkt. #86-1).)

Quicken Loans' representative apparently informed Waletzko that her application was denied during that first phone call, and then referred her to Quizzle, its partner company, which provides credit repair resources.  The parties' principal dispute centers around whether the deceased notations adversely impacted Waletzko's home loan application given TransUnion's negative credit report and her poor credit history generally.  In particular, plaintiff claims that Quicken Loans considered the deceased notations in denying Waletzko's application, pointing to testimony from Chapman's 30(b)(6) deposition that Quicken Loans would require Waletzko to "provid[e] documentation to show that she's alive" before receiving a loan.  (Dep. of Quicken Loans (dkt. #103) at 64:3-5.)   Again pointing to testimony from Chapman's deposition,

---

purports to dispute most of the remainder of defendant's proposed facts regarding that report and Quicken Loans' denial of her home loan application for reasons the court already rejected in denying her motion to strike the declaration of Jamie Chapman as set forth above.

plaintiff also stresses the FHA guidelines that Quicken Loans follows would not permit an applicant to receive a loan if reported as deceased.  (*Id.* at 64:19-65:1, 71:15-16.)  Finally, plaintiff emphasizes that the automated underwriting programs that Quicken Loans uses would not approve an applicant's loan if her credit report only included one reported score out of the three NCRAs.  (*Id.* at 72:11-16.)

In response, defendant asserts that the deceased notations reported from Experian and Equifax did not weigh into Quicken Loans' denial of Waletzko's application because of its policy to ignore a deceased notation from an NCRA when at least one other NCRA reports a credit score.  (Decl. of Jamie Chapman (dkt. #86) ¶¶ 4, 13.)  More persuasively, defendant points to evidence that the Quicken Loans banker who spoke to Waletzko on the phone denied her application before it even reached the point where Quicken Loans would have considered her eligibility for a loan using the automated underwriting programs.  (Dep. of Josephine Waletzko (dkt. #88) at 222:1-16; Dep. of Quicken Loans (dkt. #103) at 48:21-49:12.)  Citing to Chapman's deposition testimony, defendant points out that even though Waletzko met the minimum score to be eligible for an FHA loan, the Quicken Loans banker who spoke to her on the phone would have determined that other factors, including her credit history and debt-to-income ratio, disqualified her from consideration for an FHA loan.[8]  (Dep. of Quicken Loans (dkt. #103) at 62:9-22.)

---

[8] Beyond Chapman's testimony regarding Quicken Loans' general practices, defendant does a poor job supporting this assertion.  That said, Chapman's testimony at her 30(b)(6) deposition that Waletzko's application would have been denied over the phone at the pre-approval stage due to her debt-to-income ratio, credit score and credit history, *before* considering her eligibility for an FHA loan or evaluating her application with its automated underwriting programs, goes essentially unchallenged.  (*See* Dep. of Quicken Loans (dkt. #103) at 14:6-16, 26:6-18, 48:21-49:12, 53:6-13, 61:14-23, 64:19-65:21.)

It is also undisputed that the Quicken Loans banker who first speaks with the applicant on the phone is charged with determining whether "the applicant is allowed to continue with the application process." (Def.'s Resp. PFOF (dkt. #106) ¶ 90.)

While defendant failed to include important details regarding Quicken Loans' application process in its proposed findings of fact, likely because it was unable to identify the individual banker who actually spoke to Waletzko and denied her application over the phone on February 22, 2013, Chapman's deposition testimony provides some welcome clarity as to why Quicken Loans identifies multiple reasons for denying Waletzko's application. First, the banker who speaks to an applicant over the phone determines whether the caller may be eligible for a loan during the pre-approval process by making a simple calculation of the applicant's debt-to-income ratio, and is authorized to end the application process at the outset if that ratio falls short of the required thresholds. (Dep. of Quicken Loans (dkt. #103) at 53:21-54:21.) Quicken Loans will not immediately deny that application and send a denial letter, however, if the applicant indicates that she might, for example, lower her debt-to-income ratio. (*Id.* at 38:10-39:11.) Second, when an application is denied, a denial letter is generated electronically, and the banker preparing the letter can select standard reasons for the denial from a drop-down box, as well as type in reasons in his or her own words. (*Id.* at 56:21-58:11) With the benefit of this additional context, it is more understandable why Quicken Loans has cited multiple reasons for denying Waletzko's home loan application; though critically, none of Quicken Loans' stated reasons are inconsistent with one

another, nor do Quicken Loans' records in any way suggest that it considered the deceased notations in denying Waletzko's initial request for a loan.

Defendant's strongest evidence that the deceased notations played no role in Quicken Loans' denial of Waletzko's loan application can be found in the follow up denial letter itself, dated April 4, 2013.[9]   That letter lists as the reasons Quicken denied her application: "Credit history: Current/previous slow payments, judgments, liens or BK."  (Decl. of Jamie Chapman Ex. B (dkt. #86-2).)   Additionally, the second page of that letter states:

> We obtained your credit score from TransUnion and used it in making our credit decision.  Your credit score is a number that reflects the information in your credit report and can change depending on how the information in your credit report changes.
>
> - Your credit score: 581
> - Date: March 28, 2013
> - Scores range from a low of 350 to a high of 900.
> - Key factors which adversely affected your credit score:
>
>   38: You have a serious delinquency and public record or collection filed and on your credit report.
>   13: Delinquent account appears too recent.
>   20: Recent legal item or collection item reported.
>   18: Too many delinquent accounts.

(*Id.*)[10]

---

[9] For the reasons already explained with respect to the denial of plaintiff's motion to strike the declaration of Jamie Chapman, there is strong (if not overwhelming) evidence that the denial letter was mailed, if not received.  Even if the court assumes for purposes of summary judgment that the denial letter was prepared but somehow lost before mailing; it is immaterial to the reasons Quicken gave for denying her application.

[10] The letter identifies a company named "Credstar" as the CRA reporting her information and provides CredStar's address and phone number.  Defendant Credco indicates that it conducted

Plaintiff claims actual damages for Quicken Loans' denial of her mortgage application and emotional injuries. Specifically, plaintiff claims that she suffered from severe stress as a result of the difficulties caused by Credco's report, which family members corroborate. (*See* Pl.'s Additional PFOF (dkt. #91) ¶¶ 68-73.) Plaintiff also seeks statutory and punitive damages against defendant, which are available under 15 U.S.C. § 1681n for willful violations of the FCRA.

## OPINION

The purpose of summary judgment is to determine "whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Artmato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Plaintiff asserts Credco violated § 1681e(b) of the FCRA, which requires that a CRA preparing a credit report, like Credco, "follow reasonable procedures to assure

---

business under the name "CredStar" at the time, and so the parties treat CredStar and Credco as the same entity for the purposes of this lawsuit, as will the court.

maximum possible accuracy of the information concerning the individual about whom the report relates." The parties agree that plaintiff must establish four elements to make out a prima facie claim under § 1681e(b): (1) inaccurate information was included in her Credco report; (2) Credco caused the inaccuracy due to its failure to follow reasonable procedures to assure maximum possible accuracy; (3) she suffered injury; and (4) the inaccuracy caused the injury. *Zahran v. Transunion Corp.*, No. Civ. 01C1700, 2003 WL 1733561, at *3 (N.D. Ill. Mar. 31, 2003); *see also Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996), *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).

Defendant moves for summary judgment on four separate grounds. First, defendant argues that plaintiff's claim is time-barred by the applicable statute of limitations. Second, defendant argues that its report did not cause plaintiff any injury. Third, defendant claims that Credco is entitled, as a matter of law, to rely on NCRAs to report information accurately and need not initiate its own investigations into the accuracy of that information. Finally, defendant argues that it followed reasonable procedures as a reseller in providing the information submitted by the NCRAs. The court agrees that plaintiff has advanced insufficient evidence for a reasonable jury to find that Credco's report caused her any injury. Accordingly, it need not decide the other grounds defendant advances before entering summary judgment in its favor. *See Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 603 (7th Cir. 2006) ("[T]he reasonableness

inquiry is unnecessary until the plaintiff has shown that she suffered damages as a result of the inaccurate information.") (internal quotation marks and citations omitted).[11]

As already discussed, the parties dispute whether Quicken Loans even considered the deceased notations in Credco's trimerge credit report before denying Waletzko's home loan application.   Plaintiff insists that despite her credit score reported by TransUnion and the other risk factors identified in her credit history, "[t]he only possible issue on Plaintiff's credit that could be a bar to moving forward on the loan process was that she was 'deceased.'"[12]   (Pl.'s Opp'n Br. (dkt. #90) at 18.)   In reaching this conclusion, plaintiff points to the undisputed facts that:  (1) an applicant must have a minimum credit score of 580 "to be considered for an FHA loan"; and (2) Quicken referred her to Quizzle, a company that provides resources for repairing credit, after it denied her application.  (Def.'s Resp. PFOF (dkt. #106) ¶¶ 91, 93.)

---

[11] The statute of limitations question is a close one.  For the reasons already discussed, plaintiff merely claims "not to remember" receiving the April 4, 2013, denial letter from Quicken Loans, which appears insufficient to overcome the presumption that she actually received it given Chapman's testimony as to the likelihood that the letter was almost certainly mailed on or around that date in the ordinary course of Quicken's business. (Dep. of Quicken Loans (dkt. #103) at 12:15-13:2.)  Moreover, Waletzko's admissions during her deposition testimony were that (1) she was aware reporting services were telling creditors she was deceased at the time she applied with Quicken Loans, and (2) she believed this was why Quicken denied her application.  (Dep. of Josephine Waletzko (dkt. #88) at 89:7-9, 90:7-12.)  Therefore, plaintiff arguably discovered the facts underlying the violation alleged here on or near April 4, 2013, including that Credco was the reporting service, triggering the FCRA's two-year statute of limitations, and rendering her lawsuit untimely.  *See Verkuilen v. Bus. Info. Grp., Inc.*, Case No. 14-C-400, 2016 WL 1677190, at *2 (E.D. Wis. Apr. 26, 2016) ("Bringing [an FCRA claim against a CRA alleging unreasonable procedures] does not require discovery or in-depth knowledge about an agency's internal procedures, but merely a reasonable factual basis . . . enough information to bring a claim[.]").

[12] As the court has already alluded to, Chapman testified at her 30(b)(6) deposition that the Quicken Loans banker who spoke to Waletzko may also have denied her application based on a high debt-to-income ratio, although that reason is not specifically referenced in Quicken Loans' notes concerning Waletzko's application nor in the denial letter.  (Dep. of Quicken Loans (dkt. #103) at 52:8-56:4.)

Since her score exceeded the minimum by one point (581), plaintiff reasons that her referral to Quizzle must have meant she only needed to fix one or both of the two remaining disqualification factors: "the absence of two [NCRA] scores [or] being deemed dead." (Pl.'s Opp'n Br. (dkt. #90) at 18.)  At the very least, plaintiff argues her reported score and referral to Quizzle are enough for a reasonable jury to find that the deceased notations were a "substantial factor" in, if not the sole cause of, Quicken Loans' denial of her application.  *See Anderson v. Trans Union, LLC*, 345 F. Supp. 2d 963, 975 (W.D. Wis. 2004) (citing *Philbin*, 101 F.3d at 968).

Based on the undisputed facts of record, the court disagrees.  As an initial matter, it is undisputed that Waletzko applied for a home loan with Quicken Loans over the phone on February 22, 2013, and that Quicken informed her the application was denied during that *same* phone call.  Moreover, Waletzko's trimerge credit report that Quicken Loans received from Credco sometime that day includes reports from all three NCRAs of her bankruptcy and delinquent accounts, though only TransUnion reported a credit score, since the other two reported her as deceased.

More importantly, in Quicken Loans' formal confirmatory letter finalized within a few weeks of denial of Waletzko's initial loan inquiry, Quicken explained that the reasons for its denial were "Credit History: Current/previous slow payments, judgments, liens or BK."  The letter does not mention nor suggest the deceased notations from Experian and Equifax (or a lack of two NCRA credit scores) reported in Credco's trimerge credit report were factors in Quicken Loans' immediate decision to deny her loan request.

Finally, Quicken Loans' 30(b)(6) representative, Chapman, testified at her deposition that it is actually consistent with Quicken Loans' business practices to consider only a single credit score where only one NCRA provides a score, as well as to ignore a deceased notation if only one or two of the NCRAs report an applicant as deceased.  Based on Quicken Loans' records regarding Waletzko's application, Chapman also testified that the banker who spoke to Waletzko on the phone would typically have denied it as part of the pre-approval process consistent with Quicken's business practices, before evaluating her eligibility for an FHA loan or any other type of loan using its automated underwriting software.  Nor does Waletzko herself claim that the Quicken Loans banker with whom she spoke on the phone informed her or even intimated that her application was denied because of any deceased notation.

While plaintiff would speculate otherwise, she simply has not advanced sufficient evidence for a reasonable jury to find as a matter of fact that Quicken Loans considered the deceased notations contained in defendant's trimerge report, either during the initial phone denial or in its follow up letter.  In light of the unchallenged evidence that Quicken Loans would have denied her application during the pre-approval process for a number of other reasons, plaintiff is left with merely asserting that she *could* have been eligible for an FHA loan or *would* have been denied a loan under the automated underwriting programs Quicken uses, had her application proceeded to the point where those would apply.

This is not enough for a jury to infer causation.  *Contrast Philbin*, 101 F.3d at 968 ("Because the accurate reports apparently contained no adverse information and because

16

it is undisputed that [plaintiff] has never been delinquent on a credit obligation, when Sears denied him credit because of an 'unfavorable credit history,' a reasonable jury certainly could infer that Sears was referring to the inaccurate adverse information contained in the inaccurate reports.") (internal citation omitted); *Lendino v. TransUnion Credit Info. Co.*, 970 F.2d 1110, 1113 (2nd Cir. 1992) (a reasonable jury could infer causation because the limited record lacked any "other evidence which reasonably demonstrate[d] why Bloomingdale's rejected [plaintiff's] credit application").   Indeed, the fact that Waletzko applied for a home loan with Quicken Loans over the phone and spoke to a live banker belies any inference that the deceased reports from Experian and Equifax played a role in the denial of her application.[13]

In light of this factual record, therefore, no reasonable jury could find that the inaccurate deceased notification in Credco's report caused plaintiff an injury in fact. Even if the court were to credit plaintiff's claimed emotional injuries under the strict standard of proof demanded by the Seventh Circuit, *see Baghy*, 162 F. App'x at 604-05, no reasonable jury could find that Credco's report *caused* those injuries, since plaintiff fails to link them to that report, rather than Quicken Loans' denial of her application itself.   (*See* Dep. of Josephine Waletzko (dkt. #88) at 173:12-19 (pointing to trouble obtaining a mortgage as the cause of her being upset); Dep. of Anita Sobotta (dkt. #100) at 18:15-19:19 (describing denial of mortgage application as the cause of Waletzko's emotional distress).)

---

[13] Similarly, to the extent plaintiff now suggests that Quicken denied her loan because the deceased notations were "an indication of fraud" (Pl.'s Opp'n Br. (dkt. #90) at 20), she fails to explain why the banker would have referred her to Quizzle if fraud was suspected.

Nor does Credco's act of repeating the two NCRA's erroneous reports of Waletzko's death rise to the level of conduct extreme enough for a jury to infer emotional distress. *See Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 610 (7th Cir. 2005) ("The FCRA does not presume damages; instead, as discussed above, the consumer must affirmatively prove that she is entitled to damages. Therefore, the violation of a duty imposed by the statute, without more, is not inherently degrading or humiliating.") (internal quotation marks and citation omitted). "Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages[.]'" *Crabill v. Trans Union L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001). *See Diedrich v. Ocwen Loan Servicing, LLC*, No. 15-2573, slip. op. at 12-18 (7th Cir. Oct. 6, 2016) (finding no causal connection between the injury plaintiffs alleged, including emotional damages, and "failure to respond to the qualified written request for information [under RESPA], as opposed to the foreclosure on their loan, the loan process, or the litigation in general").

Finally, the court rejects plaintiff's claims for statutory damages for a willful violation of the FCRA under 15 U.S.C. § 1681n. *See Matson v. Edfinancial Servs. LLC*, No. 14-CV-1052-JPS, 2015 WL 5010515, at *9 (E.D. Wis. Aug. 21, 2015) (noting that willfulness under § 1681n is not necessarily a jury question) (collecting cases). While statutory damages are available for willful violations of the FCRA "whether or not the consumer was injured," *Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719, 725 (7th Cir. 2008), the United States Supreme Court held in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), that the "case or controversy" requirement in Article III, Section 2 of

the Constitution still requires the plaintiff to prove she suffered an "actual" or "concrete" injury for that claim to proceed.  *Id*. at 1549.  Moreover, as the Seventh Circuit just recognized in *Diedrich*, "[a]lleging an injury for purposes of standing" in response to a motion to dismiss "is not the same as submitting adequate evidence of injury . . . to survive a motion for summary judgment." Slip op. at 12.  For reasons discussed above, the plaintiff here has not met her burden to show that she is entitled to actual damages for a harm caused by defendant.  To the extent plaintiff may still claim that proof of a mere violation of the statute is sufficient for a statutory award of punitive damages without any further showing of a concrete injury, the Seventh Circuit held in *Diedrich* that "[a]fter *Spokeo*, this is clearly no longer the case." *Id*. at 11.

Even if proof of a mere violation were enough, plaintiff has not come forward with sufficient proof of willfulness to claim a right to statutory damages.  To prove willfulness, a plaintiff must show that a defendant either:   (1) "knowingly and intentionally committed an act in conscious disregard for the rights of others," *McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917, 939 (W.D. Wis. 2004); or (2) acted with reckless disregard in that its "action is not only a violation under a reasonable reading of the [FCRA's] terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).  On the facts here, plaintiff cannot show that defendant willfully violated the FCRA under either standard.

*First*, the record contains *no* evidence to support a finding that Credco acted *knowingly and intentionally* in conscious disregard for Waletzko's rights.  Certainly, failing

to address inconsistencies in the various NCRAs' credit reports, particularly material ones like whether a person is dead or not, was a conscious act, but Credco had reason to believe it violated no right of Waletzko in doing so.  On the contrary, the evidence shows Credco views itself as merely using its proprietary software for the ultimate benefit of both the lender and borrower by quickly aggregating and facilitating review of credit information furnished to the three NCRAs by others, allowing rapid decision-making by the lender on loan eligibility by organizing the available information in a form easily understood by that lender's own underwriting standards.   Plaintiff understandably enough faults Credco (and by implication other CRAs) for attempting to avoid any responsibility under the FCRA for inconsistencies between the NCRAs' reports that it passes along to lenders in the trimerge report, but there is also room for CRAs like Credco to argue that it should not be held responsible for resolving those inconsistencies before forwarding on its report, at least with respect to the particular inconsistency at issue here.

A fair reading of the FCRA for a plaintiff who could establish actual injury and the filing of a timely claim would seem to permit recovery against a CRA that chooses to ignore information that is easily identified as both material and wrong, but that is a very different question than whether this defendant knowingly and intentionally disregarded Waletzko's rights here.   Certainly, plaintiff has pointed to no case law definitively establishing that acting as a mere aggregator of data from NCRAs is a violation of Waletzko's rights, at least where the information offered in the report cuts both ways. Nor is it obvious that overall, both lenders and borrowers would not be benefited from an

efficiency standpoint by allowing such rapid aggregation, particularly if NCRAs' were still responsible for their failures to provide accurate information.  Finally, when a wrongful denial occurs based on inaccurate information provided, Credco had a good faith basis to believe that these would be more efficiently addressed between the lender, borrower and, if necessary, the NCRAs.

Indeed, Quicken Loans' 30(b)(6) representative testified that an applicant who is falsely reported as deceased can submit confirmatory documentation to Quicken directly to proceed on her loan application without first having her credit report fixed.  (Dep. of Quicken Loans (dkt. #103) at 63:15-64:18.)  On its face, Credco might understandably believe this system would be preferable to all concerned, rather than foisting responsibility to resolve inconsistencies on CRAs like Credco, who after all had the least amount of information as to the reasons for those inconsistencies compared to the NCRAs, those who furnished them information, the lender or the borrower herself. Under the circumstances, it is quite likely that even for the rights of the borrower, any material difference in the quality of the information aggregated by a CRA for the lender would be far outweighed by the additional costs of delay, or at least plaintiff has failed to offer any evidence that Credco thought otherwise.

*Second*, plaintiff fails to establish a basis to find that Credco's apparent lack of a procedure to identify and investigate on its own any discrepancies between the NCRAs' reports on an applicant being deceased constitutes a more than careless reading of current law.  Were the question whether Credco was careless or negligent in its reading of the obligations of CRAs under the Act, this court would have little trouble in allowing the

plaintiff's claim to proceed to a jury, but nothing in the FCRA itself or in subsequent case law establishes that Credco's conduct here is definitively in violation of the letter or even the spirit of the law, at least given the lack of any compelling cost/benefit analysis to the contrary. *Cf. Smith v. LexisNexis Screening Sols., Inc.*, ___ F.3d ___, 2016 WL 4761325, at *4 (6th Cir. Sep. 13, 2016) (stating that it was a "close call" in upholding the jury's verdict that the defendant CRA was negligent for not requiring an employer that requested a criminal history check to provide the applicant's middle name, but holding that the district court erred in not granting judgment as a matter of law on plaintiff's § 1681n claim because the violation was "a far cry from being willful"); *Anderson*, 345 F. Supp. 2d at 971-72 (noting the significant cost of "a requirement that agencies initiate inquiries on their own whenever their computers discern an apparent discrepancy between a notation of deceased and activity in another account," especially considering "the number of consumers who die each day" and that it "cannot be unusual for deceased consumers to have apparently active accounts"). For reasons set forth above, defendant's interpretation of its role under the FCRA with respect to the particular violation alleged is reasonable enough to avoid a lay jury imposing statutory damages on it here, particularly in light of plaintiff's failure to advance sufficient evidence that its failure to have a procedure to address that violation was objectively unreasonable or show that courts have found to the contrary. *See Safeco*, 551 U.S. at 70 (considering the "dearth of guidance" as a factor in finding that defendant's interpretation of the FCRA was not objectively unreasonable).

ORDER

IT IS ORDERED that:

1)  Plaintiff's motion to strike (dkt. #98) is DENIED;

2)  Plaintiff's motion to strike (dkt. #99) is DENIED;

3)  Defendants' motion for summary judgment (dkt. #81) is GRANTED;

4)  Plaintiff's motion to compel (dkt. #121) is DENIED as moot; and

4)  The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 7th day of October, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge